**ORAL ARGUMENT HAS NOT BEEN SCHEDULED**

# In the United States Court of Appeals for the District of Columbia Circuit

**No. 22-1251**
_____

PUBLIC CITIZEN, INC.,
*Petitioner*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*.

_____

ON PETITION FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

_____

**BRIEF OF RESPONDENT
FEDERAL ENERGY REGULATORY COMMISSION**

_____

Matthew R. Christiansen
  General Counsel

Robert H. Solomon
  Solicitor

Anand Viswanathan
  Attorney
  anand.viswanathan@ferc.gov

For Respondent
Federal Energy Regulatory
  Commission
Washington, DC 20426

Final Brief:  May 5, 2023

## CIRCUIT RULE 28(A)(1) CERTIFICATE

### A.    Parties and Amici

All parties who have appeared before the Court are listed in

Petitioner's Circuit Rule 28(a)(1) certificate.

### B.    Rulings Under Review

1.    "Order on Petition for Declaratory Order," in *Nopetro LNG,*

*LLC*, 178 FERC ¶ 61,168, FERC Docket No. CP21-179-000 (Mar. 25,

2022) (R.16), JA 40; and

2.    "Order Addressing Arguments Raised on Rehearing," in

*Nopetro LNG, LLC*, 180 FERC ¶ 61,057, FERC Docket No. CP20-179-

001 (July 29, 2022) (R.19), JA 61.

### C.    Related Cases

The Commission is unaware of any related cases in this Court or

any other court.


*/s/ Anand Viswanathan*
Anand Viswanathan
Attorney

## <u>TABLE OF CONTENTS</u>

<b><u>PAGE</u></b>

STATEMENT OF THE ISSUE ................................................................. 1

STATUTORY AND REGULATORY PROVISIONS .............................. 4

STATEMENT OF FACTS ..................................................................... 4

I.     Statutory and regulatory background ........................................... 4

    A.     The Natural Gas Act ............................................................. 4

    B.     The Energy Policy Act of 2005 ............................................ 6

    C.     The Commission's interpretation of its jurisdiction
    over liquefied natural gas facilities ....................................... 7

II.    The Commission proceedings ...................................................... 10

    A.     An overview of liquefied natural gas ................................... 10

    B.     Nopetro's petition for a declaratory order .......................... 11

    C.     The orders on review ........................................................... 13

SUMMARY OF ARGUMENT ............................................................. 15

ARGUMENT........ ............................................................................... 18

I.     Standard of review ..................................................................... 18

II.    The Commission's traditional interpretation of the Natural
    Gas Act, and whether a facility is an "LNG terminal"
    subject to its authority, is reasonable ......................................... 20

## TABLE OF CONTENTS

**PAGE**

A.  The Commission's interpretation of the term "onshore" in Natural Gas Act section 2(11) is consistent with the statutory text and context ............................................... 22

B.  The Commission's interpretation of "onshore" is consistent with its precedent ................................................ 28

C.  Public Citizen offers no evidence of congressional intent that supports its theory of what "onshore" means or contradicts the orders on review ...................................... 36

III.  The Commission reasonably applied its established jurisdictional analysis to Nopetro's facility ................................... 48

IV.  Public Citizen failed to preserve any claim of a regulatory gap ................................................................. 52

CONCLUSION........ .................................................................. 55

# TABLE OF AUTHORITIES

## COURT CASES:                                                         PAGE

*Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Fed.*
*Election Comm'n,*
    333 F.3d 168 (D.C. Cir. 2003)....................................................... 24

*Barnhart v. Walton,*
    535 U.S. 212 (2002) ...................................................................... 35

*Brown v. Gardner,*
    513 U.S. 115 (1994) ...................................................................... 24

*Burlington Truck Lines v. United States,*
    371 U.S. 156 (1962) ...................................................................... 19

*Cassell v. FCC,*
    154 F.3d 478 (D.C. Cir. 1998)....................................................... 32

*CFTC v. Schor,*
    478 U.S. 833 (1986) ...................................................................... 40

*Chem. Waste Mgmt., Inc. v. EPA,*
    869 F.2d 1526 (D.C. Cir. 1989)..................................................... 35

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
    467 U.S. 837 (1984) ................................................................ 19, 22

*City of Arlington v. FCC,*
    569 U.S. 290 (2013) ................................................................ 19, 22

*Colo. Interstate Gas Co. v. FERC,*
    599 F.3d 698 (D.C. Cir. 2010)....................................................... 20

*Conn. Dept. of Pub. Util. Control v. FERC,*
    569 F.3d 477 (D.C. Cir. 2009)................................................... 19-20

## <u>TABLE OF AUTHORITIES</u>

<u>COURT CASES:</u>                                                           <u>PAGE</u>

*Del. Dept. of Nat. Res. & Envtl. Control v. FERC,*
    558 F.3d 575 (D.C. Cir. 2009)..........................................................6-7

*District of Columbia v. Carter,*
    409 U.S. 418 (1973) ........................................................................ 43

*Distrigas Corp. v. Fed. Power Comm'n,*
    495 F.2d 1057 (D.C. Cir. 1974)........................................................ 4

*Doris Day Animal League v. Veneman,*
    315 F.3d 297 (D.C. Cir. 2003)......................................................... 41

*Edison Elec. Inst. v. OSHA,*
    849 F.3d 611 (D.C. Cir. 1988)........................................... 30, 50, 52

*Energy W. Min. Co. v. Fed. Mine Safety & Health Rev. Comm'n,*
    40 F.3d 457 (D.C. Cir. 1994) .......................................................... 35

*ExxonMobil Gas Mktg. Co. v. FERC,*
    297 F.3d 1071 (D.C. Cir. 2002)......................................... 51, 52, 53

*FCC v. Prometheus Radio Project,*
    141 S. Ct. 1150 (2021) .................................................................... 19

*FERC v. Elec. Power Ass'n,*
    577 U.S. 260 (2016) ........................................................................ 18

*Freeman v. Quicken Loans, Inc.,*
    566 U.S. 624 (2012) ........................................................................ 25

*Indep. Bankers Ass'n of Am. v. Farm Credit Admin.,*
    164 F.3d 661 (D.C. Cir. 1999)......................................................... 47

## TABLE OF AUTHORITIES

**COURT CASES:**                                                     **PAGE**

*K Mart Corp. v. Cartier, Inc.*,
    486 U.S. 281 (1988) ........................................................................ 43

*Leather Indus. of Am., Inc. v. EPA*,
    40 F.3d 392 (D.C. Cir. 1994) ......................................................... 32

*Mo. Pub. Serv. Comm'n v. FERC*,
    783 F.3d 310 (D.C. Cir. 2015) ........................................................ 20

*Motor Vehicle Mrfs. Ass'n of U.S., Inc. v. State Farm Mut. Auto.
Ins. Co.*,
    463 U.S. 29 (1983) .................................................................. 18-19

*Nat'l Ass'n of Regulatory Util. Comm'rs. v. FERC*,
    964 F.3d 1177 (D.C. Cir. 2020) ..................................................... 49

*New Fortress Energy Inc. v. FERC*,
    36 F.4th 1172 (D.C. Cir. 2022) ....................... 1, 6, 8, 15, 16, 17, 21,
                                        22, 30, 34, 47, 49, 52

*NLRB v. Bell Aerospace Co.*,
    416 U.S. 267 (1974) ........................................................................ 40

*Old Dominion Elec. Co-op., Inc. v. FERC*,
    518 F.3d 43 (D.C. Cir. 2008) ......................................................... 53

*Petit v. U.S. Dept. of Educ.*,
    675 F.3d 769 (D.C. Cir. 2012) ........................................................ 24

*Pharm. Rsch. & Mfrs. of Am. v. Thompson*,
    251 F.3d 219 (D.C. Cir. 2001) ........................................................ 42

*Public Citizen v. Farm Credit Admin.*,
    938 F.2d 290 (D.C. Cir. 1991) ........................................................ 47

# TABLE OF AUTHORITIES

<u>**COURT CASES:**</u>                                                    <u>**PAGE**</u>

*Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
    374 F.3d 1251 (D.C. Cir. 2004)..................................................48-49

*Red Lion Broad. Co. v. FCC*,
    395 U.S. 367 (1969) ....................................................................... 40

*Sea Robin Pipeline Co. v. FERC*,
    127 F.3d 365 (5th Cir. 1997) .......................................................53

*Sierra Club v. FERC*,
    827 F.3d 36 (D.C. Cir. 2016) .........................................................5

*Solar Energy Indus. Ass'n v. FERC*,
    59 F.4th 1287 (D.C. Cir. 2023) ....................................................22

*United Keetoowah Band of Cherokee Indians in Okla. v. FCC*,
    933 F.3d 728 (D.C. Cir. 2019)......................................................54

*United States v. Williams*,
    553 U.S. 285 (2008) ......................................................................25

*Village of Barrington, Ill. v. Surface Transp. Bd.*,
    636 F.3d 650 (D.C. Cir. 2011)......................................................24

*Wash. All. of Tech. Workers v. U.S. Dept. of Homeland Sec.*,
    50 F.4th 164 (D.C. Cir. 2022) ..................................................... 40

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ......................................................................19

# TABLE OF AUTHORITIES

## ADMINISTRATIVE CASES:          PAGE

*Ala. Gasline Dev. Corp.*,
    171 FERC ¶ 61,134 (2020) ....................................................... 49, 50

*Andalusian Energy, LLC*,
    174 FERC ¶ 61,107 (2021) ................................................. 30, 31, 33

*Cove Point LNG Ltd. P'ship*,
    97 FERC ¶ 61,043 (2001) ............................................................... 27

*Distrigas Corp.*,
    58 FPC 2589 (1977) ...................................................................... 27

*Emera CNG, LLC*,
    148 FERC ¶ 61,219 (2014) ................................................. 30, 31, 34

*Freeport LNG Dev., L.P.*,
    107 FERC ¶ 61,278 (2004) ...................................................... 49, 50

*Gulf Oil Ltd. P'ship*,
    148 FERC ¶ 61,029 (2014) ........................................................ 8-9

*Hackberry LNG Terminal, L.L.C.*,
    101 FERC ¶ 61,294 (2002) .......................................................... 27

*New Fortress Energy LLC*,
    174 FERC ¶ 61,207 (2021) .......................................................... 28

*New Fortress Energy LLC*,
    176 FERC ¶ 61,031 (2021) ......................................................... 6, 7

*Nopetro LNG, LLC*,
    178 FERC ¶ 61,168 (2022), *on reh'g*,
    180 FERC ¶ 61,057 (2022) ................. 7-14, 20-22, 25-31, 33-34, 36,
                                         39-44, 46-48, 51-54

### <u>TABLE OF AUTHORITIES</u>

**<u>ADMINISTRATIVE CASES:</u>**                                      **<u>PAGE</u>**

*Pivotal LNG, Inc.*,
    151 FERC ¶ 61,006 (2015) ................................. 9, 28, 30, 33, 34, 35

*Shell U.S. Gas & Power, LLC*,
    148 FERC ¶ 61,163 (2014) .......................6, 9, 10, 20, 21, 27, 28, 29,
                                                            32, 34, 39

*Sound Energy Solutions*,
    107 FERC ¶ 61,263 (2004) .............................................................33

*The Gas Company, LLC*,
    142 FERC ¶ 61,036 (2013) ..........................................................6, 9

*Transcontinental Gas Pipeline Corp.*,
    96 FERC ¶ 61,118 (2001) .......................................................51, 52

*Yukon Pac. Co. L.P.*,
    71 FERC ¶ 61,197 (1995) .............................................................27

**<u>OTHER AUTHORITIES:</u>**

151 Cong. Rec. S6980-85, S6990 (daily ed. June 22, 2005) ...............36-39

151 Cong. Rec. S7455 (daily ed. June 28, 2005) ....................................37

Antonin Scalia & Bryan A. Garner, Reading Law: *The*
*Interpretation of Legal Texts* (2012) ...........................................25-26, 42

Council on Envtl. Quality, *Mem. for Heads of Federal Dep'ts*
*and Agencies:  Establishing, Applying & Revising Categorical*
*Exclusions under [NEPA]* (2010) ...........................................................54

DOE Delegation Order No. S1-DEL-FERC-2006 (effective May 26,
2006)……………………………………………………………...……..5

## TABLE OF AUTHORITIES

**OTHER AUTHORITIES:**                                            **PAGE**

*FERC, Energy Primer:  A Handbook of Energy Market Basics*
(Apr. 2020) ....................................................................... 10


**STATUTES:**

Administrative Procedure Act

    5 U.S.C. § 706(2)(A) ...................................................... 18

Arctic Research and Policy Act of 1984

    Section 102(a)(1), 15 U.S.C. § 4101(a)(1) ...................... 44

Clean Water Act

    33 U.S.C. § 1321(a)(10) ................................................. 41

    33 U.S.C. § 2701(24) ............................................... 41, 42

Department of Energy Organization Act

    Section 301(b), 42 U.S.C. § 7151(b) ................................ 5

    Section 402(e), 42 U.S.C. § 7172(e) ................................ 5

Energy Policy Act of 2005

    Section 311(b) ............................................................... 32

# TABLE OF AUTHORITIES

**STATUTES:**                                                    **PAGE**

Natural Gas Act

    Section 1(b), 15 U.S.C. § 717(b)................................................ 2, 4, 51

    Section 2(11), 15 U.S.C. § 717a(11)................2, 7, 10, 14, 15, 16, 22, 25, 26, 27, 29, 32, 36, 43, 46, 50

    Section 3, 15 U.S.C. § 717b .............................. 8, 11, 16, 17, 21, 31, 33, 34, 46, 48

    Section 3(a), 15 U.S.C. § 717b(a).................................... 4, 26, 29, 33

    Section 3(e)(1), 15 U.S.C. § 717b(e)(1) ............. 1, 2, 6, 15, 29, 36, 46

    Section 7, 15 U.S.C. § 717f...................................... 7, 11, 13, 16, 33

    Section 19(a), 15 U.S.C. § 717r(a) .................................................. 17

    Section 19(b), 15 U.S.C. § 717r(b) ................... 17, 18, 30, 31, 49, 52

**REGULATION:**                                                 **PAGE**

    18 C.F.R. § 385.207 ........................................................................ 11

## <u>GLOSSARY</u>

| | |
|---|---|
| Br. | Petitioner Public Citizen's opening brief |
| Coalition Br. | Brief of *amici curiae* North Port St. Joe Project Area Committee, Inc., and Pioneer Bay Community Development Corp., supporting Petitioner |
| Commission or FERC | Federal Energy Regulatory Commission |
| Initial Order | *Nopetro LNG, LLC*, 178 FERC ¶ 61,168 (2022) (R.16), JA 40 |
| LNG | Liquefied natural gas |
| Nopetro Pet. | Nopetro's petition for a declaratory order (filed Apr. 20, 2021), R.1, JA 7 |
| Rehearing Order | *Nopetro LNG, LLC*, 180 FERC ¶ 61,057 (2022) (R.19), JA 61 |
| Sierra Club Br. | Brief of *amici curiae* Pennsylvania's Future, Clean Air Council, Delaware Riverkeeper Network, and Sierra Club, supporting Petitioner |

# In the United States Court of Appeals
# for the District of Columbia Circuit

**No. 22-1251**

_____

PUBLIC CITIZEN, INC.,
*Petitioner*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*.

_____

ON PETITION FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

_____

## BRIEF OF RESPONDENT
## FEDERAL ENERGY REGULATORY COMMISSION

_____

## STATEMENT OF THE ISSUE

For the second time in two years, this Court has before it a
dispute concerning the interpretation of the Federal Energy Regulatory
Commission (FERC or Commission) of its Natural Gas Act jurisdiction
over a liquefied natural gas (LNG) facility.  Last year's decision in *New
Fortress Energy Inc. v. FERC*, 36 F.4th 1172 (D.C. Cir. 2022), affirmed
the Commission's precedent-based conclusion that it had jurisdiction,
under section 3 of the Natural Gas Act, 15 U.S.C. § 717b(e)(1), over a

facility that delivered processed LNG via a short pipeline to a nearby power plant.  Here, the Commission found—again based on established precedent—that it lacks jurisdiction under section 3 over a facility (to be operated by Nopetro LNG, LLC) which would liquefy and process natural gas that would then be transported by truck a quarter-mile to ships waiting on the coast.

Congress has decreed that the provisions of the Natural Gas Act "shall" apply to "the importation or exportation of natural gas in foreign commerce and to persons engaged in such importation or exportation." 15 U.S.C. § 717(b).  When that commerce involves gas in a liquid state (i.e., liquefied natural gas), the Commission is vested with exclusive jurisdiction to review and "approve or deny an application for the siting, construction, expansion, or operation of an LNG terminal," *id*. § 717b(e)(1).

"LNG terminal" is broadly defined to include "all natural gas facilities," with two exceptions not relevant here, "located onshore or in State waters that are used to receive, unload, load, store, transport, gasify, liquefy, or process natural gas."  *Id*. § 717a(11).

2

In assessing whether a facility handling liquefied natural gas intended for export is a FERC-jurisdictional "LNG terminal," the Commission has historically considered, among other things, the location of the facility in relation to the vessels that will export the product. If the facility is capable of transferring LNG directly onto waterborne vessels, the Commission has deemed the facility an "LNG terminal" within the meaning of the Natural Gas Act (assuming other requirements are met). Conversely, a facility that relies on another mode of transportation—like trucks—to get the gas to the point of export will not be deemed a FERC-jurisdictional "LNG terminal."

Here, Nopetro's facility is not located at the coastline. LNG processed at this facility must be transported by truck to the port, where it would then be loaded onto general-use cargo ships. Applying its established precedent, the Commission found that Nopetro's facility would not be a FERC-jurisdictional "LNG terminal."

**The issue presented for review is:**

Whether the Commission reasonably interpreted the Natural Gas Act and reasonably applied its precedent in concluding that Nopetro's inland LNG facility is not located at the point of export and therefore is

not a FERC-jurisdictional "LNG terminal" within the meaning of the Act.

## STATUTORY AND REGULATORY PROVISIONS

Pertinent statutes and regulations are contained in the Addendum to this brief.

## STATEMENT OF FACTS

## I.     Statutory and regulatory background

### A.     The Natural Gas Act

The Natural Gas Act sets forth a detailed regulatory scheme governing both "the transportation of natural gas in interstate commerce" and the "importation or exportation of natural gas in foreign commerce."  15 U.S.C. § 717(b).

As to the latter, section 3 of the Natural Gas Act prohibits any person from exporting natural gas to or importing from "a foreign country without first having secured an order of the Commission authorizing it to do so."  *Id*. § 717b(a).  *See also Distrigas Corp. v. Fed. Power Comm'n*, 495 F.2d 1057, 1064 (D.C. Cir. 1974) (construing section 3 to require prior authorization to construct export and import facilities).

In 1977, Congress transferred the regulatory functions of Natural Gas Act section 3 to the Department of Energy. *See* 42 U.S.C. § 7151(b). The Department of Energy subsequently delegated back to the Commission siting authority for import and export facilities, while retaining for itself exclusive authority over the actual import or export of natural gas. Specifically, the Commission has the authority to: "Approve or disapprove the construction and operation of particular facilities, the site at which such facilities shall be located, and with respect to natural gas that involves the construction of new domestic facilities, the place of entry for imports and exit for exports." DOE Delegation Order No. S1-DEL-FERC-2006 § 1.21.A (effective May 16, 2006). *See also* 42 U.S.C. § 7172(e). The end result is that the Department of Energy authorizes the import and export of the commodity, while the Commission authorizes construction and operation of the physical facilities. *See*, *e.g.*, *Sierra Club v. FERC*, 827 F.3d 36, 40-41 (D.C. Cir. 2016) (explaining statutory responsibilities for natural gas exports).

### B.     The Energy Policy Act of 2005

Before Congress enacted the Energy Policy Act of 2005, the Commission's Natural Gas Act section 3 jurisdiction was, in the Commission's view, "clearly limited to facilities, including LNG terminals, used to import gas from or export gas to a foreign country." *The Gas Company, LLC*, 142 FERC ¶ 61,036, at P 10 (2013).  The Energy Policy Act modified the Natural Gas Act to expand the Commission's section 3 jurisdiction over LNG terminals transporting gas in interstate commerce by waterborne vessel.  *Id.*; *Shell U.S. Gas & Power, LLC*, 148 FERC ¶ 61,163, at PP 44, 50 (2014) (noting that before Energy Policy Act of 2005, the Natural Gas Act only encompassed LNG terminals operating in foreign commerce); *New Fortress Energy LLC*, 176 FERC ¶ 61,031, at P 18 (2021), *aff'd*, *New Fortress Energy Inc. v. FERC*, 36 F.4th 1172 (D.C. Cir. 2022).

The Energy Policy Act also amended Natural Gas Act section 3(e) to provide the Commission with "the exclusive authority to approve or deny an application for the siting construction, expansion, or operation of an LNG terminal."  15 U.S.C. § 717b(e)(1); *see also Del. Dept. of Nat.*

*Res. & Envtl. Control v. FERC*, 558 F.3d 575, 576 (D.C. Cir. 2009).  The

term "LNG terminal" is defined to include:

> [A]ll natural gas facilities located onshore or in State waters that
> are used to receive, unload, load, store, transport, gasify, liquefy,
> or process natural gas that is imported to the United States from a
> foreign country, exported to a foreign country from the United
> States, or transported in interstate commerce by waterborne
> vessel, but does not include –
>
> > (A) waterborne vessels used to deliver natural gas to or from
> > any such facility; or
> >
> > (B) any pipeline or storage facility subject to the jurisdiction of
> > the Commission under section 717f of this title.

15 U.S.C. § 717a(11).

### C.    The Commission's interpretation of its jurisdiction over liquefied natural gas facilities

The definition of "LNG terminal" in section 2(11) of the Natural

Gas Act, 15 U.S.C. § 717a(11), "is very broad."  *New Fortress*, 176 FERC

¶ 61,031 at P 19.  The vast majority of proposals the Commission has

considered under section 3 concern "large, coastal facilities either

receiving natural gas vapor from a transportation pipeline and

delivering LNG into a large, ocean going bulk carrier, or receiving LNG

from a large bulk carrier and delivering vapor into a pipeline for

subsequent transportation."  *Nopetro LNG, LLC*, 178 FERC ¶ 61,168, at

P 9 (2022) (Initial Order), R.16, JA 43; *see also id*. P 7 ("To date, the

7

Commission has exercised its [DOE]-delegated section 3 authority to authorize: (1) LNG terminals located at the site of import or export; and (2) the site and facilities at the place of import/export where a pipeline crosses an international border. Additionally, the Commission has declined to exert any place of entry/export authority over non-pipeline facilities that were not located at the actual point of export.") (footnotes omitted), JA 42-43.

Based on that experience, the Commission historically employs three criteria to determine whether a facility used to import or export liquefied natural gas is an "LNG terminal" for purposes of section 3 of the Natural Gas Act, 15 U.S.C. § 717b. Initial Order P 9, JA 43-44; *Nopetro LNG, LLC*, 180 FERC ¶ 61,057, at P 6 (2022) (Rehearing Order), R.19, JA 64; *see also New Fortress*, 36 F.4th at 1175 ("Notwithstanding this 'broad definition,' the Commission has interpreted its jurisdiction over LNG terminals to extend only to natural gas facilities that receive or send out gas by pipeline, not those that receive or send out gas by waterborne vessels, trucks, or trains.") (cleaned up); *Gulf Oil Ltd. P'ship*, 148 FERC ¶ 61,029, at P 8 (2014)

("[T]he Commission makes jurisdictional determinations concerning projects, including LNG projects, on a case-by-case basis.").

First, does the project involve facilities dedicated to the import or export of natural gas, as opposed to generic shipping facilities?  *See* Rehearing Order P 6, JA 64; *see also*, *e.g.*, *The Gas Company*, 142 FERC ¶ 61,036 at P 14 (pier facilities that will import containers of liquefied natural gas along with containers of general goods do not "constitute 'natural gas facilities' as that term is used in the section 2(11) definition").

Second (and most relevant here)*,* will the project be located at or near the point of import or export, or is it inland?  Rehearing Order P 6, JA 64; *see Pivotal LNG, Inc.*, 151 FERC ¶ 61,006, at P 12 (2015) (finding no jurisdiction over facilities "located inland, and consequently … not capable of transferring LNG directly onto ocean-going, bulk-carrier LNG tankers"); *Shell*, 148 FERC ¶ 61,163 at P 45 (discussing inland LNG "peaker" units versus waterside LNG

9

"terminals").[1]  *See also* 15 U.S.C. § 717a(11) (defining "LNG terminal"

as "all natural gas facilities located onshore or in State waters").

Third, will the project receive or distribute gas via a pipeline?

Rehearing Order P 6, JA 64; *see Shell*, 148 FERC ¶ 61,163 at PP 41-43.

## II.   The Commission proceedings

### A.   An overview of liquefied natural gas

Natural gas liquefies when cooled to minus 260 degrees

Fahrenheit, which reduces its volume by 600 times.  This permits the

liquefied gas to be economically transported by ships or trucks with

insulated tanks.  Liquefied natural gas can also be warmed to return it

to a gaseous state (i.e., regasified) so it can be delivered to customers by

pipe.  *See* Energy Primer at 16.

There are more than 170 LNG facilities operating in the United

States.  Some export gas from, or import gas to, the United States,

others provide supply to the interstate pipeline system, local

distribution companies, or industrial users, while still others are used

---

[1] "Peaker" units store gas for use during periods of peak demand.
*See* FERC, *Energy Primer:  A Handbook of Energy Market Basics* 20
(Apr. 2020) (Energy Primer) (available at
https://www.ferc.gov/sites/default/files/2020-06/energy-primer-
2020_Final.pdf).

to store natural gas for periods for use in periods of peak demand.  *See*

https://www.ferc.gov/natural-gas/lng.[2]  Twenty-seven operational LNG

facilities—including 18 that are used to import or export liquefied

natural gas—are subject to the Commission's jurisdiction under

sections 3 or 7 of the Natural Gas Act, 15 U.S.C. §§ 717b, 717f.  *Id.*

## B.    Nopetro's petition for a declaratory order

In April 2021, Nopetro LNG, LLC filed a petition with the

Commission seeking a declaration that Nopetro's construction and

operation of a natural gas liquefaction and truck loading facility and

related transloading operations in Port St. Joe, Florida, would not be

subject to the Commission's jurisdiction under sections 3 or 7 of the

Natural Gas Act.  *See* Initial Order P 1, JA 40; 18 C.F.R. § 385.207.

According to Nopetro, the facility would receive natural gas from St. Joe

Natural Gas Company, Inc., a local distribution company regulated by

the Florida Public Service Commission.  *See* Initial Order P 2, JA 40.

---

[2] This link displays maps of LNG terminals and FERC-jurisdictional "peakshavers."

The facility would be capable of liquifying up to 3.86 billion cubic feet of natural gas per year for export.[3]  *See id.*

LNG would depart the Nopetro facility in International Organization for Standardization (ISO) containers via third-party truck operators for a drive to a dock, roughly a quarter-mile away, owned and operated by the St. Joseph's Port.  *See id.* P 3, JA 40.  Upon reaching the dock, the containers would be loaded onto ocean-going general cargo container vessels for export and delivery to markets in the Caribbean, Central America, and South America.  *See id.*, JA 41.  The ships would not be dedicated solely to LNG export and may also carry other goods. *See id.*  The dock would remain available for general public use, including export of products other than LNG.  *See id.*  According to Nopetro, it also intends to build and own a crane at the dock, to be operated by third-party stevedores and managed by the Port; when not used for loading LNG containers onto ships, the crane would be available for use by others at the Port for a fee.  *See id.*

---

[3] According to Nopetro's petition, in March 2021 the Department of Energy granted its requested authorization to export LNG to free trade agreement and non-free trade agreement countries.  Nopetro Pet. 4 n.2, JA 12.

## C.     The orders on review

In March 2022, the Commission granted Nopetro's petition.  The Commission found that Nopetro's liquefaction facility is not an LNG terminal subject to its Natural Gas Act section 3 jurisdiction.  The Commission reached this conclusion because the facility would not be located at the point of export and because LNG could not be directly transferred to vessels for export.  Initial Order PP 10, 19, JA 44, 49. The Commission also found it lacked jurisdiction over the crane located at the dock, as "general-use pier facilities" are outside the scope of "natural gas facilities" regulated by the Commission under section 3. *Id*. P 10, JA 45.  As to section 7 of the Natural Gas Act, the Commission found that Nopetro's facility would not be subject to its jurisdiction under that provision because the project would not facilitate interstate transportation of natural gas by pipeline.  *Id*. P 16, JA 47-48.  (Public Citizen does not raise the section 7 finding in this Court.)

Public Citizen sought rehearing of the Initial Order, focusing on "two errors" in the Commission finding that the Nopetro facility was not an "onshore" "LNG terminal" subject to Commission jurisdiction under section 3(e) of the Natural Gas Act.  Pub. Citizen Rehearing Br. 1

13

(Rehearing Br.), R.17, JA 51.  Specifically, it argued that: (1) the Commission had no discretion to decline oversight over Nopetro's facility in light of the "plain language" of the Natural Gas Act, the Act's history, and Commission policy; and (2) the Commission's finding that "onshore" is limited to facilities physically on the shoreline "is contrary to the plain meaning of the statutory language, inconsistent with the statute's structure and purpose, and patently unreasonable."  *Id*.

The Commission issued its Rehearing Order in July 2022, reaching the same result and providing more explanation for its conclusion.  The Commission reiterated that the definition of "LNG terminal," 15 U.S.C. § 717a(11), is ambiguous.  Rehearing Order P 9, JA 65.

Based on the ambiguous phrasing of that provision, the agency's own consistent precedent, and evidence of legislative intent, the Commission concluded again that the Nopetro facility and operations would not be subject to its section 3 jurisdiction.  *Id*.  Neither the other statutes nor the sparse legislative history cited by Public Citizen persuaded the Commission to abandon its consistent interpretation of section 3 as applying only to coastal LNG facilities.  *See id*. PP 16-24,

14

JA 69-75.  Commissioner Danly issued separate concurring statements in both the Initial and Rehearing Orders, JA 50, 77.

## SUMMARY OF ARGUMENT

In granting the Commission exclusive authority over liquefied natural gas facilities, Congress did not specify how far that authority extends or the types of facilities subject to it.  This case concerns a dispute about how the Commission has historically resolved that question (to avoid potentially limitless assertions of federal authority) and how it did so here.

The Commission considers LNG facilities under section 3 of the Natural Gas Act, which gives it "exclusive authority to approve or deny an application for the siting, construction, expansion, or operation of an LNG terminal."  15 U.S.C. § 717b(e)(1); *New Fortress*, 36 F.4th at 1174.

In 2005, Congress added a broad definition of the phrase "LNG terminal," 15 U.S.C. § 717a(11), as part of the Energy Policy Act's amendments to the Natural Gas Act:

> [A]ll natural gas facilities located onshore or in State waters that are used to receive, unload, load, store, transport, gasify, liquefy, or process natural gas that is imported to the United States from a foreign country, exported to a foreign country from the United States, or transported in interstate commerce by waterborne vessel, but does not include—(A) waterborne

15

vessels used to deliver natural gas to or from any such facility; or (B) any pipeline or storage facility subject to the jurisdiction of the Commission under [section 7 of the Act].

To give meaning to that broad definition, the Commission has traditionally looked to its experience to decide what constitutes an LNG import or export "terminal." For the second time in as many years, this Court is confronted with a challenge to the Commission's established precedent of applying jurisdictional boundaries to its consideration of these facilities. *See New Fortress Energy Inc. v. FERC*, 36 F.4th 1172 (D.C. Cir. 2022).

Under that precedent, a facility is an "LNG terminal" "located onshore," within the meaning of sections 2(11) and 3 of the Natural Gas Act, only if located at or near the coast and if the LNG can be directly transferred from the facility to an ocean-going ship. The Commission has consistently followed that precedent in deciding whether it has section 3 authority over an LNG facility. In this case, the Commission reasonably found that it lacked authority over Nopetro's proposed liquefaction facility because it was not located on the shoreline ("the point of export") and it could not directly transfer LNG to ships.

The Commission precedent at issue here is informed by the

agency's experience with LNG facilities, its reading of the broad and ambiguous text of the statute, and the intent of Congress at the time it amended the Commission's authority over LNG terminals. That precedent remains valid, and the Commission's application of it here reasonable, just as it was in *New Fortress*.

What Public Citizen now demands is a sweeping change in agency policy. That demand may be clothed in statutory-text and congressional-intent garb, but really amounts to little more than a policy preference—i.e., for FERC to exert jurisdiction under Natural Gas Act section 3 more expansively, not just over coastal facilities (as contemplated by Congress and informed by agency precedent), but also over inland facilities located anywhere.[4] Much of what Public Citizen raises now is jurisdictionally barred, however, due to its failure to preserve these arguments for appellate review under the Natural Gas Act, 15 U.S.C. § 717r(a)-(b).

The rest of Public Citizen's arguments turn on its own conclusory

---

[4] *See, e.g.*, Br. 24 (noting Congress's use of "onshore" to encompass "all land-based facilities"); *id*. 36 ("[T]he term 'located onshore' must be interpreted to encompass[] all natural-gas facilities physically situated on land.").

reading of the statutory text and context, brief cameos by the word "onshore" in other statutes, its brush-off of Commission precedent, and a single line of testimony in Congress by a member of FERC staff.

Of course, to the extent the agency decides in the future to change how it interprets its authority over LNG terminals, it can do that, within the confines of the Natural Gas Act and the Administrative Procedure Act. For today, though, Public Citizen offers little basis to overturn the Commission's reasonably grounded and reasonably explained jurisdictional conclusions.

## ARGUMENT

### I.    Standard of review

The Commission's jurisdictional determination regarding Nopetro's liquefied natural gas facility is reviewed under the Administrative Procedure Act's deferential "arbitrary and capricious" standard. 5 U.S.C. § 706(2)(A). The "scope of review under [that] standard is narrow." *FERC v. Elec. Power Ass'n*, 577 U.S. 260, 292 (2016). The Commission's factual findings, if supported by substantial evidence, are conclusive. 15 U.S.C. § 717r(b). The relevant inquiry is simply whether the agency has articulated "a satisfactory explanation for its action including a 'rational connection between the facts found

and the choice made.'" *Motor Vehicle Mrfs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)); *see also FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021) (reviewing court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision").

This case also raises issues regarding the Commission's interpretation of the scope of its jurisdiction under the Natural Gas Act. An agency's construction of the statute it administers is reviewed under well-settled principles. If Congress has directly spoken to the precise question at issue, the Court "must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). If the statute is silent or ambiguous, the Court "must defer to a reasonable interpretation made by the [agency]." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 481 (2001) (internal quotation omitted); *see also City of Arlington v. FCC*, 569 U.S. 290, 296-98 (2013) (holding *Chevron* analysis applicable to agency's determination of its own statutory jurisdiction); *Conn. Dept. of*

19

*Pub. Util. Control v. FERC*, 569 F.3d 477, 481 (D.C. Cir. 2009) ("We

afford *Chevron* deference to the Commission's assertion of

jurisdiction.").

The Court also gives substantial deference to the Commission's

interpretation of its own precedent.  *See Mo. Pub. Serv. Comm'n v.*

*FERC*, 783 F.3d 310, 316 (D.C. Cir. 2015); *Colo. Interstate Gas Co. v.*

*FERC*, 599 F.3d 698, 703-04 (D.C. Cir. 2010).

## II.  The Commission's traditional interpretation of the Natural Gas Act, and whether a facility is an "LNG terminal" subject to its authority, is reasonable

The Commission views Natural Gas Act section 2(11), including

its undefined "onshore" phrase, as ambiguous.  Rehearing Order P 9,

JA 65; *see supra* p.7 (full statutory definition).  Read literally, the

statute's definition of "LNG terminal" would sweep in all manner of

facilities—including "otherwise NGA-exempt gathering, intrastate

pipeline, processing, and local distribution facilities" should they

"transport gas that was imported or gas that will be exported."  *Shell*,

148 FERC ¶ 61,163 at P 43 n.78; *see also id.* P 47 n.85 ("[T]he literal

language of section 2(11) is extremely expansive.").

So, as a policy matter, the Commission has historically fashioned

guardrails around its interpretation of this language to ensure it exercises its authority judiciously and in accordance with congressional intent. *See* Rehearing Order P 24 (citing *Shell*), JA 75; *see also New Fortress*, 36 F.4th at 1178 (approving Commission's application of precedent that "establishes jurisdictional boundaries" around the Commission's Natural Gas Act section 3 jurisdiction). Specifically, the Commission traditionally considers three criteria, on a case-by-case basis, in deciding whether an LNG facility is an export or import "terminal" subject to its section 3 authority: (1) whether the facility would include facilities dedicated to the import or export of LNG; (2) whether the facility would be located at or near the point of import or export; and (3) whether the facility would receive or send out gas via a pipeline. Initial Order P 9, JA 43-44.

Based on these three criteria, the only LNG projects (aside from border traversing pipelines) over which the Commission has exercised Natural Gas Act section 3 authority have been coastal facilities served by ocean-going, bulk carrier LNG tankers. Rehearing Order P 11, JA 66; *Shell*, 148 FERC ¶ 61,163 at P 39.

At issue here is the second factor above—the location of a facility

at or near the point of import or export.[5]  Public Citizen mounts (1) a

facial challenge to the Commission's policy on whether a facility is an

"LNG terminal" under Natural Gas Act section 2(11) (*infra* sections II.A

– C), and (2) a challenge to that policy as applied here to Nopetro's

facility (*infra* section III).  Neither challenge overcomes the

Commission's reasonable and consistent interpretation of the statute

and its precedent.

### A.    The Commission's interpretation of the term "onshore" in Natural Gas Act section 2(11) is consistent with the statutory text and context

The dispute here concerns the agency's interpretation of the scope

of its jurisdiction under the Natural Gas Act.  This Court's review of the

Commission's "construction of the statute which it administers,"

*Chevron*, 467 U.S. at 842, consequently follows the two-step framework

of *Chevron*.  *City of Arlington*, 569 U.S. at 296; *Solar Energy Indus.*

*Ass'n v. FERC*, 59 F.4th 1287, 1292 (D.C. Cir. 2023).  As noted above,

the Commission considers section 2(11) of the Act ambiguous.  *See*

*supra* p. 20; Rehearing Order P 9, JA 65.

---

[5] This Court's *New Fortress* decision from last year, which affirmed the Commission's interpretation of its section 3 jurisdiction, concerned the third factor—the pipeline requirement.  36 F.4th at 1175.

**1.** As to the text, Public Citizen acknowledges that the Natural Gas Act does not define the term "onshore," yet insists it is synonymous with "anywhere on land." *See, e.g.*, Br. 36 ("[T]he term 'located onshore' must be interpreted to encompass[] all natural-gas facilities physically situated on land."). And Public Citizen goes a step farther with its principal (and oft repeated) claim before the Commission and also seemingly on appeal that the agency's interpretation of "onshore" contravenes the plain meaning of the Natural Gas Act. *See, e.g.*, Rehearing Br. 1 ("[T]he Commission's ruling that 'onshore' as used in the Natural Gas Act is limited to a facility physically on the shoreline *is contrary to the plain meaning of the statutory language*, inconsistent with the statute's structure and purpose, and patently unreasonable.") (emphasis added), JA 51; *id.* at 5 (noting that Commission precedent is "contrary to the plain language of the statute" if it requires the capability to directly transfer LNG to oceangoing vessels), JA 55; *id.* at 6-7, JA 56-57; *see also* Br. 41-42 ("Like the NGA's definition of 'LNG terminal,' those definitions [in the Oil Pollution Act] . . . *make clear* that the term 'onshore' *unambiguously extends* to all dry land, without regard to proximity to the shoreline.") (emphases added).

The repeated incantations of the statute's "plain language" and "unambiguous[]" reach do not help Public Citizen. Petitioners raising what amounts to a *Chevron* step-one claim—i.e., that the agency interpretation is contrary to the statute's plain language—must show that the language "*unambiguously* forecloses the [agency's] interpretation," *Village of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 661 (D.C. Cir. 2011), or that the challenged term is susceptible of "only one possible interpretation," *Petit v. U.S. Dept. of Educ.*, 675 F.3d 769, 781 (D.C. Cir. 2012) (cleaned up).

Even the most forgiving version of Public Citizen's view of the statute cannot reasonably be construed to *unambiguously foreclose* the Commission's contrary interpretation. *See* Br. 36-37 (admitting that, "[v]iewed in isolation, the term 'onshore' can mean *either* '[e]xisting or occurring on the shore, *or* on land'") (citing dictionary definitions; emphasis added); *see also*, *e.g.*, *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Fed. Election Comm'n*, 333 F.3d 168, 173 (D.C. Cir. 2003) ("A statute is considered ambiguous if it can be read more than one way."); *Brown v. Gardner*, 513 U.S. 115, 118 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context.").

**2.** Moving on to context, the Commission reasonably read section 2(11) in context and concluded that "LNG terminal" (and its "located onshore" condition) means facilities located on or near the water or coast. *See* Rehearing Order P 14, JA 67; Initial Order P 12, JA 46. Nopetro's liquefaction facility is not an LNG terminal subject to the Commission's jurisdiction, in the Commission's judgment, because it is not located at or near the point of export—i.e., the LNG could not be directly transferred to ocean-going vessels for export and instead would have to be transported by truck to a general-use dock. Initial Order PP 10, 12, JA 44, 46; Rehearing Order P 21, JA 72.

In reaching this conclusion, the Commission applied a commonsense canon of statutory construction and gave meaning to "located onshore" based on its neighboring words: "or in State waters." Rehearing Order P 14, JA 67; *see also*, *e.g.*, *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 634–35 (2012) (applying the "'commonsense canon of *noscitur a sociis*—which counsels that a word is given more precise content by the neighboring words with which it is associated'") (quoting *United States v. Williams*, 553 U.S. 285, 294 (2008)); *see generally* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of*

*Legal Texts* 195 (2012) (Scalia & Garner) (when words "are associated in a context suggesting that the words have something in common, they should be assigned a permissible meaning that makes them similar"). This construction—requiring some nexus to the shoreline or coast—also comports with the structure of the statute, i.e., section 2(11)'s definition of LNG terminals (over which the Commission has exclusive authority under section 3) references gas "transported in interstate commerce by waterborne vessel." 15 U.S.C. § 717a(11); Rehearing Order P 14, JA 67-68.

Syntax aside, historical associations from past usage too inform, and support, the agency's contextual reading of "onshore" here. Long before enactment of the Energy Policy Act of 2005, Commission orders reflected the agency's historical understanding that LNG import and export facilities[6] ("terminals," as the Commission has traditionally

---

[6] As noted *supra* pp. 4-6, before Congress amended the Natural Gas Act via the Energy Policy Act of 2005, the Commission exercised jurisdiction over LNG facilities under section 3(a) of the Natural Gas Act, 15 U.S.C. § 717b(a).

called them[7]) were located on the coast. *See* Rehearing Order PP 12 &
n.31, 21, JA 66, 73; *see also*, *e.g.*, *Hackberry LNG Terminal, L.L.C.*, 101
FERC ¶ 61,294, at P 25 (2002) (referring to a coastal facility as
"onshore"); *Cove Point LNG Ltd. P'ship*, 97 FERC ¶ 61,043, at 61,203
(2001) (noting "the reality that, in order to operate a viable LNG
facility, the terminal operator must ensure that the customer can
unload its tankers of LNG at the facility"); *Yukon Pac. Co. L.P.*, 71
FERC ¶ 61,197, at 61,699 (1995) (referencing Dept. of Energy Order No.
350, which emphasized the "need for the FERC to exercise the full
extent of its section 3 authority to regulate the marine transportation of
LNG"); *Distrigas Corp.*, 58 FPC 2589, 2590 (1977) (authorizing the
construction and operation of an LNG terminal in Everett,
Massachusetts that would receive LNG imports from Algeria).

The 2005 addition of an expansive definition of "LNG terminal,"
as "located onshore or in State waters," 15 U.S.C. § 717a(11), did not
prompt the Commission to revisit or alter its historical understanding

---

[7] *Shell*, 148 FERC ¶ 61,163 at P 45 (noting "common[]" references
to inland LNG facilities as "peaker" units and waterside LNG facilities
as "terminals").

of LNG terminals or its interpretation of its own jurisdiction. *See* Rehearing Order P 12 ("[S]ection 2(11) 'does not seek to redefine the term natural gas facilities as commonly understood for purposes of Commission jurisdiction.'") (quoting *Shell*, 148 FERC ¶ 61,163 at P 43), JA 66; *Shell*, 148 FERC ¶ 61,163 at P 47 n.85 (expressing disbelief that Congress intended its adoption of "LNG terminal" in section 2(11) to "expand the Commission's NGA jurisdiction" to encompass certain facilities, "including facilities that may be far inland"). Public Citizen has not identified any instance where the Commission has exercised section 3 authority over an inland LNG facility unconnected to the coast.

## B. The Commission's interpretation of "onshore" is consistent with its precedent

The Commission's jurisdictional determination here follows agency precedent lockstep. *See*, *e.g.*, *New Fortress*, 174 FERC ¶ 61,207, at P 17 (2021) (contrasting New Fortress's "waterside" LNG facility, over which the Commission found section 3 jurisdiction, with *Pivotal*, which involved inland LNG facilities over 100 miles from the point of export and over which the Commission found it lacked jurisdiction); *Pivotal LNG, Inc.*, 151 FERC ¶ 61,006, at P 12 (2015) ("[T]he LNG

facilities owned by Pivotal and its affiliates are all located inland, and consequently are not capable of transferring LNG directly onto ocean-going, bulk-carrier LNG tankers."); *Shell*, 148 FERC ¶ 61,163 at P 45 (stating Commission view that a "terminal" refers to a "waterside facility," which "either receives gas as LNG from a waterborne vessel for revaporization or liquefies gas for delivery as LNG to a waterborne vessel").

Under that precedent, because LNG cannot be transferred directly from Nopetro's facility to ocean-going vessels, the facility is not located at or near the point of export and therefore is not an "LNG terminal," 15 U.S.C. § 717a(11), subject to the Commission's exclusive authority under section 3(e)(1), *id*. § 717b(e)(1).  Initial Order P 10, JA 44; Rehearing Order PP 9, 21, JA 65, 72.  For the same reason, the Commission also found that Nopetro's facility would not be subject to its section 3(a) authority over import and export facilities, 15 U.S.C. § 717b(a).[8]  Rehearing Order P 15 (discussing agency precedent), JA 65;

---

[8] Public Citizen has not raised the Commission's section 3(a) jurisdiction before this Court, *see*, *e.g.*, Br. 1-2, and did not do so on rehearing before the Commission either.  Rehearing Order P 15 (noting that Public Citizen "does not argue [on rehearing] that Nopetro's facilities are part of an 'export facility' under NGA section 3(a)"), JA 68;

*see also Emera CNG, LLC*, 148 FERC ¶ 61,219, at P 13 (2014) (finding a facility not subject to section 3(a) jurisdiction because it was not capable of transferring natural gas "directly into an ocean-going vessel for export"); *Andalusian Energy, LLC*, 174 FERC ¶ 61,107, at P 11 (2021) (same).

So even if the journey by truck from facility to port is less than a mile, the Commission has consistently declined jurisdiction in such instances—and reasonably did so again here.[9]  Rehearing Order PP 15,

---

Rehearing Br., JA 51-60; 15 U.S.C. § 717r(b) ("No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do.").  Because this argument was not preserved by the only petitioner before the Court, *amici curiae* Sierra Club *et al.* cannot raise it now.  *See New Fortress*, 36 F.4th at 1179; *Edison Elec. Inst. v. OSHA*, 849 F.2d 611, 625 (D.C. Cir. 1988); Sierra Club Br. 7-9.

[9] Public Citizen notes, at Br. 20, its rehearing argument relying on a dissenting statement by former Commissioner Bay in *Pivotal*.  But only "duly issued orders of a Commission majority, not a dissent, carry precedential weight," and the Commission risks a remand on arbitrary-and-capricious grounds were it to depart from precedent without a reasoned basis.  Rehearing Order P 14, JA 67.  In any event, Commissioner Bay agreed with the Commission's construction of "LNG terminal."  *Id.* P 15 & n.39 (citing *Pivotal*, 151 FERC ¶ 61,006 (Bay, Comm'r, dissenting) (the facts that the facilities at issue "are located inland and incapable of transferring LNG directly to tankers . . . establish that the facilities do not constitute an 'LNG terminal' as defined by section 2(11) of the Act"), JA 68.

21 & n.58, JA 68, 72; *Andalusian*, 174 FERC ¶ 61,107 at P 11; *Emera*, 148 FERC ¶ 61,219 at P 13.  Both *Andalusian* and *Emera* involved "essentially identical" facts as here, Rehearing Order P 15, JA 68, i.e., the same distance of truck transport from facility to coast (a quarter-mile), and the Commission declined jurisdiction in those cases as it did here.[10]  *See Andalusian*, 174 FERC ¶ 61,107 at P 11; *Emera*, 148 FERC ¶ 61,219 at P 13.  The fact these orders issued after 2005 (Br. 56) does not undermine their relevance for showing consistent agency action.

Here, the Commission reasonably explained that it has opted to take the "direct transfer" approach instead of drawing an arbitrary distance threshold that would qualify as sufficiently "near" the point of export.  Rehearing Order P 21, JA 72.  This approach makes sense.  Judgments about proximity are inherently subjective.  And in practice they would be both challenging to administer and ripe for disputes over why one distance is "near" (or "close enough," Br. 27) while another not.

---

[10] Although *Emera* noted without explication that the facility there "will be 'located onshore,'" the Commission nevertheless declined to exercise jurisdiction under Natural Gas Act section 3.  148 FERC ¶ 61,219 at P 14.  Public Citizen did not address *Emera*, let alone that order's cursory reference to the facility being "onshore," in its rehearing brief before the Commission.  *See* 15 U.S.C. § 717r(b).

*See*, *e.g.*, *Cassell v. FCC*, 154 F.3d 478, 485 (D.C. Cir. 1998) ("We are generally unwilling to review line-drawing performed by the Commission unless a petitioner can demonstrate that lines drawn ... are patently unreasonable, having no relationship to the underlying regulatory problem.") (internal quotation omitted); *Leather Indus. of Am., Inc. v. EPA*, 40 F.3d 392, 409 (D.C. Cir. 1994) (leaving "line-drawing to the agency's discretion," where it did not appear irrational and petitioners failed to show any dire consequences).

To the extent Public Citizen argues that the agency's "direct transfer" approach is inconsistent with congressional intent because Congress did not expressly exclude truck transport from section 2(11)'s definition of "LNG terminal," *see* Br. 60, the Court lacks jurisdiction over this claim because Public Citizen failed to exhaust it before the Commission on rehearing.[11]  *Cf. Shell*, 148 FERC ¶ 61,163 at PP 48, 50

---

[11] While Public Citizen on rehearing did reference the exclusions in section 2(11), 15 U.S.C. § 717a(11), it did so for a different purpose: to distinguish the Commission's "onshore" authority from the Coast Guard's "offshore" purview.  Rehearing Br. 8 (noting that the distinction of responsibility "is also supported by language in Section 311(b) of the Energy Policy Act of 2005 that excludes 'waterborne vessels used to deliver natural gas to or from any such facility' from FERC's jurisdiction, as Congress had already granted the Coast Guard that responsibility"), JA 58.  This understanding of Public Citizen's position

(explaining that the exclusions in section 2(11) demarcate the Commission's section 3 authority from its section 7 authority); *Sound Energy Solutions*, 107 FERC 61,263, at P 25 (2004) (Commission's reliance on section 3 rather than section 7 for LNG terminals "better distinguishes foreign from interstate commerce").

Whatever Public Citizen's opinion of Commission precedent, the virtue of consistent agency decisionmaking favors the orders on review. Indeed, the Commission has consistently declined to exercise section 3 authority over *inland* facilities that must transport LNG by truck to export vessels moored in coastal waters—and Public Citizen does not argue otherwise.  Initial Order PP 10, 12, 14, JA 44, 46, 47; Rehearing Order PP 11, 14-15, 21, 24, JA 66-69, 72, 75; *Pivotal*, 151 FERC ¶ 61,006 at P 12; *see also Andalusian*, 174 FERC ¶ 61,107 at P 11 (finding that a facility located a quarter-mile from the point of export is not capable of directly transferring natural gas onto an ocean-going vessel for export and therefore is not an export facility under NGA section 3(a)); *Emera*, 148 FERC ¶ 61,219 at P 13 (same).  The

---

on rehearing is confirmed by the Commission's order.  *See* Rehearing Order P 16 n.44, JA 69.

Commission explained in *Pivotal* that it has not traditionally exercised section 3 authority over facilities that transport LNG to the point of export "by means other than interstate pipeline." 151 FERC ¶ 61,006 at P 12; *see also id.* n.17 ("The Commission has never issued authorization under section 3 to designate points of import or export for gas carried by truck, train, or waterborne vessel or authorized the site of, or construction and operation of, any complementary facility, such as a road, bridge, railway, or stand-alone pier, needed to import or export gas by a non-pipeline mode of transportation."); *New Fortress*, 36 F.4th at 1178 (approving Commission's application of precedent that "establishes jurisdictional boundaries" around its section 3 jurisdiction).

And in this case the Commission explained that, aside from one category of project not relevant here, it has consistently exercised its section 3 authority only over *coastal* LNG facilities served by ocean-going LNG tankers. Rehearing Order P 11, JA 66; Initial Order P 12, JA 46; *see also Shell*, 148 FERC ¶ 61,163 at P 39 ("To date, aside from … border-crossing pipelines, the only other facilities for which the Commission has granted section 3 siting, construction, and operating authority have been coastal LNG facilities that are served by ocean-

going, bulk-carrier LNG tankers."); *Pivotal*, 151 FERC ¶ 61,006 at P 8
("[T]he Commission has only exercised its authority under section 3
over import and export facilities to regulate (1) pipelines constructed at
the place of entry for imports or exit for exports and (2) coastal LNG
terminals that are accessible to ocean-going, bulk-carrier LNG tankers
and that are connected to pipelines that deliver gas to or take gas away
from the terminal.") (footnotes omitted).  Again, Public Citizen
identifies no instance where the Commission has exercised section 3
authority over an inland LNG facility unconnected to the coast.

Such consistency with agency precedent "weighs heavily" in the
Commission's favor here.  *See*, *e.g.*, *Energy W. Min. Co. v. Fed. Mine
Safety & Health Rev. Comm'n*, 40 F.3d 457, 463 (D.C. Cir. 1994) ("In
considering whether an agency's interpretation of its own regulations is
permissible, the consistency with which that interpretation has been
applied in the past weighs heavily in the agency's favor."); *Chem. Waste
Mgmt., Inc. v. EPA*, 869 F.2d 1526, 1540 (D.C. Cir. 1989) (same).
Deference is thus warranted.  *See Barnhart v. Walton*, 535 U.S. 212,
220 (2002) ("Court[s] will normally accord particular deference to an
agency's interpretation of 'longstanding' duration.").

### C.    Public Citizen offers no evidence of congressional intent that supports its theory of what "onshore" means or contradicts the orders on review

The Commission's past and present construction of the phrase "LNG terminal," and "onshore" in particular, also accords with the statute's purpose.  To the extent the legislative history of the Energy Policy Act of 2005[12] carries any probative value here in ascertaining the intent of Congress, it reveals that Congress was focused on coastal—not inland—LNG facilities.  *See* Rehearing Order P 19, JA 71.

**1.** Before enactment, Senator Dianne Feinstein presented Amendment No. 841, which would have prohibited FERC from approving an LNG terminal application "without the approval of the Governor of the State in which the facility would be located."  151 Cong. Rec. S6980-81 (daily ed. June 22, 2005); *see* Rehearing Order P 19 & n.51 (citing congressional debate), JA 71.  During the ensuing debate, Senator Feinstein and her co-sponsors offered revelatory rationale in

---

[12] The Energy Policy Act, as described above, amended the Natural Gas Act by adding the "LNG terminal" definition in section 2(11) and providing (in section 3(e)(1)) the Commission with "exclusive authority to approve or deny an application for the siting, construction, expansion, or operation of an LNG terminal."

36

support of this proposal and against the extent of FERC's siting

authority in the then-existing draft legislation, as excerpted below:

- "[T]his bill gives the State less input for facilities that are located *on shore, in our busy ports*, and near closely packed communities."[13]
- "[The bill] denies States a role in deciding whether and where LNG terminals may be located *on our coastlines*."[14]
- "Does FERC have a better understanding than a State's Governor of the potential environmental impact of an LNG facility located *on or near the State's shore*? . . . I am not arguing that no LNG terminals should be constructed *on or close to our shores*. I am simply arguing that FERC should not be the final arbiter in determining where those facilities are located."[15]
- "[I]f the State were to find that the onshore LNG terminal would negatively impact *the State's coastline*, the Secretary of Commerce could take it upon himself to overturn that decision."[16]
- "The decision to fundamentally change the nature of a *coastal community* in the placing of an LNG site should only be made by including all people in and all actors affected by the siting. . . . *My State of Maine has a coastline that is more than 5,000 miles long, which is why there is great interest in*

---

[13] 151 Cong. Rec. S6982 (daily ed. June 22, 2005) (statement of Sen. Feinstein) (emphasis added) (cited at Rehearing Order P 19 n.51, JA 71); *see also* 151 Cong. Rec. S7455 (daily ed. June 28, 2005) (statement of Sen. Feinstein).

[14] 151 Cong. Rec. S6990 (daily ed. June 22, 2005) (statement of Sen. Boxer) (emphasis added).

[15] *Id*. (emphases added).

[16] *Id*. S6982 (daily ed. June 22, 2005) (statement of Sen. Feinstein) (emphasis added).

*siting LNG facilities at different locations along its coast.*"[17]

- "We are not talking about the siting of a neighborhood ball park or a new Wal-Mart but a processing facility that totally alters *the coastal landscape* and *a facility that needs to be fed LNG from 13-story-high tankers coming into the port* each and every day."[18]

- Noting concern over the California Governor's lack of veto power over the "only proposed onshore project in California," at the Port of Long Beach[19];

- Expressing concern over one particular pending proposal to site an LNG facility "*in Weaver's Cove at the mouth of the Taunton River*" in Massachusetts, and explaining that "[t]o transport LNG to the proposed facility at Weaver's Cove, … [a] 33-million-gallon tanker has to travel *31 miles of coastline, through narrow waterways*, along some of our most pristine areas, *including Narragansett Bay, one of the populous estuaries* in the United States."[20]

- Noting two proposed LNG projects pending before FERC that will "have a huge impact on the people of Rhode Island," and that "*LNG ships will have to transit Narragansett Bay to get to both of these facilities*"[21];

- Identifying possible risk of a terrorist attack "on a tanker

---

[17] *Id*. S6984-85 (daily ed. June 22, 2005) (statement of Sen. Snowe) (emphases added).

[18] *Id*. S6985 (emphases added).

[19] *Id*. S6982 (daily ed. June 22, 2005) (statement of Sen. Feinstein).

[20] *Id*. S6984 (daily ed. June 22, 2005) (statement of Sen. Kennedy) (emphases added).

[21] *Id*. S6985 (daily ed. June 22, 2005) (statement of Sen. Reed) (emphasis added).

delivering LNG to a U.S. terminal."[22]

Such evident legislative focus on coastal impacts of LNG facilities undercuts Public Citizen's theory that Congress intended to confer upon the Commission jurisdiction over LNG facilities anywhere on land. *See* Br. 24 (noting "Congress's use of 'onshore' to encompass *all land-based facilities*") (emphasis added); Br. 25 (noting "Congress's intent to include *all liquefaction facilities on land*, as well as facilities in state waters") (emphasis added); Rehearing Order P 19 ("[T]he legislative history of [the Energy Policy Act] evinces that Congress specifically contemplated the word 'onshore' as referring to coastal, rather than inland, facilities."), JA 71. Moreover, at the time Congress was considering the Energy Policy Act legislation, it was fully aware of a jurisdictional dispute between the Commission and a state agency, the California Public Utilities Commission, over a coastal LNG facility in Long Beach, California. Rehearing Order P 19 & n.50, JA 71; *see also Shell*, 148 FERC ¶ 61,163 at P 49.

The fact that Congress, in 2005, did not revise the longstanding

---

[22] *Id.*

agency interpretation as to LNG facilities subject to Commission

jurisdiction "'is persuasive evidence that the interpretation is the one

intended by Congress.'" *CFTC v. Schor*, 478 U.S. 833, 846 (1986)

(quoting *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 275 (1974)); *see also*

*Schor*, 478 U.S. at 846 ("'Congress has not just kept its silence by

refusing to overturn [an] administrative construction, but has ratified it

with positive legislation.'") (quoting *Red Lion Broad. Co. v. FCC*, 395

U.S. 367, 381-82 (1969)); *Wash. All. of Tech. Workers v. U.S. Dept. of*

*Homeland Sec.*, 50 F.4th 164, 183 (D.C. Cir. 2022) (citing *Schor*);

Rehearing Order P 21 n.59, JA 73.  Accordingly, it is reasonable to

assume "Congress did not contemplate a sweeping expansion of the

Commission's jurisdiction to encompass all inland LNG facilities

without purporting to do so in clear terms, at least without some

contrary indication," as the Commission explained.  Rehearing Order

P 19, JA 71.

And there is no doubt Congress could have written the statute

differently.  Had it intended the Commission to assert dominion over all

land-based, non-deepwater LNG terminals, Congress could have said as

much in unmistakable terms, certainly with more specificity than

"onshore or in State waters."  *Id*.

**2.** This is particularly relevant given that Congress previously defined the term "onshore" in other statutes, as Public Citizen highlights in its opening brief.  *See* Br. 41.  Take the Oil Pollution Act of 1990, which equated the term with "located in, on, or under, any land within the United States, other than submerged land."  33 U.S.C. § 2701(24) (cited at Br. 41).  The Clean Water Act, which Public Citizen also cites, adopted the same definition.  33 U.S.C. § 1321(a)(10) (cited at Br. 41).

But deliberate clarity elsewhere does not elucidate deliberate ambiguity here.  *See Doris Day Animal League v. Veneman*, 315 F.3d 297, 299 (D.C. Cir. 2003) (noting that Congress's failure to speak with clarity signals "room for disagreement about the statute's meaning").  Especially considering that Congress used the same "onshore" definition on more than one occasion, it certainly would have been aware of this more precise formulation of the term when it enacted the Energy Policy Act decades later—and yet chose not to use that definition (or any definition for that matter) in that statute.  *See* Rehearing Order PP 19, 22, JA 70-71, 73-74.

The truism that the words "draw meaning from context" is instructive here. *Pharm. Rsch. & Mfrs. of Am. v. Thompson*, 251 F.3d 219, 224 (D.C. Cir. 2001). The mere appearance of a word or phrase in multiple statutes is not informative as to Congress's intent for that word or phrase in any particular statute—especially when they deal with different subjects at different times. *See* Rehearing Order P 22, JA 73-74; *see also* Scalia & Garner 172 (noting that the argument that a phrase in one statute "must bear the well-established or unavoidable meaning that the same word or phrase has in a different statute altogether," without more, "does not have much force").

For this reason, Public Citizen's reference to the Oil Pollution Act (enacted in 1990) is unhelpful, considering the dissimilarity of the subject matter as compared to the Energy Policy Act (enacted fifteen years later). Rehearing Order P 22, JA 73-74. The former's definition of "onshore facility" includes "motor vehicles and rolling stock," 33 U.S.C. § 2701(24), matters far outside the Commission's purview, let alone section 3 of the Natural Gas Act. Rehearing Order P 22, JA 73. In any case, the traditional method of interpreting a statutory provision is to look at the rest of that same statute—not different ones, as Public

42

Citizen insists.  *See*, *e.g.*, *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) ("In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole."); *District of Columbia v. Carter*, 409 U.S. 418, 421 (1973) (cited at Rehearing Order P 22 n.60, JA 73).

Still, Public Citizen contends that the Commission violated the established meaning of "onshore," seemingly based on a word search of the entire United States Code.  Br. 41-43.  But it never explains why the usage of "onshore" and "offshore" in other statutes means what it presumes here.  None of the various provisions of the other cited statutes or the Energy Policy Act supports the conclusory assertion that "onshore" in section 2(11) of the Natural Gas Act "could only mean land-based activities or facilities" (Br. 43) or facilities "anywhere on land" (Br. 41).[23]  *See* Rehearing Order P 22 (finding that Public Citizen offered

---

[23] Public Citizen's rehearing brief before the Commission, for example, noted more than 20 uses of "onshore" in the Energy Policy Act, "all of which refer to facilities on land within the United States that are not submerged under water," Rehearing Br. 8, JA 58.  But the only support it musters for this presumption is a hyperlink to the 551-page enacted version of that statute.  *Id*. n.20, JA 58.

no support for the claim that "onshore" must mean anywhere on land),
JA 74.

Worse still, Public Citizen makes no serious effort to explain how
other statutes, enacted for different purposes and covering different
subjects, bear any relevance to the question presented in this case. *See
id.*, JA 73-74. For example, how can provisions of the Mineral Leasing
Act (on the leasing of federal lands under the authority of the Secretary
of the Interior), which happen to use terms like "onshore" and
"offshore," inform the interpretation of the Commission's jurisdiction
over LNG export facilities under section 3 of the Natural Gas Act? *See
also, e.g.*, 15 U.S.C. § 4101(a)(1) ("The Congress finds and declares
that—(1) the Arctic, onshore and offshore, contains vital energy
resources that can reduce the Nation's dependence on foreign oil and
improve the national balance of payments") (cited at Br. 42).

Aside from the winking hint of similarity with "other oil and gas
regulatory regimes," Br. 41, Public Citizen has yet to offer any real
connection between all these different statutes, either in this Court or
before the Commission. *See* Rehearing Order P 22, JA 74; Br. 41-42;
Rehearing Br. 8, JA 58.

**3.** Public Citizen claims to have unearthed the true purpose behind the 2005 amendments to the Natural Gas Act—not from a committee report or even a single legislator, but from a lone statement by agency staff testifying at a congressional hearing.  The agency official, the Director of the FERC Office of Energy Projects, described section 3 of the Natural Gas Act as conferring on the Commission exclusive jurisdiction over LNG facilities "onshore and in state water," while parenthetically adding "as distinguished from" the Coast Guard's jurisdiction over "offshore" facilities.[24]  *See* Br. 12 ("Thus, in 2005, Congress understood that the Commission retained jurisdiction over natural-gas import and export facilities that were not covered by the Deepwater Port Act.").

But the bifurcation of siting responsibility between the Coast Guard (for facilities "offshore") and the Commission (for facilities "onshore or in State waters") does not demonstrate or even suggest that

---

[24] Public Citizen also cites, for the first time on appeal, a brief colloquy during a 2004 congressional hearing in which the then-Chairman of FERC agreed that FERC has responsibility over "onshore" facilities and a Maritime Administration official confirmed his agency's responsibility for "offshore" facilities.  Br. 11-12, 39.

"onshore" must mean *anywhere on land*, as Public Citizen contends.

*See* Br. 42 ("[T]he term 'onshore' unambiguously extends to all dry land,

without regard to proximity to the shoreline."); Rehearing Order PP 16-

18, JA 69-70.

As the Commission explained, there is no dispute here that the

Commission, not the Coast Guard, has exclusive jurisdiction over

"onshore" facilities.  15 U.S.C. § 717(e)(1); Rehearing Order P 17, JA 69.

Nor is it disputed that an "onshore or in State waters" location is an

explicit requirement for an "LNG terminal" under section 2(11),

15 U.S.C. § 717a(11).   Rehearing Order P 17, JA 69.

The relevant question here is "whether 'onshore,' especially when

paired with 'or in State waters,' should be read so broadly as to

encompass non-coastal facilities."  *Id.*  In light of the breadth and

ambiguity of the definition of "LNG terminal," the Commission has

reasonably chosen not to construe its Natural Gas Act section 3

jurisdiction so broadly that it sweeps in more facilities than Congress

intended.  *Id.* P 24, JA 75.  Rather, consistent with its longstanding

interpretation of section 3, the Commission has exercised authority over

those onshore facilities located on the coast "such that LNG can be

46

directly transferred to vessels for export." *Id.*; *see also New Fortress*, 36 F.4th at 1178 (approving Commission's application of precedent that "establishes jurisdictional boundaries" around its section 3 jurisdiction). And of course, a lone member of agency staff does not speak for the agency. *See* Rehearing Order P 18, JA 70.

Besides, scraps of witness testimony usually make for poor signs of legislative resolve. *See*, *e.g.*, *Public Citizen v. Farm Credit Admin.*, 938 F.2d 290, 292 (D.C. Cir. 1991) ("[T]he testimony of witnesses before congressional committees prior to passage of legislation is generally weak evidence of legislative intent."); *Indep. Bankers Ass'n of Am. v. Farm Credit Admin.*, 164 F.3d 661, 668 (D.C. Cir. 1999) (observing that the testimony of witnesses at congressional hearings "may not reflect [the views] of the legislators who actually voted on the bill"). As the Commission here noted, one can seize upon other fragments of this same testimony to reach the opposite conclusion—e.g., confirming the need for proximity to the shoreline when the witness identified "deepwater access to accommodate LNG ship traffic" as among the first of any "basic criteria for any proposed LNG terminal." Rehearing Order P 18, JA 70.

### III. The Commission reasonably applied its established jurisdictional analysis to Nopetro's facility

Public Citizen also challenges the Commission's interpretation of Natural Gas Act section 3 as applied to Nopetro's facility. It contends the Commission failed to explain why a quarter-mile distance between Nopetro's facility and the shoreline is not sufficient to meet the Commission's own test for "onshore," Br. 57-58, effectively an arbitrary-and-capricious claim.

But as Public Citizen acknowledges, the Commission has consistently declined to specify any particular distance between an LNG facility and the point of export for the facility to qualify as an "onshore" LNG terminal. Br. 58; *see also* Rehearing Order P 21, JA 72; Initial Order P 12, JA 46. And the Commission reasonably explained why it opts not to do so and instead considers whether LNG can be directly transferred from facility to ship. *See supra* pp. 29-31; Rehearing Order P 21, JA 72-73.

Of course, Public Citizen is entitled to disagree with an agency's decisions. But that disagreement does not suffice to show that these orders on review are arbitrary and capricious. *See*, *e.g.*, *Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 374 F.3d 1251, 1263 (D.C.

48

Cir. 2004) ("At bottom, Public Citizen's arbitrary-and-capricious

challenge boils down to a policy disagreement with NHTSA. …

[B]ecause NHTSA's [decision] is both supported by the record and

rationally explained, we have no basis for substituting Public Citizen's

views for the agency's …."); *Nat'l Ass'n of Regulatory Util. Comm'rs v.*

*FERC*, 964 F.3d 1177, 1190 (D.C. Cir. 2020) (petitioners' disagreement

with FERC's decision did not show that the agency's decision was

arbitrary and capricious).

Public Citizen also raises a new arbitrary-and-capricious

argument on appeal:  that the Commission acted inconsistent with its

own precedent, where the agency had previously exercised jurisdiction

"over facilities up to several *hundred* miles from the point of export."

Br. 63 (citing *Ala. Gasline Dev. Corp.*, 171 FERC ¶ 61,134 (2020), and

*Freeport LNG Dev., L.P.*, 107 FERC ¶ 61,278 (2004)).  But Public

Citizen never exhausted this argument through rehearing before the

Commission, as required by the Natural Gas Act, 15 U.S.C. § 717r(b).

This Court thus lacks jurisdiction to hear this argument.  *See also*

Sierra Club Br. 8 (citing *Alaska Gasline*); *New Fortress*, 36 F.4th at

1179 ("if amici wished to challenge" an issue not raised by the petitioner

or any party, they "'should have done so by filing a petition for review properly raising the issue'") (quoting *Edison Elec. Inst.*, 849 F.2d at 625).

In any event, neither *Alaska Gasline* nor *Freeport* helps Public Citizen or its *amici curiae*. There was no dispute in either of those proceedings as to whether the proposed facilities were "onshore" for purposes of section 2(11) of the Natural Gas Act. The Alaska LNG project in *Alaska Gasline* did include hundreds of miles of pipeline, as Public Citizen points out—but that pipeline linked up with liquefaction facilities "*located on the eastern shore of Cook Inlet* in the Nikiski area of the Kenai Peninsula." 171 FERC ¶ 61,134 at P 4 (emphasis added). And the order noted the Coast Guard's finding that the Cook Inlet was "a suitable waterway for LNG marine traffic." *Id*. P 234.

Similarly, while the Freeport project did include a 9.6-mile pipeline, it also included a terminal on Quintana Island. *Freeport*, 107 FERC ¶ 61,278 at P 1; *see also id*. P 18 (noting expected frequency of LNG tankers docking at the receiving terminal at Quintana Island). The mere fact that the Commission, under its section 3 jurisdiction, has approved projects that include both inland and coastal facilities does

50

not mean that every part located inland is "onshore" within the meaning of section 2(11).

Public Citizen also points to precedent, from this Court and from the Commission, distinguishing "onshore" from "offshore."  Br. 43-44 (citing *ExxonMobil Gas Mktg. Co. v. FERC*, 297 F.3d 1071 (D.C. Cir. 2002), and *Transcontinental Gas Pipeline Corp.*, 96 FERC ¶ 61,118 (2001)).  As the Commission explained, these authorities are not informative here because they involved no finding as to the meaning of "onshore" and arose in different contexts.  *See* Rehearing Order PP 17, 23, JA 69, 74-75.

Neither this Court's *ExxonMobil* decision nor the Commission's *Transcontinental Gas* order provide any guidance on the Commission's section 3 jurisdiction.  True, *ExxonMobil* did address "jurisdictional questions" under the Natural Gas Act, as Public Citizen points out.  Br. 44.  But any resemblance ends there:  that case involved a different section of the Act, section 1(b), 15 U.S.C. § 717(b), and this Court held that the Commission reasonably declined jurisdiction (under section 1(b)) based on the agency's traditional test for distinguishing interstate transportation from non-jurisdictional "gathering" of natural gas.

51

*ExxonMobil*, 297 F.3d at 1084; *see also* Rehearing Order P 23, JA 74-75;

*Transcontinental Gas*, 96 FERC ¶ 61,118, at 61,449, 61,455-56 (finding

that certain facilities were exempt from FERC jurisdiction under

section 1(b)).  Neither of these authorities support overturning the

Commission's traditional interpretation of what constitutes an "LNG

terminal."  Rehearing Order P 23, JA 75.

## IV.  Public Citizen failed to preserve any claim of a regulatory gap

Public Citizen raises another new argument on appeal:  it claims

the Nopetro facility's environmental impacts would not be subject to

NEPA environmental review if the Commission does not exercise

jurisdiction.  Br. 47.  This argument is not properly before the Court

because, on rehearing before the Commission, Public Citizen never

made any NEPA argument or otherwise claimed any regulatory gap.[25]

15 U.S.C. § 717r(b); *see* Rehearing Br., JA 51-60.

In any case, this Court has emphasized that only Congress—and

---

[25] Several other parties raised a regulatory-gap argument but did not seek agency rehearing.  Initial Order P 17 & n.42, JA 48.  Again, because the only petitioner in this Court never preserved arguments related to NEPA or any potential regulatory gap, neither *amici* may raise these issues now.  *See New Fortress*, 36 F.4th at 1179; *Edison Elec. Inst.*, 849 F.2d at 625; Sierra Club Br. 18-25; Coalition Br. 21-27.

not the need for regulation—can confer upon the Commission the authority to regulate. *See ExxonMobil*, 297 F.3d at 1088; *Sea Robin Pipeline Co. v. FERC*, 127 F.3d 365, 371 (5th Cir. 1997) ("Need for regulation cannot alone create authority to regulate.") (endorsed by this Court in *ExxonMobil*); Initial Order P 18, JA 48; *see also* Coalition Br. 27 (arguing that FERC must consider the "legacy of pollution" that the project would allegedly cause and the reversal of "local-led progress towards a cleaner and more just local economy"). So long as the Commission has reasonably interpreted its statutory authority and explained the basis for its decision, that is the end of the matter. *See, e.g., Old Dominion Elec. Co-op, Inc. v. FERC*, 518 F.3d 43, 48 (D.C. Cir. 2008) (under the deferential arbitrary-and-capricious standard, the court upholds FERC's orders in which it can "discern a reasoned path" to the decision) (internal quotation omitted).

And as the Commission explained, Nopetro's facility was in fact subject to NEPA review through the Department of Energy's determination of a categorical exclusion.[26]  Initial Order P 18 & n.47,

---

[26] The Department's categorical exclusion determination, cited at Initial Order P 18 n.47, JA 48, is available at the following link:

JA 48; *see generally United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 735 (D.C. Cir. 2019) ("'Categorical exclusions are not exemptions or waivers of NEPA review; they are simply one type of NEPA review.'") (quoting Council on Envtl. Quality, *Mem. for Heads of Federal Dep'ts & Agencies: Establishing, Applying & Revising Categorical Exclusions under [NEPA]* 2 (2010)). Like any LNG facility, Nopetro's facility is subject to oversight from multiple agencies under multiple statutes and regulations. *See* Initial Order P 18, JA 49. For example, the facility's export operations would be subject to EPA regulations and requirements under the Clean Water Act, Clean Air Act, and the Hazardous Materials Transportation Act. *Id.* Delivery of gas to the facility would be covered by Department of Transportation regulations (which also would cover trucking operations) and oversight from the Florida Public Service Commission. *See id.*; Nopetro Pet. 22-23, JA 30-31. Public Citizen has not argued with specificity that oversight by other federal regulators or state regulators related to potential environmental impacts is insufficient.

---

https://www.energy.gov/sites/default/files/2021-03/NoPetro%20-167-LNG%20CX.pdf.

With this record, Public Citizen cannot show that the Commission was compelled to adopt a more expansive interpretation of the statute, or otherwise acted in an arbitrary and capricious manner, when it faithfully applied its longstanding interpretation here.

## CONCLUSION

The agency's jurisdictional determination should be sustained, and thus the petition for review should be denied.

Respectfully submitted,

Matthew R. Christiansen
General Counsel

Robert H. Solomon
Solicitor

*/s/ Anand Viswanathan*
Anand Viswanathan
Attorney

Federal Energy Regulatory
   Commission
Washington, DC  20426
Tel.: (202) 502-6537
Email: anand.viswanathan@ferc.gov

Final Brief:  May 5, 2023

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Circuit Rule 32(e), I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 10,895 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

I further certify that this brief complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Century Schoolbook 14-point font using Microsoft Word 365.

*/s/ Anand Viswanathan*
Anand Viswanathan
Attorney

Federal Energy Regulatory
   Commission
Washington, DC 20426
Tel.: (202) 502-6537
Email: anand.viswanathan@ferc.gov

May 5, 2023

# ADDENDUM

## STATUTES
## AND
## REGULATIONS

# Table Of Contents

**Statutes**:                                                                                           **Page**

Administrative Procedure Act

    5 U.S.C. § 706(2)(A) .................................................................. A-1

Department of Energy Organization Act

    Section 301, 42 U.S.C. § 7151 ...................................................... A-2

    Section 402, 42 U.S.C. § 7172 ...................................................... A-5

Natural Gas Act

    Section 1, 15 U.S.C. 717 ................................................................ A-8

    Section 2, 15 U.S.C. § 717a ........................................................... A-9

    Section 3, 15 U.S.C. § 717b .......................................................... A-10

    Section 7, 15 U.S.C. § 717f .......................................................... A-12

    Section 19, 15 U.S.C. § 717r.......................................................... A-15

**Regulation**:

    18 C.F.R. § 385.207 .................................................................... A-17

vides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, §10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, §10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, §10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

#### Statutory Notes and Related Subsidiaries

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: "This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title]."

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801.    Congressional review.
802.    Congressional disapproval procedure.
803.    Special rule on statutory, regulatory, and judicial deadlines.
804.    Definitions.
805.    Judicial review.
806.    Applicability; severability.
807.    Exemption for monetary policy.
808.    Effective date of certain rules.

### § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(2)(A) The Comptroller General shall provide a report on each major rule to the committees of

### (c) Location

The Secretary shall locate such office at a university with expertise and experience in the matters specified in subsection (b).

(Pub. L. 106–398, §1 [div. C, title XXXI, §3197], Oct. 30, 2000, 114 Stat. 1654, 1654A–482.)

#### Editorial Notes

##### CODIFICATION

Section was enacted as part of the Floyd D. Spence National Defense Authorization Act for Fiscal Year 2001, and not as part of the Department of Energy Organization Act which comprises this chapter.

## § 7144e. Office of Indian Energy Policy and Programs

### (a) Establishment

There is established within the Department an Office of Indian Energy Policy and Programs (referred to in this section as the ''Office''). The Office shall be headed by a Director, who shall be appointed by the Secretary and compensated at a rate equal to that of level IV of the Executive Schedule under section 5315 of title 5.

### (b) Duties of Director

The Director, in accordance with Federal policies promoting Indian self-determination and the purposes of this chapter, shall provide, direct, foster, coordinate, and implement energy planning, education, management, conservation, and delivery programs of the Department that—

    (1) promote Indian tribal energy development, efficiency, and use;

    (2) reduce or stabilize energy costs;

    (3) enhance and strengthen Indian tribal energy and economic infrastructure relating to natural resource development and electrification; and

    (4) bring electrical power and service to Indian land and the homes of tribal members located on Indian lands or acquired, constructed, or improved (in whole or in part) with Federal funds.

(Pub. L. 95–91, title II, §217, as added Pub. L. 109–58, title V, §502(a), Aug. 8, 2005, 119 Stat. 763.)

#### Editorial Notes

##### REFERENCES IN TEXT

This chapter, referred to in subsec. (b), was in the original ''this Act'', meaning Pub. L. 95–91, Aug. 4, 1977, 91 Stat. 565, as amended, known as the Department of Energy Organization Act, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 7101 of this title and Tables.

### SUBCHAPTER III—TRANSFERS OF FUNCTIONS

## § 7151. General transfers

    (a) Except as otherwise provided in this chapter, there are transferred to, and vested in, the Secretary all of the functions vested by law in the Administrator of the Federal Energy Administration or the Federal Energy Administration, the Administrator of the Energy Research and Development Administration or the Energy Research and Development Administration; and

the functions vested by law in the officers and components of either such Administration.

    (b) Except as provided in subchapter IV, there are transferred to, and vested in, the Secretary the function of the Federal Power Commission, or of the members, officers, or components thereof. The Secretary may exercise any power described in section 7172(a)(2) of this title to the extent the Secretary determines such power to be necessary to the exercise of any function within his jurisdiction pursuant to the preceding sentence.

(Pub. L. 95–91, title III, §301, Aug. 4, 1977, 91 Stat. 577.)

#### Editorial Notes

##### REFERENCES IN TEXT

This chapter, referred to in subsec. (a), was in the original ''this Act'', meaning Pub. L. 95–91, Aug. 4, 1977, 91 Stat. 565, as amended, known as the Department of Energy Organization Act, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 7101 of this title and Tables.

#### Executive Documents

##### EMERGENCY PREPAREDNESS FUNCTIONS

For assignment of certain emergency preparedness functions to the Secretary of Energy, see Parts 1, 2, and 7 of Ex. Ord. No. 12656, Nov. 18, 1988, 53 F.R. 47491, set out as a note under section 5195 of this title.

##### EX. ORD. NO. 12038. TRANSFER OF CERTAIN FUNCTIONS TO SECRETARY OF ENERGY

Ex. Ord. No. 12038, Feb. 3, 1978, 43 F.R. 4957, as amended by Ex. Ord. No. 12156, Sept. 10, 1979, 44 F.R. 53073, provided:

By virtue of the authority vested in me as President of the United States of America, in order to reflect the responsibilities of the Secretary of Energy for the performance of certain functions previously vested in other officers of the United States by direction of the President and subsequently transferred to the Secretary of Energy pursuant to the Department of Energy Organization Act (91 Stat. 565; 42 U.S.C. 7101 et seq.) it is hereby ordered as follows:

SECTION 1. *Functions of the Federal Energy Administration.* In accordance with the transfer of all functions vested by law in the Federal Energy Administration, or the Administrator thereof, to the Secretary of Energy pursuant to Section 301(a) of the Department of Energy Organization Act [subsec. (a) of this section], hereinafter referred to as the Act, the Executive Orders and Proclamations referred to in this Section, which conferred authority or responsibility upon the Administrator of the Federal Energy Administration, are amended as follows:

(a) Executive Order No. 11647, as amended [formerly set out as a note under 31 U.S.C. 501], relating to Federal Regional Councils, is further amended by deleting ''The Federal Energy Administration'' in Section 1(a)(10) and substituting ''The Department of Energy'', and by deleting ''The Deputy Administrator of the Federal Energy Administration'' in Section 3(a)(10) and substituting ''The Deputy Secretary of Energy''.

(b) Executive Order No. 11790 of June 25, 1974 [set out as a note under 15 U.S.C. 761], relating to the Federal Energy Administration Act of 1974, is amended by deleting ''Administrator of the Federal Energy Administration'' and ''Administrator'' wherever they appear in Sections 1 through 6 and substituting ''Secretary of Energy'' and ''Secretary'', respectively, and by deleting Section 7 through 10.

(c) Executive Order No. 11912, as amended [set out as a note under 42 U.S.C. 6201], relating to energy policy

and conservation, and Proclamation No. 3279, as amended [formerly set out as a note under 19 U.S.C. 1862], relating to imports of petroleum and petroleum products, are further amended by deleting "Administrator of the Federal Energy Administration", "Federal Energy Administration", and "Administrator" (when used in reference to the Federal Energy Administration) wherever those terms appear and by substituting "Secretary of Energy", "Department of Energy", and "Secretary", respectively, and by deleting "the Administrator of Energy Research and Development" in Section 10(a)(1) of Executive Order No. 11912, as amended.

SEC. 2. *Functions of the Federal Power Commission.* In accordance with the transfer of functions vested in the Federal Power Commission to the Secretary of Energy pursuant to Section 301(b) of the Act [subsec. (b) of this section], the Executive Orders referred to in this Section, which conferred authority or responsibility upon the Federal Power Commission, or Chairman thereof, are amended or modified as follows:

(a) Executive Order No. 10485 of September 3, 1953, [set out as a note under 15 U.S.C. 717b], relating to certain facilities at the borders of the United States is amended by deleting Section 2 thereof, and by deleting "Federal Power Commission" and "Commission" wherever those terms appear in Sections 1, 3 and 4 of such Order and substituting for each "Secretary of Energy".

(b) Executive Order No. 11969 of February 2, 1977 [formerly set out as a note under 15 U.S.C. 717], relating to the administration of the Emergency Natural Gas Act of 1977 [formerly set out as a note under 15 U.S.C. 717], is hereby amended by deleting the second sentence in Section 1, by deleting "the Secretary of the Interior, the Administrator of the Federal Energy Administration, other members of the Federal Power Commission" and in Section 2, and by deleting "Chairman of the Federal Power Commission" and "Chairman" wherever those terms appear and substituting therefor "Secretary of Energy" and "Secretary", respectively.

(c) Paragraph (2) of Section 3 of Executive Order No. 11331, as amended [formerly set out as a note under 42 U.S.C. 1962b], relating to the Pacific Northwest River Basins Commission, is hereby amended by deleting "from each of the following Federal departments and agencies" and substituting therefor "to be appointed by the head of each of the following Executive agencies", by deleting "Federal Power Commission" and substituting therefor "Department of Energy", and by deleting "such member to be appointed by the head of each department or independent agency he represents,".

SEC. 3. *Functions of the Secretary of the Interior.* In accordance with the transfer of certain functions vested in the Secretary of the Interior to the Secretary of Energy pursuant to Section 302 of the Act [42 U.S.C. 7152], the Executive Orders referred to in this Section, which conferred authority or responsibility on the Secretary of the Interior, are amended or modified as follows:

(a) Sections 1 and 4 of Executive Order No. 8526 of August 27, 1940, relating to functions of the Bonneville Power Administration, are hereby amended by substituting "Secretary of Energy" for "Secretary of the Interior", by adding "of the Interior" after "Secretary" in Sections 2 and 3, and by adding "and the Secretary of Energy," after "the Secretary of the Interior" wherever the latter term appears in Section 5.

(b) Executive Order No. 11177 of September 16, 1964, relating to the Columbia River Treaty, is amended by deleting "Secretary of the Interior" and "Department of the Interior" wherever those terms appear and substituting therefor "Secretary of Energy" and "Department of Energy", respectively.

SEC. 4. *Functions of the Atomic Energy Commission and the Energy Research and Development Administration.*

(a) In accordance with the transfer of all functions vested by law in the Administrator of Energy Research and Development to the Secretary of Energy pursuant to Section 301(a) of the Act [subsec. (a) of this section] the Executive Orders referred to in this Section are amended or modified as follows:

(1) All current Executive Orders which refer to functions of the Atomic Energy Commission, including Executive Order No. 10127, as amended; Executive Order No. 10865, as amended [set out as a note under 50 U.S.C. 3161]; Executive Order No. 10899 of December 9, 1960 [set out as a note under 42 U.S.C. 2162]; Executive Order No. 11057 of December 18, 1962 [set out as a note under 42 U.S.C. 2162]; Executive Order No. 11477 of August 7, 1969 [set out as a note under 42 U.S.C. 2187]; Executive Order No. 11752 of December 17, 1973 [formerly set out as a note under 42 U.S.C. 4331]; and Executive Order No. 11761 of January 17, 1974 [formerly set out as a note under 20 U.S.C. 1221]; are modified to provide that all such functions shall be exercised by (1) the Secretary of Energy to the extent consistent with the functions of the Atomic Energy Commission that were transferred to the Administrator of Energy Research and Development pursuant to the Energy Organization Act of 1974 (Public Law 93–438; 88 Stat. 1233) [42 U.S.C. 5801 et seq.], and (2) the Nuclear Regulatory Commission to the extent consistent with the functions of the Atomic Energy Commission that were transferred to the Commission by the Energy Reorganization Act of 1974 [42 U.S.C. 5801 et seq.].

(2) [Former] Executive Order No. 11652, as amended, relating to the classification of national security matters, is further amended by substituting "Department of Energy" for "Energy Research and Development Administration" in Sections 2(A), 7(A) and 8 and by deleting "Federal Power Commission" in Section 2(B)(3).

(3) Executive Order No. 11902 of February 2, 1976 [formerly set out as a note under 42 U.S.C. 5841], relating to export licensing policy for nuclear materials and equipment, is amended by substituting "the Secretary of Energy" for "the Administrator of the United States Energy Research and Development Administration, hereinafter referred to as the Administrator" in Section 1(b) and for the "Administrator" in Sections 2 and 3.

(4) [Former] Executive Order No. 11905, as amended, relating to foreign intelligence activities, is further amended by deleting "Energy Research and Development Administration", "Administrator or the Energy Research and Development Administration", and "ERDA" wherever those terms appear and substituting "Department of Energy", "Secretary of Energy", and "DOE" respectively.

(5) Section 3(2) of each of the following Executive Orders is amended by substituting "Department of Energy" for "Energy Research and Development Administration":

(i) Executive Order No. 11345, as amended [formerly set out as a note under 42 U.S.C. 1962b], establishing the Great Lakes River Basin Commission.

(ii) Executive Order No. 11371, as amended [formerly set out as a note under 42 U.S.C. 1962b], establishing the New England River Basin Commission.

(iii) Executive Order No. 11578, as amended [formerly set out as a note under 42 U.S.C. 1962b], establishing the Ohio River Basin Commission.

(iv) Executive Order No. 11658, as amended [formerly set out as a note under 42 U.S.C. 1962b], establishing the Missouri River Basin Commission.

(v) Executive Order No. 11659, as amended [formerly set out as a note under 42 U.S.C. 1962b], establishing the Mississippi River Basin Commission.

SEC. 5. *Special Provisions Relating to Emergency Preparedness and Mobilization Functions.*

(a) Executive Order No. 10480, as amended [formerly set out as a note under former 50 U.S.C. App. 2153], is further amended by adding thereto the following new Sections:

"Sec. 609. Effective October 1, 1977, the Secretary of Energy shall exercise all authority and discharge all responsibility herein delegated to or conferred upon (a) the Atomic Energy Commission, and (b) with respect to petroleum, gas, solid fuels and electric power, upon the Secretary of the Interior.

"Sec. 610. Whenever the Administrator of General Services believes that the functions of an Executive

agency have been modified pursuant to law in such manner as to require the amendment of any Executive order which relates to the assignment of emergency preparedness functions or the administration of mobilization programs, he shall promptly submit any proposals for the amendment of such Executive orders to the Director of the Office of Management and Budget in accordance with the provisions of Executive Order No. 11030, as amended [set out as a note under 44 U.S.C. 1505].

(b) Executive Order No. 11490, as amended [formerly set out as a note under 50 U.S.C. App. 2251], is further amended by adding thereto the following new section:

"Sec. 3016. Effective October 1, 1977, the Secretary of Energy shall exercise all authority and discharge all responsibility herein delegated to or conferred upon (a) the Federal Power Commission, (b) the Energy Research and Development Administration, and (c) with respect to electric power, petroleum, gas and solid fuels, upon the Department of the Interior.".

Sec. 6. This Order shall be effective as of October 1, 1977, the effective date of the Department of Energy Organization Act [this chapter] pursuant to the provisions of section 901 [42 U.S.C. 7341] thereof and Executive Order No. 12009 of September 13, 1977 [formerly set out as a note under 42 U.S.C. 7341], and all actions taken by the Secretary of Energy on or after October 1, 1977, which are consistent with the foregoing provisions are entitled to full force and effect.

JIMMY CARTER.

### § 7151a. Jurisdiction over matters transferred from Energy Research and Development Administration

Notwithstanding any other provision of law, jurisdiction over matters transferred to the Department of Energy from the Energy Research and Development Administration which on the effective date of such transfer were required by law, regulation, or administrative order to be made on the record after an opportunity for an agency hearing may be assigned to the Federal Energy Regulatory Commission or retained by the Secretary at his discretion.

(Pub. L. 95–238, title I, §104(a), Feb. 25, 1978, 92 Stat. 53.)

#### Editorial Notes

##### CODIFICATION

Section was enacted as part of the Department of Energy Act of 1978—Civilian Applications, and not as part of the Department of Energy Organization Act which comprises this chapter.

### § 7152. Transfers from Department of the Interior

#### (a) Functions relating to electric power

(1) There are transferred to, and vested in, the Secretary all functions of the Secretary of the Interior under section 825s of title 16, and all other functions of the Secretary of the Interior, and officers and components of the Department of the Interior, with respect to—

(A) the Southeastern Power Administration;

(B) the Southwestern Power Administration;

(C) the Bonneville Power Administration including but not limited to the authority contained in the Bonneville Project Act of 1937 [16 U.S.C. 832 et seq.] and the Federal Columbia River Transmission System Act [16 U.S.C. 838 et seq.];

(D) the power marketing functions of the Bureau of Reclamation, including the construction, operation, and maintenance of transmission lines and attendant facilities; and

(E) the transmission and disposition of the electric power and energy generated at Falcon Dam and Amistad Dam, international storage reservoir projects on the Rio Grande, pursuant to the Act of June 18, 1954, as amended by the Act of December 23, 1963.

(2) The Southeastern Power Administration, the Southwestern Power Administration, and the Bonneville Power Administration,[1] shall be preserved as separate and distinct organizational entities within the Department. Each such entity shall be headed by an Administrator appointed by the Secretary. The functions transferred to the Secretary in paragraphs (1)(A), (1)(B), (1)(C), and (1)(D) shall be exercised by the Secretary, acting by and through such Administrators. Each such Administrator shall maintain his principal office at a place located in the region served by his respective Federal power marketing entity.

(3) The functions transferred in paragraphs (1)(E) and (1)(F)[2] of this subsection shall be exercised by the Secretary, acting by and through a separate and distinct Administration within the Department which shall be headed by an Administrator appointed by the Secretary. The Administrator shall establish and shall maintain such regional offices as necessary to facilitate the performance of such functions. Neither the transfer of functions effected by paragraph (1)(E) of this subsection nor any changes in cost allocation or project evaluation standards shall be deemed to authorize the reallocation of joint costs of multipurpose facilities theretofore allocated unless and to the extent that such change is hereafter approved by Congress.

#### (b), (c) Repealed. Pub. L. 97–100, title II, §201, Dec. 23, 1981, 95 Stat. 1407

#### (d) Functions of Bureau of Mines

There are transferred to, and vested in, the Secretary those functions of the Secretary of the Interior, the Department of the Interior, and officers and components of that Department under the Act of May 15, 1910, and other authorities, exercised by the Bureau of Mines, but limited to—

(1) fuel supply and demand analysis and data gathering;

(2) research and development relating to increased efficiency of production technology of solid fuel minerals, other than research relating to mine health and safety and research relating to the environmental and leasing consequences of solid fuel mining (which shall remain in the Department of the Interior); and

(3) coal preparation and analysis.

(Pub. L. 95–91, title III, §302, Aug. 4, 1977, 91 Stat. 578; Pub. L. 97–100, title II, §201, Dec. 23, 1981, 95 Stat. 1407; Pub. L. 104–58, title I, §104(h), Nov. 28, 1995, 109 Stat. 560.)

---

[1] So in original. The comma probably should not appear.

[2] See References in Text note below.

Pub. L. 112–74, div. B, title III, Dec. 23, 2011, 125 Stat. 875.

Pub. L. 111–85, title III, Oct. 28, 2009, 123 Stat. 2871.

Pub. L. 111–8, div. C, title III, Mar. 11, 2009, 123 Stat. 625.

Pub. L. 110–161, div. C, title III, Dec. 26, 2007, 121 Stat. 1966.

Pub. L. 109–103, title III, Nov. 19, 2005, 119 Stat. 2277.

Pub. L. 108–447, div. C, title III, Dec. 8, 2004, 118 Stat. 2957.

Pub. L. 108–137, title III, Dec. 1, 2003, 117 Stat. 1859.

Pub. L. 108–7, div. D, title III, Feb. 20, 2003, 117 Stat. 153.

Pub. L. 107–66, title III, Nov. 12, 2001, 115 Stat. 508.

Pub. L. 106–377, §1(a)(2) [title III], Oct. 27, 2000, 114 Stat. 1441, 1441A–78.

Pub. L. 106–60, title III, Sept. 29, 1999, 113 Stat. 494.

Pub. L. 105–245, title III, Oct. 7, 1998, 112 Stat. 1851.

Pub. L. 105–62, title III, Oct. 13, 1997, 111 Stat. 1334.

Pub. L. 104–206, title III, Sept. 30, 1996, 110 Stat. 2998.

Pub. L. 104–46, title III, Nov. 13, 1995, 109 Stat. 416.

Pub. L. 103–316, title III, Aug. 26, 1994, 108 Stat. 1719.

Pub. L. 103–126, title III, Oct. 28, 1993, 107 Stat. 1330.

Pub. L. 102–377, title III, Oct. 2, 1992, 106 Stat. 1338.

Pub. L. 102–104, title III, Aug. 17, 1991, 105 Stat. 531.

Pub. L. 101–514, title III, Nov. 5, 1990, 104 Stat. 2093.

Pub. L. 101–101, title III, Sept. 29, 1989, 103 Stat. 661.

Pub. L. 100–371, title III, July 19, 1988, 102 Stat. 870.

Pub. L. 100–202, §101(d) [title III], Dec. 22, 1987, 101 Stat. 1329–104, 1329–124.

## § 7172. Jurisdiction of Commission

### (a) Transfer of functions from Federal Power Commission

(1) There are transferred to, and vested in, the Commission the following functions of the Federal Power Commission or of any member of the Commission or any officer or component of the Commission:

   (A) the investigation, issuance, transfer, renewal, revocation, and enforcement of licenses and permits for the construction, operation, and maintenance of dams, water conduits, reservoirs, powerhouses, transmission lines, or other works for the development and improvement of navigation and for the development and utilization of power across, along, from, or in navigable waters under part I of the Federal Power Act [16 U.S.C. 791a et seq.];

   (B) the establishment, review, and enforcement of rates and charges for the transmission or sale of electric energy, including determinations on construction work in progress, under part II of the Federal Power Act [16 U.S.C. 824 et seq.], and the interconnection, under section 202(b), of such Act [16 U.S.C. 824a(b)], of facilities for the generation, transmission, and sale of electric energy (other than emergency interconnection);

   (C) the establishment, review, and enforcement of rates and charges for the transportation and sale of natural gas by a producer or gatherer or by a natural gas pipeline or natural gas company under sections 1, 4, 5, and 6 of the Natural Gas Act [15 U.S.C. 717, 717c to 717e];

   (D) the issuance of a certificate of public convenience and necessity, including abandonment of facilities or services, and the establishment of physical connections under section 7 of the Natural Gas Act [15 U.S.C. 717f];

   (E) the establishment, review, and enforcement of curtailments, other than the establishment and review of priorities for such curtailments, under the Natural Gas Act [15 U.S.C. 717 et seq.]; and

   (F) the regulation of mergers and securities acquisition under the Federal Power Act [16 U.S.C. 791a et seq.] and Natural Gas Act [15 U.S.C. 717 et seq.].

(2) The Commission may exercise any power under the following sections to the extent the Commission determines such power to be necessary to the exercise of any function within the jurisdiction of the Commission:

   (A) sections 4, 301, 302, 306 through 309, and 312 through 316 of the Federal Power Act [16 U.S.C. 797, 825, 825a, 825e to 825h, 825k to 825o]; and

   (B) sections 8, 9, 13 through 17, 20, and 21 of the Natural Gas Act [15 U.S.C. 717g, 717h, 717l to 717p, 717s, 717t].

### (b) Repealed. Pub. L. 103–272, § 7(b), July 5, 1994, 108 Stat. 1379

### (c) Consideration of proposals made by Secretary to amend regulations issued under section 753 of title 15; exception

(1) Pursuant to the procedures specified in section 7174 of this title and except as provided in paragraph (2), the Commission shall have jurisdiction to consider any proposal by the Secretary to amend the regulation required to be issued under section 753(a)[1] of title 15 which is required by section 757 or 760a[1] of title 15 to be transmitted by the President to, and reviewed by, each House of Congress, under section 6421 of this title.

(2) In the event that the President determines that an emergency situation of overriding national importance exists and requires the expeditious promulgation of a rule described in paragraph (1), the President may direct the Secretary to assume sole jurisdiction over the promulgation of such rule, and such rule shall be transmitted by the President to, and reviewed by, each House of Congress under section 757 or 760a[1] of title 15, and section 6421 of this title.

### (d) Matters involving agency determinations to be made on record after agency hearing

The Commission shall have jurisdiction to hear and determine any other matter arising under any other function of the Secretary—

   (1) involving any agency determination required by law to be made on the record after an opportunity for an agency hearing; or

   (2) involving any other agency determination which the Secretary determines shall be made on the record after an opportunity for an agency hearing,

except that nothing in this subsection shall require that functions under sections 6213 and 6214[1] of this title shall be within the jurisdiction of the Commission unless the Secretary assigns such a function to the Commission.

### (e) Matters assigned by Secretary after public notice and matters referred under section 7174 of this title

In addition to the other provisions of this section, the Commission shall have jurisdiction

---

[1] See References in Text note below.

over any other matter which the Secretary may assign to the Commission after public notice, or which are required to be referred to the Commission pursuant to section 7174 of this title.

**(f) Limitation**

No function described in this section which regulates the exports or imports of natural gas or electricity shall be within the jurisdiction of the Commission unless the Secretary assigns such a function to the Commission.

**(g) Final agency action**

The decision of the Commission involving any function within its jurisdiction, other than action by it on a matter referred to it pursuant to section 7174 of this title, shall be final agency action within the meaning of section 704 of title 5 and shall not be subject to further review by the Secretary or any officer or employee of the Department.

**(h) Rules, regulations, and statements of policy**

The Commission is authorized to prescribe rules, regulations, and statements of policy of general applicability with respect to any function under the jurisdiction of the Commission pursuant to this section.

(Pub. L. 95–91, title IV, § 402, Aug. 4, 1977, 91 Stat. 583; Pub. L. 103–272, § 7(b), July 5, 1994, 108 Stat. 1379.)

### Editorial Notes

#### REFERENCES IN TEXT

The Federal Power Act, referred to in subsec. (a)(1)(A), (B), and (F), is act June 10, 1920, ch. 285, 41 Stat. 1063, as amended, which is classified generally to chapter 12 (§ 791a et seq.) of Title 16, Conservation. Parts I and II of the Federal Power Act are classified generally to subchapters I (§ 791a et seq.) and II (§ 824 et seq.), respectively, of chapter 12 of Title 16. For complete classification of this Act to the Code, see section 791a of Title 16 and Tables.

The Natural Gas Act, referred to in subsec. (a)(1)(E), (F), is act June 21, 1938, ch. 556, 52 Stat. 821, as amended, which is classified generally to chapter 15B (§ 717 et seq.) of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see section 717w of Title 15 and Tables.

Sections 753, 757, and 760a of title 15, referred to in subsec. (c), were omitted from the Code pursuant to section 760g of Title 15, which provided for the expiration of the President's authority under those sections on Sept. 30, 1981.

Section 6214 of this title, referred to in subsec. (d), was repealed by Pub. L. 106–469, title I, § 103(3), Nov. 9, 2000, 114 Stat. 2029.

#### AMENDMENTS

1994—Subsec. (b). Pub. L. 103–272 struck out subsec. (b) which read as follows: "There are transferred to, and vested in, the Commission all functions and authority of the Interstate Commerce Commission or any officer or component of such Commission where the regulatory function establishes rates or charges for the transportation of oil by pipeline or establishes the valuation of any such pipeline." See section 60502 of Title 49, Transportation.

### Statutory Notes and Related Subsidiaries

#### OIL PIPELINE REGULATORY REFORM

Pub. L. 102–486, title XVIII, Oct. 24, 1992, 106 Stat. 3010, provided that:

"SEC. 1801. OIL PIPELINE RATEMAKING METHODOLOGY.

"(a) ESTABLISHMENT.—Not later than 1 year after the date of the enactment of this Act [Oct. 24, 1992], the Federal Energy Regulatory Commission shall issue a final rule which establishes a simplified and generally applicable ratemaking methodology for oil pipelines in accordance with section 1(5) of part I of the Interstate Commerce Act [former 49 U.S.C. 1(5)].

"(b) EFFECTIVE DATE.—The final rule to be issued under subsection (a) may not take effect before the 365th day following the date of the issuance of the rule.

"SEC. 1802. STREAMLINING OF COMMISSION PROCEDURES.

"(a) RULEMAKING.—Not later than 18 months after the date of the enactment of this Act [Oct. 24, 1992], the Commission shall issue a final rule to streamline procedures of the Commission relating to oil pipeline rates in order to avoid unnecessary regulatory costs and delays.

"(b) SCOPE OF RULEMAKING.—Issues to be considered in the rulemaking proceeding to be conducted under subsection (a) shall include the following:

"(1) Identification of information to be filed with an oil pipeline tariff and the availability to the public of any analysis of such tariff filing performed by the Commission or its staff.

"(2) Qualification for standing (including definitions of economic interest) of parties who protest oil pipeline tariff filings or file complaints thereto.

"(3) The level of specificity required for a protest or complaint and guidelines for Commission action on the portion of the tariff or rate filing subject to protest or complaint.

"(4) An opportunity for the oil pipeline to file a response for the record to an initial protest or complaint.

"(5) Identification of specific circumstances under which Commission staff may initiate a protest.

"(c) ADDITIONAL PROCEDURAL CHANGES.—In conducting the rulemaking proceeding to carry out subsection (a), the Commission shall identify and transmit to Congress any other procedural changes relating to oil pipeline rates which the Commission determines are necessary to avoid unnecessary regulatory costs and delays and for which additional legislative authority may be necessary.

"(d) WITHDRAWAL OF TARIFFS AND COMPLAINTS.—

"(1) WITHDRAWAL OF TARIFFS.—If an oil pipeline tariff which is filed under part I of the Interstate Commerce Act [former 49 U.S.C. 1 et seq.] and which is subject to investigation is withdrawn—

"(A) any proceeding with respect to such tariff shall be terminated;

"(B) the previous tariff rate shall be reinstated; and

"(C) any amounts collected under the withdrawn tariff rate which are in excess of the previous tariff rate shall be refunded.

"(2) WITHDRAWAL OF COMPLAINTS.—If a complaint which is filed under section 13 of the Interstate Commerce Act [former 49 U.S.C. 13] with respect to an oil pipeline tariff is withdrawn, any proceeding with respect to such complaint shall be terminated.

"(e) ALTERNATIVE DISPUTE RESOLUTION.—To the maximum extent practicable, the Commission shall establish appropriate alternative dispute resolution procedures, including required negotiations and voluntary arbitration, early in an oil pipeline rate proceeding as a method preferable to adjudication in resolving disputes relating to the rate. Any proposed rates derived from implementation of such procedures shall be considered by the Commission on an expedited basis for approval.

"SEC. 1803. PROTECTION OF CERTAIN EXISTING RATES.

"(a) RATES DEEMED JUST AND REASONABLE.—Except as provided in subsection (b)—

''(1) any rate in effect for the 365-day period ending on the date of the enactment of this Act [Oct. 24, 1992] shall be deemed to be just and reasonable (within the meaning of section 1(5) of the Interstate Commerce Act [former 49 U.S.C. 1(5)]); and

''(2) any rate in effect on the 365th day preceding the date of such enactment shall be deemed to be just and reasonable (within the meaning of such section 1(5)) regardless of whether or not, with respect to such rate, a new rate has been filed with the Commission during such 365-day period;

if the rate in effect, as described in paragraph (1) or (2), has not been subject to protest, investigation, or complaint during such 365-day period.

''(b) CHANGED CIRCUMSTANCES.—No person may file a complaint under section 13 of the Interstate Commerce Act [former 49 U.S.C. 13] against a rate deemed to be just and reasonable under subsection (a) unless—

''(1) evidence is presented to the Commission which establishes that a substantial change has occurred after the date of the enactment of this Act [Oct. 24, 1992]—

''(A) in the economic circumstances of the oil pipeline which were a basis for the rate; or

''(B) in the nature of the services provided which were a basis for the rate; or

''(2) the person filing the complaint was under a contractual prohibition against the filing of a complaint which was in effect on the date of enactment of this Act and had been in effect prior to January 1, 1991, provided that a complaint by a party bound by such prohibition is brought within 30 days after the expiration of such prohibition.

If the Commission determines pursuant to a proceeding instituted as a result of a complaint under subsection (b) of the Interstate Commerce Act that the rate is not just and reasonable, the rate shall not be deemed to be just and reasonable. Any tariff reduction or refunds that may result as an outcome of such a complaint shall be prospective from the date of the filing of the complaint.

''(c) LIMITATION REGARDING UNDULY DISCRIMINATORY OR PREFERENTIAL TARIFFS.—Nothing in this section shall prohibit any aggrieved person from filing a complaint under section 13 or section 15(1) of the Interstate Commerce Act [former 49 U.S.C. 13, 15(1)] challenging any tariff provision as unduly discriminatory or unduly preferential.

''SEC. 1804. DEFINITIONS.

''For the purposes of this title, the following definitions apply:

''(1) COMMISSION.—The term 'Commission' means the Federal Energy Regulatory Commission and, unless the context requires otherwise, includes the Oil Pipeline Board and any other office or component of the Commission to which the functions and authority vested in the Commission under section 402(b) of the Department of Energy Organization Act (42 U.S.C. 7172(b)) are delegated.

''(2) OIL PIPELINE.—

''(A) IN GENERAL.—Except as provided in subparagraph (B), the term 'oil pipeline' means any common carrier (within the meaning of the Interstate Commerce Act [former 49 U.S.C. 1 et seq.]) which transports oil by pipeline subject to the functions and authority vested in the Commission under section 402(b) of the Department of Energy Organization Act (42 U.S.C. 7172(b)).

''(B) EXCEPTION.—The term 'oil pipeline' does not include the Trans-Alaska Pipeline authorized by the Trans-Alaska Pipeline Authorization Act (43 U.S.C. 1651 et seq.) or any pipeline delivering oil directly or indirectly to the Trans-Alaska Pipeline.

''(3) OIL.—The term 'oil' has the same meaning as is given such term for purposes of the transfer of functions from the Interstate Commerce Commission to the Federal Energy Regulatory Commission under section 402(b) of the Department of Energy Organization Act (42 U.S.C. 7172(b)).

''(4) RATE.—The term 'rate' means all charges that an oil pipeline requires shippers to pay for transportation services.''

## § 7173. Initiation of rulemaking procedures before Commission

### (a) Proposal of rules, regulations, and statements of policy of general applicability by Secretary and Commission

The Secretary and the Commission are authorized to propose rules, regulations, and statements of policy of general applicability with respect to any function within the jurisdiction of the Commission under section 7172 of this title.

### (b) Consideration and final action on proposals of Secretary

The Commission shall have exclusive jurisdiction with respect to any proposal made under subsection (a), and shall consider and take final action on any proposal made by the Secretary under such subsection in an expeditious manner in accordance with such reasonable time limits as may be set by the Secretary for the completion of action by the Commission on any such proposal.

### (c) Utilization of rulemaking procedures for establishment of rates and charges under Federal Power Act and Natural Gas Act

Any function described in section 7172 of this title which relates to the establishment of rates and charges under the Federal Power Act [16 U.S.C. 791a et seq.] or the Natural Gas Act [15 U.S.C. 717 et seq.], may be conducted by rulemaking procedures. Except as provided in subsection (d), the procedures in such a rulemaking proceeding shall assure full consideration of the issues and an opportunity for interested persons to present their views.

### (d) Submission of written questions by interested persons

With respect to any rule or regulation promulgated by the Commission to establish rates and charges for the first sale of natural gas by a producer or gatherer to a natural gas pipeline under the Natural Gas Act [15 U.S.C. 717 et seq.], the Commission may afford any interested person a reasonable opportunity to submit written questions with respect to disputed issues of fact to other interested persons participating in the rulemaking proceedings. The Commission may establish a reasonable time for both the submission of questions and responses thereto.

(Pub. L. 95–91, title IV, § 403, Aug. 4, 1977, 91 Stat. 585.)

### Editorial Notes

#### REFERENCES IN TEXT

The Federal Power Act, referred to in subsec. (c), is act June 10, 1920, ch. 285, 41 Stat. 1063, as amended, which is classified generally to chapter 12 (§ 791a et seq.) of Title 16, Conservation. For complete classification of this Act to the Code, see section 791a of Title 16 and Tables.

The Natural Gas Act, referred to in subsecs. (c) and (d), is act June 21, 1938, ch. 556, 52 Stat. 821, as amended, which is classified generally to chapter 15B (§ 717 et seq.) of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see section 717w of Title 15 and Tables.

## § 715m. Cooperation between Secretary of the Interior and Federal and State authorities

The Secretary of the Interior, in carrying out the Act of February 22, 1935, as amended (15 U.S.C., ch. 15A), is authorized to cooperate with Federal and State authorities.

(June 25, 1946, ch. 472, § 3, 60 Stat. 307.)

### Editorial Notes

#### REFERENCES IN TEXT

Act of February 22, 1935, referred to in text, is act Feb. 22, 1935, ch. 18, 49 Stat. 30, popularly known as the "Hot Oil Act" and also as the "Connally Hot Oil Act", which is classified generally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 715 of this title and Tables.

#### CODIFICATION

Section was not enacted as a part of act Feb. 22, 1935, which comprises this chapter.

### Executive Documents

#### DELEGATION OF FUNCTIONS

Delegation of President's authority to Secretary of the Interior, see note set out under section 715j of this title.

## CHAPTER 15B—NATURAL GAS

Sec.
717.    Regulation of natural gas companies.
717a.    Definitions.
717b.    Exportation or importation of natural gas; LNG terminals.
717b–1.    State and local safety considerations.
717c.    Rates and charges.
717c–1.    Prohibition on market manipulation.
717d.    Fixing rates and charges; determination of cost of production or transportation.
717e.    Ascertainment of cost of property.
717f.    Construction, extension, or abandonment of facilities.
717g.    Accounts; records; memoranda.
717h.    Rates of depreciation.
717i.    Periodic and special reports.
717j.    State compacts for conservation, transportation, etc., of natural gas.
717k.    Officials dealing in securities.
717l.    Complaints.
717m.    Investigations by Commission.
717n.    Process coordination; hearings; rules of procedure.
717o.    Administrative powers of Commission; rules, regulations, and orders.
717p.    Joint boards.
717q.    Appointment of officers and employees.
717r.    Rehearing and review.
717s.    Enforcement of chapter.
717t.    General penalties.
717t–1.    Civil penalty authority.
717t–2.    Natural gas market transparency rules.
717u.    Jurisdiction of offenses; enforcement of liabilities and duties.
717v.    Separability.
717w.    Short title.
717x.    Conserved natural gas.
717y.    Voluntary conversion of natural gas users to heavy fuel oil.
717z.    Emergency conversion of utilities and other facilities.

## § 717. Regulation of natural gas companies

### (a) Necessity of regulation in public interest

As disclosed in reports of the Federal Trade Commission made pursuant to S. Res. 83 (Seventieth Congress, first session) and other reports made pursuant to the authority of Congress, it is declared that the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and that Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest.

### (b) Transactions to which provisions of chapter applicable

The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, and to the importation or exportation of natural gas in foreign commerce and to persons engaged in such importation or exportation, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.

### (c) Intrastate transactions exempt from provisions of chapter; certification from State commission as conclusive evidence

The provisions of this chapter shall not apply to any person engaged in or legally authorized to engage in the transportation in interstate commerce or the sale in interstate commerce for resale, of natural gas received by such person from another person within or at the boundary of a State if all the natural gas so received is ultimately consumed within such State, or to any facilities used by such person for such transportation or sale, provided that the rates and service of such person and facilities be subject to regulation by a State commission. The matters exempted from the provisions of this chapter by this subsection are declared to be matters primarily of local concern and subject to regulation by the several States. A certification from such State commission to the Federal Power Commission that such State commission has regulatory jurisdiction over rates and service of such person and facilities and is exercising such jurisdiction shall constitute conclusive evidence of such regulatory power or jurisdiction.

### (d) Vehicular natural gas jurisdiction

The provisions of this chapter shall not apply to any person solely by reason of, or with respect to, any sale or transportation of vehicular natural gas if such person is—

(1) not otherwise a natural-gas company; or
(2) subject primarily to regulation by a State commission, whether or not such State commission has, or is exercising, jurisdiction over the sale, sale for resale, or transportation of vehicular natural gas.

(June 21, 1938, ch. 556, § 1, 52 Stat. 821; Mar. 27, 1954, ch. 115, 68 Stat. 36; Pub. L. 102–486, title IV, § 404(a)(1), Oct. 24, 1992, 106 Stat. 2879; Pub. L. 109–58, title III, § 311(a), Aug. 8, 2005, 119 Stat. 685.)

### Editorial Notes

#### AMENDMENTS

2005—Subsec. (b). Pub. L. 109–58 inserted "and to the importation or exportation of natural gas in foreign commerce and to persons engaged in such importation or exportation," after "such transportation or sale,".

1992—Subsec. (d). Pub. L. 102–486 added subsec. (d).

1954—Subsec. (c). Act Mar. 27, 1954, added subsec. (c).

### Statutory Notes and Related Subsidiaries

#### TERMINATION OF FEDERAL POWER COMMISSION; TRANSFER OF FUNCTIONS

The Federal Power Commission was terminated, and its functions, personnel, property, funds, etc., were transferred to Secretary of Energy (except for certain functions which were transferred to the Federal Energy Regulatory Commission) by sections 7151(b), 7171(a), 7172(a), 7291, and 7293 of Title 42, The Public Health and Welfare.

#### STATE LAWS AND REGULATIONS

Pub. L. 102–486, title IV, § 404(b), Oct. 24, 1992, 106 Stat. 2879, provided that: "The transportation or sale of natural gas by any person who is not otherwise a public utility, within the meaning of State law—

"(1) in closed containers; or

"(2) otherwise to any person for use by such person as a fuel in a self-propelled vehicle,

shall not be considered to be a transportation or sale of natural gas within the meaning of any State law, regulation, or order in effect before January 1, 1989. This subsection shall not apply to any provision of any State law, regulation, or order to the extent that such provision has as its primary purpose the protection of public safety."

#### EMERGENCY NATURAL GAS ACT OF 1977

Pub. L. 95–2, Feb. 2, 1977, 91 Stat. 4, authorized President to declare a natural gas emergency and to require emergency deliveries and transportation of natural gas until the earlier of Apr. 30, 1977, or termination of emergency by President and provided for antitrust protection, emergency purchases, adjustment in charges for local distribution companies, relationship to Natural Gas Act, effect of certain contractual obligations, administrative procedure and judicial review, enforcement, reporting to Congress, delegation of authorities, and preemption of inconsistent State or local action.

### Executive Documents

#### EXECUTIVE ORDER NO. 11969

Ex. Ord. No. 11969, Feb. 2, 1977, 42 F.R. 6791, as amended by Ex. Ord. No. 12038, Feb. 3, 1978, 43 F.R. 4957, which delegated to the Secretary of Energy the authority vested in the President by the Emergency Natural Gas Act of 1977 except the authority to declare and terminate a natural gas emergency, was revoked by Ex. Ord. No. 12553, Feb. 25, 1986, 51 F.R. 7237.

#### PROCLAMATION NO. 4485

Proc. No. 4485, Feb. 2, 1977, 42 F.R. 6789, declared that a natural gas emergency existed within the meaning of section 3 of the Emergency Natural Gas Act of 1977, set out as a note above, which emergency was terminated by Proc. No. 4495, Apr. 1, 1977, 42 F.R. 18053, formerly set out below.

#### PROCLAMATION NO. 4495

Proc. No. 4495, Apr. 1, 1977, 42 F.R. 18053, terminated the natural gas emergency declared to exist by Proc. No. 4485, Feb. 2, 1977, 42 F.R. 6789, formerly set out above.

### § 717a. Definitions

When used in this chapter, unless the context otherwise requires—

(1) "Person" includes an individual or a corporation.

(2) "Corporation" includes any corporation, joint-stock company, partnership, association, business trust, organized group of persons, whether incorporated or not, receiver or receivers, trustee or trustees of any of the foregoing, but shall not include municipalities as hereinafter defined.

(3) "Municipality" means a city, county, or other political subdivision or agency of a State.

(4) "State" means a State admitted to the Union, the District of Columbia, and any organized Territory of the United States.

(5) "Natural gas" means either natural gas unmixed, or any mixture of natural and artificial gas.

(6) "Natural-gas company" means a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale.

(7) "Interstate commerce" means commerce between any point in a State and any point outside thereof, or between points within the same State but through any place outside thereof, but only insofar as such commerce takes place within the United States.

(8) "State commission" means the regulatory body of the State or municipality having jurisdiction to regulate rates and charges for the sale of natural gas to consumers within the State or municipality.

(9) "Commission" and "Commissioner" means the Federal Power Commission, and a member thereof, respectively.

(10) "Vehicular natural gas" means natural gas that is ultimately used as a fuel in a self-propelled vehicle.

(11) "LNG terminal" includes all natural gas facilities located onshore or in State waters that are used to receive, unload, load, store, transport, gasify, liquefy, or process natural gas that is imported to the United States from a foreign country, exported to a foreign country from the United States, or transported in interstate commerce by waterborne vessel, but does not include—

(A) waterborne vessels used to deliver natural gas to or from any such facility; or

(B) any pipeline or storage facility subject to the jurisdiction of the Commission under section 717f of this title.

(June 21, 1938, ch. 556, § 2, 52 Stat. 821; Pub. L. 102–486, title IV, § 404(a)(2), Oct. 24, 1992, 106 Stat. 2879; Pub. L. 109–58, title III, § 311(b), Aug. 8, 2005, 119 Stat. 685.)

### Editorial Notes

#### AMENDMENTS

2005—Par. (11). Pub. L. 109–58 added par. (11).

1992—Par. (10). Pub. L. 102–486 added par. (10).

### Statutory Notes and Related Subsidiaries

#### TERMINATION OF FEDERAL POWER COMMISSION; TRANSFER OF FUNCTIONS

The Federal Power Commission was terminated, and its functions, personnel, property, funds, etc., were transferred to the Secretary of Energy (except for cer-

tain functions which were transferred to the Federal Energy Regulatory Commission) by sections 7151(b), 7171(a), 7172(a)(1), 7291, and 7293 of Title 42, The Public Health and Welfare.

## § 717b. Exportation or importation of natural gas; LNG terminals

### (a) Mandatory authorization order

After six months from June 21, 1938, no person shall export any natural gas from the United States to a foreign country or import any natural gas from a foreign country without first having secured an order of the Commission authorizing it to do so. The Commission shall issue such order upon application, unless, after opportunity for hearing, it finds that the proposed exportation or importation will not be consistent with the public interest. The Commission may by its order grant such application, in whole or in part, with such modification and upon such terms and conditions as the Commission may find necessary or appropriate, and may from time to time, after opportunity for hearing, and for good cause shown, make such supplemental order in the premises as it may find necessary or appropriate.

### (b) Free trade agreements

With respect to natural gas which is imported into the United States from a nation with which there is in effect a free trade agreement requiring national treatment for trade in natural gas, and with respect to liquefied natural gas—

(1) the importation of such natural gas shall be treated as a ''first sale'' within the meaning of section 3301(21) of this title; and

(2) the Commission shall not, on the basis of national origin, treat any such imported natural gas on an unjust, unreasonable, unduly discriminatory, or preferential basis.

### (c) Expedited application and approval process

For purposes of subsection (a), the importation of the natural gas referred to in subsection (b), or the exportation of natural gas to a nation with which there is in effect a free trade agreement requiring national treatment for trade in natural gas, shall be deemed to be consistent with the public interest, and applications for such importation or exportation shall be granted without modification or delay.

### (d) Construction with other laws

Except as specifically provided in this chapter, nothing in this chapter affects the rights of States under—

(1) the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.);

(2) the Clean Air Act (42 U.S.C. 7401 et seq.); or

(3) the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.).

### (e) LNG terminals

(1) The Commission shall have the exclusive authority to approve or deny an application for the siting, construction, expansion, or operation of an LNG terminal. Except as specifically provided in this chapter, nothing in this chapter is intended to affect otherwise applicable law related to any Federal agency's authorities or responsibilities related to LNG terminals.

(2) Upon the filing of any application to site, construct, expand, or operate an LNG terminal, the Commission shall—

(A) set the matter for hearing;

(B) give reasonable notice of the hearing to all interested persons, including the State commission of the State in which the LNG terminal is located and, if not the same, the Governor-appointed State agency described in section 717b–1 of this title;

(C) decide the matter in accordance with this subsection; and

(D) issue or deny the appropriate order accordingly.

(3)(A) Except as provided in subparagraph (B), the Commission may approve an application described in paragraph (2), in whole or part, with such modifications and upon such terms and conditions as the Commission find[1] necessary or appropriate.

(B) Before January 1, 2015, the Commission shall not—

(i) deny an application solely on the basis that the applicant proposes to use the LNG terminal exclusively or partially for gas that the applicant or an affiliate of the applicant will supply to the facility; or

(ii) condition an order on—

(I) a requirement that the LNG terminal offer service to customers other than the applicant, or any affiliate of the applicant, securing the order;

(II) any regulation of the rates, charges, terms, or conditions of service of the LNG terminal; or

(III) a requirement to file with the Commission schedules or contracts related to the rates, charges, terms, or conditions of service of the LNG terminal.

(C) Subparagraph (B) shall cease to have effect on January 1, 2030.

(4) An order issued for an LNG terminal that also offers service to customers on an open access basis shall not result in subsidization of expansion capacity by existing customers, degradation of service to existing customers, or undue discrimination against existing customers as to their terms or conditions of service at the facility, as all of those terms are defined by the Commission.

### (f) Military installations

(1) In this subsection, the term ''military installation''—

(A) means a base, camp, post, range, station, yard, center, or homeport facility for any ship or other activity under the jurisdiction of the Department of Defense, including any leased facility, that is located within a State, the District of Columbia, or any territory of the United States; and

(B) does not include any facility used primarily for civil works, rivers and harbors projects, or flood control projects, as determined by the Secretary of Defense.

(2) The Commission shall enter into a memorandum of understanding with the Secretary of Defense for the purpose of ensuring that the

---

[1] So in original. Probably should be ''finds''.

Commission coordinate and consult [2] with the Secretary of Defense on the siting, construction, expansion, or operation of liquefied natural gas facilities that may affect an active military installation.

(3) The Commission shall obtain the concurrence of the Secretary of Defense before authorizing the siting, construction, expansion, or operation of liquefied natural gas facilities affecting the training or activities of an active military installation.

(June 21, 1938, ch. 556, §3, 52 Stat. 822; Pub. L. 102–486, title II, §201, Oct. 24, 1992, 106 Stat. 2866; Pub. L. 109–58, title III, §311(c), Aug. 8, 2005, 119 Stat. 685.)

#### Editorial Notes

##### References in Text

The Coastal Zone Management Act of 1972, referred to in subsec. (d)(1), is title III of Pub. L. 89–454 as added by Pub. L. 92–583, Oct. 27, 1972, 86 Stat. 1280, as amended, which is classified generally to chapter 33 (§1451 et seq.) of Title 16, Conservation. For complete classification of this Act to the Code, see Short Title note set out under section 1451 of Title 16 and Tables.

The Clean Air Act, referred to in subsec. (d)(2), is act July 14, 1955, ch. 360, 69 Stat. 322, as amended, which is classified generally to chapter 85 (§7401 et seq.) of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 7401 of Title 42 and Tables.

The Federal Water Pollution Control Act, referred to in subsec. (d)(3), is act June 30, 1948, ch. 758, as amended generally by Pub. L. 92–500, §2, Oct. 18, 1972, 86 Stat. 816, which is classified generally to chapter 26 (§1251 et seq.) of Title 33, Navigation and Navigable Waters. For complete classification of this Act to the Code, see Short Title note set out under section 1251 of Title 33 and Tables.

##### Amendments

2005—Pub. L. 109–58, §311(c)(1), inserted ''; LNG terminals'' after ''natural gas'' in section catchline.

Subsecs. (d) to (f). Pub. L. 109–58, §311(c)(2), added subsecs. (d) to (f).

1992—Pub. L. 102–486 designated existing provisions as subsec. (a) and added subsecs. (b) and (c).

#### Executive Documents

##### Transfer of Functions

Enforcement functions of Secretary or other official in Department of Energy and Commission, Commissioners, or other official in Federal Energy Regulatory Commission related to compliance with authorizations for importation of natural gas from Alberta as pre-deliveries of Alaskan gas issued under this section with respect to pre-construction, construction, and initial operation of transportation system for Canadian and Alaskan natural gas transferred to the Federal Inspector, Office of Federal Inspector for Alaska Natural Gas Transportation System, until first anniversary of date of initial operation of Alaska Natural Gas Transportation System, see Reorg. Plan No. 1 of 1979, §§102(d), 203(a), 44 F.R. 33663, 33666, 93 Stat. 1373, 1376, effective July 1, 1979, set out under section 719e of this title. Office of Federal Inspector for the Alaska Natural Gas Transportation System abolished and functions and authority vested in Inspector transferred to Secretary of Energy by section 3012(b) of Pub. L. 102–486, set out as an Abolition of Office of Federal Inspector note under section 719e of this title. Functions and authority vest-

ed in Secretary of Energy subsequently transferred to Federal Coordinator for Alaska Natural Gas Transportation Projects by section 720d(f) of this title.

##### Delegation of Functions

Functions of President respecting certain facilities constructed and maintained on United States borders delegated to Secretary of State, see Ex. Ord. No. 11423, Aug. 16, 1968, 33 F.R. 11741, set out as a note under section 301 of Title 3, The President.

##### Ex. Ord. No. 10485. Providing for the Performance of Certain Functions Heretofore Performed by the President With Respect to Electric Power and Natural Gas Facilities Located on the Borders of the United States

Ex. Ord. No. 10485. Sept. 3, 1953, 18 F.R. 5397, as amended by Ex. Ord. No. 12038, Feb. 3, 1978, 43 F.R. 4957, provided:

SECTION 1. (a) The Secretary of Energy is hereby designated and empowered to perform the following-described functions:

(1) To receive all applications for permits for the construction, operation, maintenance, or connection, at the borders of the United States, of facilities for the transmission of electric energy between the United States and a foreign country.

(2) To receive all applications for permits for the construction, operation, maintenance, or connection, at the borders of the United States, of facilities for the exportation or importation of natural gas to or from a foreign country.

(3) Upon finding the issuance of the permit to be consistent with the public interest, and, after obtaining the favorable recommendations of the Secretary of State and the Secretary of Defense thereon, to issue to the applicant, as appropriate, a permit for such construction, operation, maintenance, or connection. The Secretary of Energy shall have the power to attach to the issuance of the permit and to the exercise of the rights granted thereunder such conditions as the public interest may in its judgment require.

(b) In any case wherein the Secretary of Energy, the Secretary of State, and the Secretary of Defense cannot agree as to whether or not a permit should be issued, the Secretary of Energy shall submit to the President for approval or disapproval the application for a permit with the respective views of the Secretary of Energy, the Secretary of State and the Secretary of Defense.

SEC. 2. [Deleted.]

SEC. 3. The Secretary of Energy is authorized to issue such rules and regulations, and to prescribe such procedures, as it may from time to time deem necessary or desirable for the exercise of the authority delegated to it by this order.

SEC. 4. All Presidential Permits heretofore issued pursuant to Executive Order No. 8202 of July 13, 1939, and in force at the time of the issuance of this order, and all permits issued hereunder, shall remain in full force and effect until modified or revoked by the President or by the Secretary of Energy.

SEC. 5. Executive Order No. 8202 of July 13, 1939, is hereby revoked.

### § 717b–1. State and local safety considerations

#### (a) Promulgation of regulations

The Commission shall promulgate regulations on the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) pre-filing process within 60 days after August 8, 2005. An applicant shall comply with pre-filing process required under the National Environmental Policy Act of 1969 prior to filing an application with the Commission. The regulations shall require that the pre-filing process commence at least 6 months prior to the filing of an application for author-

---

[2] So in original. Probably should be ''coordinates and consults''.

section shall be construed to create a private right of action.

(June 21, 1938, ch. 556, §4A, as added Pub. L. 109–58, title III, §315, Aug. 8, 2005, 119 Stat. 691.)

## § 717d. Fixing rates and charges; determination of cost of production or transportation

### (a) Decreases in rates

Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State commission, or gas distributing company, shall find that any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order: *Provided, however,* That the Commission shall have no power to order any increase in any rate contained in the currently effective schedule of such natural gas company on file with the Commission, unless such increase is in accordance with a new schedule filed by such natural gas company; but the Commission may order a decrease where existing rates are unjust, unduly discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates.

### (b) Costs of production and transportation

The Commission upon its own motion, or upon the request of any State commission, whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transportation of natural gas by a natural-gas company in cases where the Commission has no authority to establish a rate governing the transportation or sale of such natural gas.

(June 21, 1938, ch. 556, §5, 52 Stat. 823.)

## § 717e. Ascertainment of cost of property

### (a) Cost of property

The Commission may investigate and ascertain the actual legitimate cost of the property of every natural-gas company, the depreciation therein, and, when found necessary for rate-making purposes, other facts which bear on the determination of such cost or depreciation and the fair value of such property.

### (b) Inventory of property; statements of costs

Every natural-gas company upon request shall file with the Commission an inventory of all or any part of its property and a statement of the original cost thereof, and shall keep the Commission informed regarding the cost of all additions, betterments, extensions, and new construction.

(June 21, 1938, ch. 556, §6, 52 Stat. 824.)

## § 717f. Construction, extension, or abandonment of facilities

### (a) Extension or improvement of facilities on order of court; notice and hearing

Whenever the Commission, after notice and opportunity for hearing, finds such action necessary or desirable in the public interest, it may by order direct a natural-gas company to extend or improve its transportation facilities, to establish physical connection of its transportation facilities with the facilities of, and sell natural gas to, any person or municipality engaged or legally authorized to engage in the local distribution of natural or artificial gas to the public, and for such purpose to extend its transportation facilities to communities immediately adjacent to such facilities or to territory served by such natural-gas company, if the Commission finds that no undue burden will be placed upon such natural-gas company thereby: *Provided,* That the Commission shall have no authority to compel the enlargement of transportation facilities for such purposes, or to compel such natural-gas company to establish physical connection or sell natural gas when to do so would impair its ability to render adequate service to its customers.

### (b) Abandonment of facilities or services; approval of Commission

No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment.

### (c) Certificate of public convenience and necessity

(1)(A) No natural-gas company or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations: *Provided, however,* That if any such natural-gas company or predecessor in interest was bona fide engaged in transportation or sale of natural gas, subject to the jurisdiction of the Commission, on February 7, 1942, over the route or routes or within the area for which application is made and has so operated since that time, the Commission shall issue such certificate without requiring further proof that public convenience and necessity will be served by such operation, and without further proceedings, if application for such certificate is made to the Commission within ninety days after February 7, 1942. Pending the determination of any such application, the continuance of such operation shall be lawful.

(B) In all other cases the Commission shall set the matter for hearing and shall give such reasonable notice of the hearing thereon to all interested persons as in its judgment may be necessary under rules and regulations to be prescribed by the Commission; and the application shall be decided in accordance with the procedure provided in subsection (e) of this section and such certificate shall be issued or denied accordingly: *Provided, however,* That the Commission may issue a temporary certificate in cases of emergency, to assure maintenance of adequate service or to serve particular customers, without notice or hearing, pending the determination of an application for a certificate, and may by regulation exempt from the requirements of this section temporary acts or operations for which the issuance of a certificate will not be required in the public interest.

(2) The Commission may issue a certificate of public convenience and necessity to a natural-gas company for the transportation in interstate commerce of natural gas used by any person for one or more high-priority uses, as defined, by rule, by the Commission, in the case of—

(A) natural gas sold by the producer to such person; and

(B) natural gas produced by such person.

**(d) Application for certificate of public convenience and necessity**

Application for certificates shall be made in writing to the Commission, be verified under oath, and shall be in such form, contain such information, and notice thereof shall be served upon such interested parties and in such manner as the Commission shall, by regulation, require.

**(e) Granting of certificate of public convenience and necessity**

Except in the cases governed by the provisos contained in subsection (c)(1) of this section, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require.

**(f) Determination of service area; jurisdiction of transportation to ultimate consumers**

(1) The Commission, after a hearing had upon its own motion or upon application, may determine the service area to which such authorization under this section is to be limited. Within such service area as determined by the Commission a natural-gas company may enlarge or extend its facilities for the purpose of supplying increased market demands in such service area without further authorization; and

(2) If the Commission has determined a service area pursuant to this subsection, transportation to ultimate consumers in such service area by the holder of such service area determination, even if across State lines, shall be subject to the exclusive jurisdiction of the State commission in the State in which the gas is consumed. This section shall not apply to the transportation of natural gas to another natural gas company.

**(g) Certificate of public convenience and necessity for service of area already being served**

Nothing contained in this section shall be construed as a limitation upon the power of the Commission to grant certificates of public convenience and necessity for service of an area already being served by another natural-gas company.

**(h) Right of eminent domain for construction of pipelines, etc.**

When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas, and the necessary land or other property, in addition to right-of-way, for the location of compressor stations, pressure apparatus, or other stations or equipment necessary to the proper operation of such pipe line or pipe lines, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated: *Provided,* That the United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000.

(June 21, 1938, ch. 556, §7, 52 Stat. 824; Feb. 7, 1942, ch. 49, 56 Stat. 83; July 25, 1947, ch. 333, 61 Stat. 459; Pub. L. 95–617, title VI, §608, Nov. 9, 1978, 92 Stat. 3173; Pub. L. 100–474, §2, Oct. 6, 1988, 102 Stat. 2302.)

### Editorial Notes

#### Amendments

1988—Subsec. (f). Pub. L. 100–474 designated existing provisions as par. (1) and added par. (2).

1978—Subsec. (c). Pub. L. 95–617, §608(a), (b)(1), designated existing first paragraph as par. (1)(A) and existing second paragraph as par. (1)(B) and added par. (2).

Subsec. (e). Pub. L. 95–617, §608(b)(2), substituted ''subsection (c)(1)'' for ''subsection (c)''.

1947—Subsec. (h). Act July 25, 1947, added subsec. (h).

1942—Subsecs. (c) to (g). Act Feb. 7, 1942, struck out subsec. (c), and added new subsecs. (c) to (g).

### Statutory Notes and Related Subsidiaries

#### Effective Date of 1988 Amendment

Pub. L. 100–474, §3, Oct. 6, 1988, 102 Stat. 2302, provided that: ''The provisions of this Act [amending this sec-

tion and enacting provisions set out as a note under section 717w of this title] shall become effective one hundred and twenty days after the date of enactment [Oct. 6, 1988].''

### Executive Documents

#### TRANSFER OF FUNCTIONS

Enforcement functions of Secretary or other official in Department of Energy and Commission, Commissioners, or other official in Federal Energy Regulatory Commission related to compliance with certificates of public convenience and necessity issued under this section with respect to pre-construction, construction, and initial operation of transportation system for Canadian and Alaskan natural gas transferred to Federal Inspector, Office of Federal Inspector for Alaska Natural Gas Transportation System, until first anniversary of date of initial operation of Alaska Natural Gas Transportation System, see Reorg. Plan No. 1 of 1979, §§ 102(d), 203(a), 44 F.R. 33663, 33666, 93 Stat. 1373, 1376, effective July 1, 1979, set out under section 719e of this title. Office of Federal Inspector for the Alaska Natural Gas Transportation System abolished and functions and authority vested in Inspector transferred to Secretary of Energy by section 3012(b) of Pub. L. 102–486, set out as an Abolition of Office of Federal Inspector note under section 719e of this title. Functions and authority vested in Secretary of Energy subsequently transferred to Federal Coordinator for Alaska Natural Gas Transportation Projects by section 720d(f) of this title.

### § 717g. Accounts; records; memoranda

#### (a) Rules and regulations for keeping and preserving accounts, records, etc.

Every natural-gas company shall make, keep, and preserve for such periods, such accounts, records of cost-accounting procedures, correspondence, memoranda, papers, books, and other records as the Commission may by rules and regulations prescribe as necessary or appropriate for purposes of the administration of this chapter: *Provided, however,* That nothing in this chapter shall relieve any such natural-gas company from keeping any accounts, memoranda, or records which such natural-gas company may be required to keep by or under authority of the laws of any State. The Commission may prescribe a system of accounts to be kept by such natural-gas companies, and may classify such natural-gas companies and prescribe a system of accounts for each class. The Commission, after notice and opportunity for hearing, may determine by order the accounts in which particular outlays or receipts shall be entered, charged, or credited. The burden of proof to justify every accounting entry questioned by the Commission shall be on the person making, authorizing, or requiring such entry, and the Commission may suspend a charge or credit pending submission of satisfactory proof in support thereof.

#### (b) Access to and inspection of accounts and records

The Commission shall at all times have access to and the right to inspect and examine all accounts, records, and memoranda of natural-gas companies; and it shall be the duty of such natural-gas companies to furnish to the Commission, within such reasonable time as the Commission may order, any information with respect thereto which the Commission may by order require, including copies of maps, contracts, reports of engineers, and other data, records, and papers, and to grant to all agents of the Commission free access to its property and its accounts, records, and memoranda when requested so to do. No member, officer, or employee of the Commission shall divulge any fact or information which may come to his knowledge during the course of examination of books, records, data, or accounts, except insofar as he may be directed by the Commission or by a court.

#### (c) Books, accounts, etc., of the person controlling gas company subject to examination

The books, accounts, memoranda, and records of any person who controls directly or indirectly a natural-gas company subject to the jurisdiction of the Commission and of any other company controlled by such person, insofar as they relate to transactions with or the business of such natural-gas company, shall be subject to examination on the order of the Commission.

(June 21, 1938, ch. 556, §8, 52 Stat. 825.)

### § 717h. Rates of depreciation

#### (a) Depreciation and amortization

The Commission may, after hearing, require natural-gas companies to carry proper and adequate depreciation and amortization accounts in accordance with such rules, regulations, and forms of account as the Commission may prescribe. The Commission may from time to time ascertain and determine, and by order fix, the proper and adequate rates of depreciation and amortization of the several classes of property of each natural-gas company used or useful in the production, transportation, or sale of natural gas. Each natural-gas company shall conform its depreciation and amortization accounts to the rates so ascertained, determined, and fixed. No natural-gas company subject to the jurisdiction of the Commission shall charge to operating expenses any depreciation or amortization charges on classes of property other than those prescribed by the Commission, or charge with respect to any class of property a percentage of depreciation or amortization other than that prescribed therefor by the Commission. No such natural-gas company shall in any case include in any form under its operating or other expenses any depreciation, amortization, or other charge or expenditure included elsewhere as a depreciation or amortization charge or otherwise under its operating or other expenses. Nothing in this section shall limit the power of a State commission to determine in the exercise of its jurisdiction, with respect to any natural-gas company, the percentage rates of depreciation or amortization to be allowed, as to any class of property of such natural-gas company, or the composite depreciation or amortization rate, for the purpose of determining rates or charges.

#### (b) Rules

The Commission, before prescribing any rules or requirements as to accounts, records, or memoranda, or as to depreciation or amortization rates, shall notify each State commission having jurisdiction with respect to any natural-gas company involved and shall give reasonable

### Statutory Notes and Related Subsidiaries

#### Repeals

Act Oct. 28, 1949, ch. 782, cited as a credit to this section, was repealed (subject to a savings clause) by Pub. L. 89–554, Sept. 6, 1966, § 8, 80 Stat. 632, 655.

### § 717r. Rehearing and review

#### (a) Application for rehearing; time

Any person, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

#### (b) Review of Commission order

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were

reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings, which is supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28.

#### (c) Stay of Commission order

The filing of an application for rehearing under subsection (a) shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

#### (d) Judicial review

##### (1) In general

The United States Court of Appeals for the circuit in which a facility subject to section 717b of this title or section 717f of this title is proposed to be constructed, expanded, or operated shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval (hereinafter collectively referred to as ''permit'') required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.).

##### (2) Agency delay

The United States Court of Appeals for the District of Columbia shall have original and exclusive jurisdiction over any civil action for the review of an alleged failure to act by a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.), for a facility subject to section 717b of this title or section 717f of this title. The failure of an agency to take action on a permit required under Federal law, other than the Coastal Zone Management Act of 1972, in accordance with the Commission schedule established pursuant to section 717n(c) of this title shall be considered inconsistent with Federal law for the purposes of paragraph (3).

##### (3) Court action

If the Court finds that such order or action is inconsistent with the Federal law governing such permit and would prevent the construc-

tion, expansion, or operation of the facility subject to section 717b of this title or section 717f of this title, the Court shall remand the proceeding to the agency to take appropriate action consistent with the order of the Court. If the Court remands the order or action to the Federal or State agency, the Court shall set a reasonable schedule and deadline for the agency to act on remand.

**(4) Commission action**

For any action described in this subsection, the Commission shall file with the Court the consolidated record of such order or action to which the appeal hereunder relates.

**(5) Expedited review**

The Court shall set any action brought under this subsection for expedited consideration.

(June 21, 1938, ch. 556, §19, 52 Stat. 831; June 25, 1948, ch. 646, §32(a), 62 Stat. 991; May 24, 1949, ch. 139, §127, 63 Stat. 107; Pub. L. 85–791, §19, Aug. 28, 1958, 72 Stat. 947; Pub. L. 109–58, title III, §313(b), Aug. 8, 2005, 119 Stat. 689.)

### Editorial Notes

#### REFERENCES IN TEXT

The Coastal Zone Management Act of 1972, referred to in subsec. (d)(1), (2), is title III of Pub. L. 89–454, as added by Pub. L. 92–583, Oct. 27, 1972, 86 Stat. 1280, as amended, which is classified generally to chapter 33 (§1451 et seq.) of Title 16, Conservation. For complete classification of this Act to the Code, see Short Title note set out under section 1451 of Title 16 and Tables.

#### CODIFICATION

In subsec. (b), "section 1254 of title 28" substituted for "sections 239 and 240 of the Judicial Code, as amended [28 U.S.C. 346, 347]" on authority of act June 25, 1948, ch. 646, 62 Stat. 869, the first section of which enacted Title 28, Judiciary and Judicial Procedure.

#### AMENDMENTS

2005—Subsec. (d). Pub. L. 109–58 added subsec. (d).

1958—Subsec. (a). Pub. L. 85–791, §19(a), inserted sentence providing that until record in a proceeding has been filed in a court of appeals, Commission may modify or set aside any finding or order issued by it.

Subsec. (b). Pub. L. 85–791, §19(b), in second sentence, substituted "transmitted by the clerk of the court to" for "served upon", substituted "file with the court" for "certify and file with the court a transcript of", and inserted "as provided in section 2112 of title 28", and, in third sentence, substituted "petition" for "transcript", and "jurisdiction, which upon the filing of the record with it shall be exclusive" for "exclusive jurisdiction".

### Statutory Notes and Related Subsidiaries

#### CHANGE OF NAME

Act June 25, 1948, eff. Sept. 1, 1948, as amended by act May 24, 1949, substituted "court of appeals" for "circuit court of appeals" wherever appearing.

## § 717s. Enforcement of chapter

**(a) Action in district court for injunction**

Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule, regulation, or order thereunder, it may in its discretion bring an ac-

tion in the proper district court of the United States, or the United States courts of any Territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices and to enforce compliance with this chapter or any rule, regulation, or order thereunder, and upon a proper showing a permanent or temporary injunction or decree or restraining order shall be granted without bond. The Commission may transmit such evidence as may be available concerning such acts or practices or concerning apparent violations of the Federal antitrust laws to the Attorney General, who, in his discretion, may institute the necessary criminal proceedings.

**(b) Mandamus**

Upon application of the Commission the district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have jurisdiction to issue writs of mandamus commanding any person to comply with the provisions of this chapter or any rule, regulation, or order of the Commission thereunder.

**(c) Employment of attorneys by Commission**

The Commission may employ such attorneys as it finds necessary for proper legal aid and service of the Commission or its members in the conduct of their work, or for proper representation of the public interest in investigations made by it, or cases or proceedings pending before it, whether at the Commission's own instance or upon complaint, or to appear for or represent the Commission in any case in court; and the expenses of such employment shall be paid out of the appropriation for the Commission.

**(d) Violation of market manipulation provisions**

In any proceedings under subsection (a), the court may prohibit, conditionally or unconditionally, and permanently or for such period of time as the court determines, any individual who is engaged or has engaged in practices constituting a violation of section 717c–1 of this title (including related rules and regulations) from—

(1) acting as an officer or director of a natural gas company; or

(2) engaging in the business of—

(A) the purchasing or selling of natural gas; or

(B) the purchasing or selling of transmission services subject to the jurisdiction of the Commission.

(June 21, 1938, ch. 556, §20, 52 Stat. 832; June 25, 1948, ch. 646, §1, 62 Stat. 875, 895; Pub. L. 109–58, title III, §318, Aug. 8, 2005, 119 Stat. 693.)

### Editorial Notes

#### CODIFICATION

The words "the District Court of the United States for the District of Columbia" in subsec. (a) following "district court of the United States" and in subsec. (b) following "district courts of the United States" omitted as superfluous in view of section 132(a) of Title 28, Judiciary and Judicial Procedure, which states that "There shall be in each judicial district a district court which shall be a court of record known as the United

**§ 385.207**

(3) The Commission may establish a hearing before an ALJ;

(h) *Fast Track processing.* (1) The Commission may resolve complaints using Fast Track procedures if the complaint requires expeditious resolution. Fast Track procedures may include expedited action on the pleadings by the Commission, expedited hearing before an ALJ, or expedited action on requests for stay, extension of time, or other relief by the Commission or an ALJ.

(2) A complainant may request Fast Track processing of a complaint by including such a request in its complaint, captioning the complaint in bold type face "COMPLAINT REQUESTING FAST TRACK PROCESSING," and explaining why expedition is necessary as required by section 385.206(b)(11).

(3) Based on an assessment of the need for expedition, the period for filing answers, interventions and comments to a complaint requesting Fast Track processing may be shortened by the Commission from the time provided in section 385.206(f).

(4) After the answer is filed, the Commission will issue promptly an order specifying the procedure and any schedule to be followed.

(i) *Simplified procedure for small controversies.* A simplified procedure for complaints involving small controversies is found in section 385.218 of this subpart.

(j) *Satisfaction.* (1) If the respondent to a complaint satisfies such complaint, in whole or in part, either before or after an answer is filed, the complainant and the respondent must sign and file:

(i) A statement setting forth when and how the complaint was satisfied; and

(ii) A motion for dismissal of, or an amendment to, the complaint based on the satisfaction.

(2) The decisional authority may order the submission of additional information before acting on a motion for dismissal or an amendment under paragraph (c)(1)(ii) of this section.

[Order 225, 47 FR 19022, May 3, 1982, as amended by Order 602, 64 FR 17097, Apr. 8, 1999; Order 602–A, 64 FR 43608, Aug. 11, 1999; Order 647, 69 FR 32440, June 10, 2004; Order 769, 77 FR 65476, Oct. 29, 2012]

**18 CFR Ch. I (4–1–22 Edition)**

**§ 385.207   Petitions (Rule 207).**

(a) *General rule.* A person must file a petition when seeking:

(1) Relief under subpart I, J, or K of this part;

(2) A declaratory order or rule to terminate a controversy or remove uncertainty;

(3) Action on appeal from a staff action, other than a decision or ruling of a presiding officer, under Rule 1902;

(4) A rule of general applicability; or

(5) Any other action which is in the discretion of the Commission and for which this chapter prescribes no other form of pleading.

(b) *Declarations of intent under the Federal Power Act.* For purposes of this part, a declaration of intent under section 23(b) of the Federal Power Act is treated as a petition for a declaratory order.

(c) Except as provided in § 381.302(b), each petition for issuance of a declaratory order must be accompanied by the fee prescribed in § 381.302(a).

[Order 225, 47 FR 19022, May 3, 1982, as amended by Order 395, 49 FR 35357, Sept. 7, 1984]

**§ 385.208   [Reserved]**

**§ 385.209   Notices of tariff or rate examination and orders to show cause (Rule 209).**

(a) *Issuance.* (1) If the Commission seeks to determine the validity of any rate, rate schedule, tariff, tariff schedule, fare, charge, or term or condition of service, or any classification, contract, practice, or any related regulation established by and for the applicant which is demanded, observed, charged, or collected, the Commission will initiate a proceeding by issuing a notice of tariff or rate examination.

(2) The Commission may initiate a proceeding against a person by issuing an order to show cause.

(b) *Contents.* A notice of examination or an order to show cause will contain a statement of the matters about which the Commission is inquiring, and a statement of the authority under which the Commission is acting. The statement is tentative and sets forth issues to be considered by the Commission.

## CERTIFICATE OF SERVICE

I hereby certify that, on May 5, 2023, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Anand Viswanathan*
Anand Viswanathan
Attorney