ORAL ARGUMENT NOT YET SCHEDULED

**No. 22-1251**

_____

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

PUBLIC CITIZEN, INC.,

Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

Respondent.

_____

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

_____

**BRIEF FOR PETITIONER PUBLIC CITIZEN, INC.**

_____

Nandan M. Joshi
Scott L. Nelson
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
njoshi@citizen.org

*Attorneys for Petitioner*

Initial Brief: January 18, 2023
Final Brief: May 8, 2023

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES, AND RULE 26.1 DISCLOSURE

As required by Circuit Rules 26.1 and 28(a)(1), and Federal Rule of Appellate Procedure 26.1, counsel for Public Citizen, Inc., hereby certifies as follows:

### 1. Parties and Amici

The parties in this Court are:

- **Public Citizen, Inc.**, petitioner.

- **Federal Energy Regulatory Commission**, respondent.

- **Nopetro LNG, LLC**, intervenor in support of respondent.

The parties and commenters in the proceeding before the Federal Energy Regulatory Commission are:

- **Nopetro LNG, LLC**

- **Public Citizen, Inc.**

- **Center for Liquefied Natural Gas**

- **Natural Gas Supply Association**

- **Cecile T. Scofield**

- **Delaware Riverkeeper Network**

- **St. Joe Natural Gas Company, Inc.**

- **Jason Shoaf, Member, Florida House of Representatives**

- **Neal P. Dunn, U.S. Congressman**

## 2. Rulings Under Review

Petitioner seeks review of the following orders of the Federal

Energy Regulatory Commission:

- Nopetro LNG, LLC, Order on Petition for Declaratory Order, Docket No. CP21-179-000, 178 FERC ¶ 61,168 (issued Mar. 25, 2022) (JA 40–50).

- Nopetro LNG, LLC, Order Addressing Arguments Raised on Rehearing, Docket No. CP21-179-001, 180 FERC ¶ 61,057 (issued July 29, 2022) (JA 61–79).

## 3. Related Cases

This case has not previously been before this Court or any other

court. Undersigned counsel is unaware of any other case that is related

to this case.

## 4. Rule 26.1 Disclosure

Petitioner Public Citizen, Inc. is a nonprofit organization that has

not issued shares or debt securities to the public. It has no parent

companies, and no publicly held company has any form of ownership

interest in it. Public Citizen is a membership organization that advocates

the interests of consumers, citizens, and the public in a variety of areas.

Its general nature and purpose include advocating for the adoption and

implementation of governmental policies and actions that protect against

corporate actions and behaviors that threaten to harm public health and safety and the environment.

# TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases, and
    Rule 26.1 Disclosure ...................................................... i

Table of Authorities ........................................................ v

Glossary ...................................................................... xvi

Jurisdiction ................................................................... 1

Questions Presented ......................................................... 1

Statutes ....................................................................... 2

Statement of the Case ....................................................... 2

    A.   Background on LNG Exports ....................................... 2

    B.   Regulation of Natural Gas Exports ............................... 7

    C.   Proceedings Below ................................................ 14

Summary of Argument ...................................................... 22

Standing ..................................................................... 28

Standard of Review ......................................................... 32

Argument .................................................................... 34

I.    Nopetro's proposed Port St. Joe facility is "located
    onshore" because it is situated on land. ............................ 34

    A.   The term "located onshore" in the definition of "LNG
        terminal" refers to a facility's physical location on
        land. .......................................................... 36

    B.   The Commission's reasons for refusing to recognize
        that facilities situated on land are "located onshore"
        are flawed. .................................................... 47

II.   If "located onshore" requires a facility to be located at or
    near the shoreline, Nopetro's Port St. Joe facility
    satisfies that requirement. ......................................... 57

Conclusion ................................................................... 65

Certificate of Compliance .......................................................................... 66

Certificate of Service .................................................................................. 67

## Statutory Addendum

Natural Gas Act

§§ 1(a) and (b), 15 U.S.C. §§ 717(a) and (b).................................... A-1

§ 2(11), 15 U.S.C. § 717a(11) ............................................................ A-1

§§ 3(a) and (e)(1), 15 U.S.C. §§ 717b(a) and (e)(1) .......................... A-2

§ 3A, 15 U.S.C. § 717b-1 ................................................................... A-2

Deepwater Port Act

§ 3(9), 33 U.S.C. § 1502(9) ................................................................ A-4

§ 8(e), 33 U.S.C. § 1507(e) ................................................................ A-5

## Standing Addendum

Declaration of Pastor Chester Davis ..................................................... B-1

Declaration of Cheryl Steindorf ............................................................ B-4

Declaration of John Ehrman................................................................... B-7

Declaration of Robert Weismann........................................................... B-11

# TABLE OF AUTHORITIES*

**Cases**                                                          **Page(s)**

*Belize Society Development Ltd. v. Government of Belize,*
    794 F.3d 99 (D.C. Cir. 2015) .................................................................44

*Big Bend Conservation Alliance v. FERC,*
    896 F.3d 418 (D.C. Cir. 2018) ...............................................................8

*Border Pipe Line Co. v. FPC,*
    171 F.2d 149 (D.C. Cir. 1949) ...............................................................7

*Bostock v. Clayton County,*
    140 S. Ct. 1731 (2020) ...........................................................................48

*Boumediene v. Bush,*
    553 U.S. 723 (2008) ...............................................................................51

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,*
    467 U.S. 837 (1984) ...............................................................................33

*Cigar Ass'n of America v. FDA,*
    5 F.4th 68 (D.C. Cir. 2021) ...................................................................34

*City of Clarksville v. FERC,*
    888 F.3d 477 (D.C. Cir. 2018) ....................................................33, 34, 35

*Department of Transportation v. Public Citizen,*
    541 U.S. 752 (2004) ...............................................................................46

\*  *Distrigas Corp. v. FPC,*
    495 F.2d 1057 (D.C. Cir. 1974) ..............................................8, 9, 23, 38

*ExxonMobil Gas Marketing Co. v. FERC,*
    297 F.3d 1071 (D.C. Cir. 2002) .............................................................44

---

\* Authorities upon which we chiefly rely are marked with asterisks.

*George v. McDonough,*
   142 S. Ct. 1953 (2022) .............................................................. 44

*Good Fortune Shipping SA v. Commissioner of Internal Revenue Service,*
   897 F.3d 256 (D.C. Cir. 2018) ................................................. 64

*Gundy v. United States,*
   139 S. Ct. 2116 (2019) .............................................................. 37

*Hillman v. Maretta,*
   569 U.S. 483 (2013) .................................................................. 60

*Humane Society of the United States v. Zinke,*
   865 F.3d 585 (D.C. Cir. 2017) ................................................. 32

*IBP, Inc. v. Alvarez,*
   546 U.S. 21 (2005) .................................................................... 43

*Loan Syndications and Trading Ass'n v. SEC,*
   882 F.3d 220 (D.C. Cir. 2018) ................................................. 64

*Louisiana Public Service Commission v. FERC,*
   772 F.3d 1297 (D.C. Cir. 2014) ............................................... 32

*Maryland v. EPA,*
   958 F.3d 1185 (D.C. Cir. 2020) ............................................... 33

*Massachusetts v. EPA,*
   549 U.S. 497 (2007) .................................................................. 33

*McDermott Int'l, Inc. v. Wilander,*
   498 U.S. 337 (1991) .................................................................. 45

*Michigan v. EPA,*
   576 U.S. 743 (2015) .................................................................. 34

*New Fortress Energy Inc. v. FERC,*
  36 F.4th 1172 (D.C. Cir. 2022) ............................................56

*Newman v. FERC,*
  27 F.4th 690 (D.C. Cir. 2022) ..............................................54

*Pharmaceutical Research and Manufacturers of America v. FTC,*
  790 F.3d 198 (D.C. Cir. 2015) ..............................................33

*Sierra Club v. FERC,*
  827 F.3d 36 (D.C. Cir. 2016) .......................................9, 29, 32

*Sierra Club v. FERC,*
  827 F.3d 59 (D.C. Cir. 2016) ..........................................28, 29

*Sierra Club v. FERC,*
  867 F.3d 1357 (D.C. Cir. 2017) ............................................29

*Taggart v. Lorenzen,*
  139 S. Ct. 1795 (2019) ......................................................44

*Van Buren v. United States,*
  141 S. Ct. 1648 (2021) ......................................................34

*Vecinos para el Bienestar de la Comunidad Costera v. FERC,*
  6 F.4th 1321 (D.C. Cir. 2021) .............................................13

*West Virginia Public Services Commission v. United States
  Department of Energy,*
  681 F.2d 847 (D.C. Cir. 1982) ...............................................9

**Statutes**

5 U.S.C. § 706(2) ...............................................................32

15 U.S.C. § 717(a) ...........................................................7, 41

15 U.S.C. § 717(b) .........................................................14, 40

15 U.S.C. § 717a(6) ...................................................................... 7

15 U.S.C. § 717a(9) .................................................................... 13

15 U.S.C. § 717a(11) ................................... 1, 2, 13, 34, 35, 63

15 U.S.C. §§ 717a(11)(A) and (B) ............................................ 34

15 U.S.C. § 717b(a) ............................................................... 7, 40

15 U.S.C. § 717b(c) .................................................................... 15

15 U.S.C. § 717b(e) .................................................................. 1, 2

15 U.S.C. § 717b(e)(1) .................................................. 13, 36, 45

15 U.S.C. § 717b-1 ......................................................... 31, 46, 64

15 U.S.C. § 717b-1(a) ................................................................ 14

15 U.S.C. § 717b-1(b) ................................................................ 14

15 U.S.C. § 717b-1(e) ................................................................ 14

15 U.S.C. §§ 717c–717i ............................................................... 7

15 U.S.C. § 717f ........................................................................... 7

15 U.S.C. § 717n(b) .................................................................... 14

15 U.S.C. § 717r ........................................................................... 1

15 U.S.C. § 4101(a)(1) ............................................................... 42

16 U.S.C. § 1453(1) .................................................................... 51

30 U.S.C. § 181 *et seq.* ............................................................. 43

30 U.S.C. § 226................................................................42

30 U.S.C. § 226(a)...........................................................42

30 U.S.C. § 226(b)(1)(C)...................................................42

33 U.S.C. §§ 1321(10), (11)........................................41, 51

33 U.S.C. § 1501 *et seq.*......................................9, 22, 38

33 U.S.C. § 1502(9)....................................................10, 36

33 U.S.C. § 1503..........................................................10, 38

33 U.S.C. § 1507(e).....................................................10, 38

33 U.S.C. § 2701(22).........................................................41

33 U.S.C. § 2701(24).........................................................41

42 U.S.C. § 6217(a)...........................................................42

42 U.S.C. § 7131..................................................................8

42 U.S.C. § 7134..................................................................8

42 U.S.C. § 7151(b)..............................................................8

42 U.S.C. § 7172(a)(1)(D)....................................................8

42 U.S.C. § 7436(d)............................................................51

42 U.S.C. § 15902(h)..........................................................43

42 U.S.C. § 15909(b)(2)(A)................................................43

42 U.S.C. § 15910(b)(3)(A)................................................43

42 U.S.C. § 15912(a) ...................................................................42

42 U.S.C. § 15921(b)(1).............................................................43

42 U.S.C. § 16181(b)(4).............................................................43

43 U.S.C. § 1331 *et seq*. ...........................................................43

43 U.S.C. § 3006(a)(2)................................................................42

Bipartisan Budget Act of 2013,
  Pub. L. No. 113-67, § 301, 127 Stat. 1165, 1181 ...................43

Coast Guard and Maritime Transportation Act of 2012,
  Pub. L. No. 112-213, § 312, 126 Stat. 1540, 1569 ..................10

Energy Policy Act of 2005,
  Pub. L. No. 109-58, 119 Stat. 594...........................................12

  § 311(a) ....................................................................................40

  § 999A ......................................................................................43

Maritime Transportation Security Act of 2002,
  Pub. L. No. 107-295, 116 Stat. 2064.........................................9

## Regulations

10 C.F.R. Part 1021, Subpt. D, App. B ....................................16

18 C.F.R. § 153.5(a) ..................................................................54

33 C.F.R. § 148.3(a) ..................................................................10

40 C.F.R. § 98.230......................................................................51

49 C.F.R. § 193.2007..................................................................50

49 C.F.R. § 193.2057 ...............................................................50

49 C.F.R. § 193.2059 ...............................................................50

**Federal Register**

Executive Order 13,580 (July 12, 2011),
    76 Fed. Reg. 41,989 (July 15, 2011) ....................................42

\* U.S. Department of Energy, National Environmental Policy Act
    Implementing Procedures,
    85 Fed. Reg. 78,197 (Dec. 4, 2020) ...........................16, 38, 46

U.S. Department of Energy, Procedures for Liquefied Natural Gas
    Export Decisions,
    79 Fed. Reg. 48,132 (Aug. 15, 2014) ....................................10

U.S. Department of Energy, Small-Scale Natural Gas Exports,
    83 Fed. Reg. 35,106 (Aug. 24, 2018) ....................................15

**Administrative Decisions**

*Alaska Gasline Development Corp.*,
    171 FERC ¶ 61,134 (2020) ..................................................62

*Andalusian Energy, LLC*,
    174 FERC ¶ 61,107 (2021) ..................................................56

*Dynegy LNG Production Terminal, L.P.*,
    97 FERC ¶ 61,231 (2001) ...............................................38, 51

*Emera CNG, LLC*,
    148 FERC ¶ 61,219 (2014) ..................................................56

*Freeport LNG Development, L.P.*,
    107 FERC ¶ 61,278 (2004) ..................................................62

*Hackberry LNG Terminal*, L.L.C.,
    101 FERC ¶ 61,294 (2002).......................................................10, 39, 55

\*    *New Fortress Energy LLC*,
    174 FERC ¶ 61,207 (2021),
    *aff'd, New Fortress Energy Inc. v. FERC*,
    36 F.4th 1172 (D.C. Cir. 2022) ...................................................56, 61, 62

*Pivotal LNG, Inc.*,
    151 FERC ¶ 61,006 (2015)...........................................................21, 56

*Shell U.S. Gas & Power, LLC*,
    148 FERC ¶ 61,163 (2014)...........................................................35, 56

*Sound Energy Solutions*,
    107 FERC ¶ 61,263 (2004)...................................................................54

*The Gas Company*, *LLC*,
    142 FERC ¶ 61,036 (2013)...................................................................35

*Transcontinental Gas Pipeline Corp.*,
    96 FERC ¶ 61,118 (2001)......................................................................44

**Legislative History**

151 Cong. Rec. S6982 (daily ed. June 22, 2005)
    (statement of Sen. Feinstein) ...............................................................52

151 Cong. Rec. S6991 (daily ed. June 22, 2005)
    (statement of National Governors Association)...................................52

*Liquefied Natural Gas, Hearing before the Senate
    Subcommittee on Energy*, 109th Cong. (2005) -------------------- 12, 40, 50

*LNG Import Terminal and Deepwater Port Siting: Federal and
    State Roles*, *Hearing before the House Subcommittee on Energy
    Policy, Natural Resources and Regulatory Affairs*, 108th Cong.
    (2004) ------------------------------------------------------------------------- 12, 39

Maritime Transportation Security Act of 2002,
   H.R. Conf. Rep. No. 107-777 (2002) ......................................................10

## Other Authorities

Government Accountability Office, *Natural Gas: Federal Approval
   Process for Liquefied Natural Gas Exports*, GAO-14-762 (2014)...........6

Government Accountability Office, *Natural Gas Exports:
   Updated Guidance and Regulations Could Improve Facility
   Permitting Processes*, GAO-20-619 (2020) ---------------------- 2, 3, 4, 6, 11

Memorandum of Understanding Related to the Licensing of
   Deepwater Ports 5 (2004),
   https://www.ferc.gov/media/2004-mou-deepwater-ports ------- 11, 39, 49

Merriam-Webster's Collegiate Dictionary (10th ed. 1993) .....................36

Oxford English Dictionary Online ..........................................................36

Random House Webster's Collegiate Dictionary (1992) .........................36

U.S. Department of Energy, Delegation Order No. S1-DEL-
   FERC-2006 (May 16, 2006),
   https://www.directives.doe.gov/delegations-documents/s1-del-
   ferc-2006/@@images/file ---------------------------------------------------- 9

U.S. Department of Energy, *LNG Annual Report–2016*,
   https://www.energy.gov/fecm/articles/lng-annual-report-2016..............6

U.S. Department of Energy, *LNG Monthly* (Dec. 2022),
   https://www.energy.gov/sites/default/files/2022-
   12/LNG%20Monthly%20October%202022.pdf .......................................7

U.S. Department of Energy, *Liquefied Natural Gas: Understanding the
   Basic Facts* (August 2005), https://www.energy
   .gov/sites/prod/files/2013/04/f0/LNG_primerupd.pdf..............................3

U.S. Department of Energy, *Liquefied Natural Gas (LNG)*, https:// www.energy.gov/fecm/liquefied-natural-gas-lng ....................................4

U.S. Department of Energy, *Small Scale and Containerized LNG* (Apr. 2022), https://www.energy.gov/sites/default/files/2022-04/SSLNG%20snapshot%20for%20FECM%20website%2004%2001%2022.pdf ................................................................................................5

U.S. Energy Information Administration, *Natural gas explained: Liquified natural gas,* https://www.eia.gov/energyexplained/natural-gas/liquefied-natural-gas.php..............................................................4

U.S. Energy Information Administration, *Natural gas explained: Natural gas imports and exports,* https://www.eia.gov/energyexplained/natural-gas/imports-and-exports.php ........................................................................................3

Webster's Third New International Dictionary Unabridged (1965) .............................................................37

Webster's II New Riverside University Dictionary (1994) .................................................................................37

# GLOSSARY

DOE             Department of Energy

FPC             Federal Power Commission

LNG             Liquefied natural gas

MTSA            Maritime Transportation Security Act

NEPA            National Environmental Policy Act of 1969

NGA             Natural Gas Act

## JURISDICTION

The Federal Energy Regulatory Commission issued the declaratory order on review (JA 40–50) on March 25, 2022. Public Citizen, a party to the proceeding culminating in the declaratory order, filed a timely petition for rehearing (JA 51–60) on April 22, 2022. The Commission denied Public Citizen's rehearing petition in the rehearing order on review (JA 61–79) on July 29, 2022. Public Citizen filed a timely petition for review in this Court on September 27, 2022. This Court's jurisdiction rests on 15 U.S.C. § 717r.

## QUESTIONS PRESENTED

Section 3(e) of the Natural Gas Act (NGA), 15 U.S.C. § 717b(e), grants the Commission jurisdiction over "LNG terminal[s]," which are defined to include "natural gas facilities" that are "located onshore" and "are used to receive, … transport, [or]  liquefy … natural gas that is … exported to a foreign country," *id.* § 717a(11). In the orders on review, the Commission concluded that a facility that would be dedicated to receiving, liquefying, and exporting natural gas and would be located a quarter mile from the shoreline of the Gulf of Mexico was not an "LNG terminal." The questions presented are:

1

**1.** Is a natural-gas facility that is situated on land "located onshore" for purposes of 15 U.S.C. §§ 717a(11) and 717b(e)?

**2.** If a natural-gas facility must be located near the shoreline to be "located onshore," may the Commission treat a facility located no more than a quarter mile from the shoreline as not "located onshore" because, after liquefying natural gas for export, the facility uses trucks to move the natural gas the short distance (mostly within the facility's footprint) from the liquefaction plant to the dock where it will be loaded onto the cargo ships that will transport it abroad?

## STATUTES

Pertinent statutes are reprinted in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Background on LNG Exports

The United States is "the largest natural gas producer in the world," and, since 2017, has been "a net exporter of natural gas." U.S. Gov't Accountability Off., GAO-20-619, *Natural Gas Exports: Updated Guidance and Regulations Could Improve Facility Permitting Processes* 1 (2020) (2020 GAO Report).[1] Almost all domestically produced natural

_____

[1] http://www.gao.gov/assets/gao-20-619.pdf.

gas is exported in one of two ways: by pipeline to Canada or Mexico or by ship to other markets. *Id.* at 1–2. Exports by ship have increased dramatically over the last few years. In 2021, more natural gas was exported by ship than by pipeline. U.S. Energy Info. Admin., *Natural gas explained: Natural gas imports and exports* (Dec. 16, 2022).[2]

To transport natural gas by ship efficiently, the gas must be liquefied, "which condenses the gas, enabling greater volumes to be carried in smaller containers." 2020 GAO Report 2. Liquefaction occurs at a liquefaction facility, *id.* at 7, which cools the gas to minus 260 degrees Fahrenheit to reduce its volume 600-fold, U.S. Dep't of Energy, *Liquefied Natural Gas (LNG).*[3] The liquefied natural gas, or "LNG," is then loaded onto a ship for export.

Facilities located on land use two methods of conveying LNG to ships. The first method involves the use of pumps, pipes, and specialized piping designed to handle low-temperature LNG. LNG leaving the liquefaction plant is "pumped to an insulated storage tank." U.S. Dep't of

---

[2] https://www.eia.gov/energyexplained/natural-gas/imports-and-exports.php.

[3] https://www.energy.gov/fecm/liquefied-natural-gas-lng.

Energy, *Liquefied Natural Gas: Understanding the Basic Facts* 10 (Aug. 2005).[4] From the storage tank, "specially constructed pumps and jointed loading pipes" are used to load the LNG directly onto ships (also called tankers or carriers), which contain storage tanks "designed for the safe and efficient transportation of cryogenic liquid." *Id.* at 11–12. The following is a depiction of this method of transport:



2020 GAO Report 8.

In the second method, LNG leaving the liquefaction facility is not stored in large, insulated storage containers, but in "smaller International Organization for Standardization (ISO)-compliant containers." U.S. Energy Info. Admin., *Natural gas explained, Liquefied*

---

[4] https://www.energy.gov/sites/prod/files/2013/04/f0/LNG_primer upd.pdf.

4

*natural gas* (May 19, 2022).[5] These containers are "specialized intermodal tanks that can be loaded onto trucks, ships, and rail cars." U.S. Dep't of Energy, *Small-Scale and Containerized LNG* (Apr. 2022).[6] As the Department of Energy has explained, exporting LNG in containers creates a "virtual pipeline[]" for countries that lack "natural gas pipeline infrastructure [or] are not near a port that can receive large LNG tankers," as well as for "small markets on islands or other remote locations." *Id.* (formatting altered).

A liquefaction facility need not be located on land. Instead, natural gas can be piped to "floating liquefaction vessels" in offshore waters where the gas is liquefied before the LNG is loaded on to LNG carriers, as depicted below:

---

[5] https://www.eia.gov/energyexplained/natural-gas/liquefied-natural-gas.php. All references to "containers" in this brief are to containers compliant with these standards.

[6] https://www.energy.gov/sites/default/files/2022-04/SSLNG%20snap shot%20for%20FECM%20website%2004%2001%2022.pdf.



2020 GAO Report 7–8. Such offshore facilities are typically located "beyond state waters in federal waters" and are commonly called "deepwater facilities" in contrast to "LNG export facilities … located on land or in state waters." *Id.* at 2.

As late as 2014, the United States had only one facility to create LNG for export by ship—a single facility in Alaska. Gov't Accountability Off., GAO-14-762, *Natural Gas: Federal Approval Process for Liquefied Natural Gas Exports* 1 & n.2 (2014) (2014 GAO Report).[7] Since then, LNG exports have seen explosive growth. In 2016, the United States exported almost 184 billion cubic feet of natural gas by LNG tanker and 0.1 billion cubic feet by container. U.S. Dep't of Energy, *LNG Annual Report–2016*, at 2–3.[8] Altogether, between February 2016 and October 2022, the United States has exported almost 13,000 billion cubic feet of natural gas

---

[7] https://www.gao.gov/assets/gao-14-762.pdf.

[8] https://www.energy.gov/fecm/articles/lng-annual-report-2016.

by LNG tanker and 4.5 billion cubic feet by container. U.S. Dep't of Energy, *LNG Monthly* 2 (pub. Dec. 2022).[9]

## B.    Regulation of Natural Gas Exports

**Natural Gas Act (NGA)**. Congress enacted the NGA in 1938 to regulate "the transportation of natural gas and the sale thereof in interstate and foreign commerce." 15 U.S.C. § 717(a). As this Court has held, interstate commerce does not include foreign commerce. *Border Pipe Line Co. v. FPC*, 171 F.2d 149, 150 (D.C. Cir. 1949). Much of the NGA applies to "natural-gas compan[ies]" engaged in interstate commerce, 15 U.S.C. §§ 717a(6), 717c–717i, including section 7, 15 U.S.C. § 717f, which requires companies to obtain the Commission's approval before transporting natural gas or constructing, acquiring, or operating facilities for that purpose. Foreign commerce is regulated under section 3 of the NGA, which prohibits any person from "export[ing] any natural gas from the United States to a foreign country or import[ing] any natural gas from a foreign country" without prior agency approval. *Id.* § 717b(a).

---

[9] https://www.energy.gov/sites/default/files/2022-12/LNG%20Monthly %20October%202022.pdf.

7

In *Distrigas Corp. v. FPC*, 495 F.2d 1057 (D.C. Cir. 1974), this Court addressed the interplay between sections 3 and 7 as applied to an LNG import facility. The Commission's predecessor agency, the Federal Power Commission (FPC), had sought to regulate "all of Distrigas' facilities and sales" under section 7. *Id.* at 1062. This Court rejected that argument, concluding that it was contrary to *Border Pipe Line* and the "statutory language." *Id.* at 1063. In response to the FPC's concern that a "regulatory gap" would arise if import facilities were not subject to section 7, the Court confirmed that the agency had "plenary and elastic" authority under section 3 to regulate import facilities. *Id.* at 1064. Since *Distrigas*, section 3 has been understood to require prior agency authorization both to engage in exports or imports, and "to construct export and import facilities." *Big Bend Conservation All. v. FERC*, 896 F.3d 418, 420 (D.C. Cir. 2018).

In 1977, Congress created the Department of Energy (DOE), 42 U.S.C. § 7131, and established the Commission as an independent agency within the Department, *id.* § 7134. Congress transferred the FPC's section 7 authority to the Commission, 42 U.S.C. § 7172(a)(1)(D), and its section 3 authority to DOE, 42 U.S.C. § 7151(b). Today, DOE directly

exercises most of its section 3 authority to authorize exports and import of natural gas. It has, however, long delegated to the Commission "the power, recognized under section 3 since *Distrigas*, to approve or disapprove the site, construction and operation of particular facilities." *W. Va. Pub. Servs. Comm'n v. DOE*, 681 F.2d 847, 858 n.48 (D.C. Cir. 1982); *see* DOE, Delegation Order No. S1-DEL-FERC-2006, § 1.21.A (May 16, 2006) (current delegation order).[10] "As a result, if an operator of a natural gas terminal … wants to export natural gas and has to construct or modify facilities to do so, it must obtain authorizations from both the Department of Energy (to export) and the Commission (to construct and to operate the necessary facilities)." *Sierra Club v. FERC*, 827 F.3d 36, 41 (D.C. Cir. 2016) (*Sierra Club I*).

**Maritime Transportation Security Act of 2002 (MTSA)**. Enacted in 2002, the MTSA, Pub. L. No. 107-295, 116 Stat. 2064, carved out certain offshore import facilities from the Commission's jurisdiction. The MTSA extended the Deepwater Port Act of 1974, 33 U.S.C. § 1501 *et seq.*, which had previously applied to deepwater crude-oil facilities, to

---

[10] https://www.directives.doe.gov/delegations-documents/s1-del-ferc-2006/@@images/file.

"natural gas importation, storage, and handling." H.R. Conf. Rep. No. 107-777, at 86 (2002). A 2012 amendment authorized deepwater ports to export natural gas. *See* Coast Guard and Maritime Transportation Act of 2012, Pub. L. No. 112-213, § 312, 126 Stat. 1540, 1569.

A "deepwater port" encompasses natural-gas facilities "located beyond State seaward boundaries." 33 U.S.C. § 1502(9). The MTSA excludes regulation of the construction and operation of deepwater ports from the scope of the NGA, 33 U.S.C. § 1507(e), and grants the Secretary of Transportation the authority to approve the "ownership, construction, and operation of a deepwater port," *id*. § 1503. Through delegations of authority, the Coast Guard and the Maritime Administration currently share responsibility for implementing the Deepwater Port Act. *See* 33 C.F.R. § 148.3(a).

Although the MTSA "transfer[red] to the Department of Transportation regulatory authority over LNG *facilities* constructed offshore in federal waters," *Hackberry LNG Terminal, L.L.C.*, 101 FERC ¶ 61,294, at 62,180 para. 25 (2002) (emphasis added), an exporter or importer still must obtain DOE's authorization under section 3 to export or import natural gas. *See Procedures for Liquefied Natural Gas Export*

10

*Decisions*, 79 Fed. Reg. 48,132, 48,133 (Aug. 15, 2014). The MTSA also did not disturb the Commission's section 3 jurisdiction over "the construction and siting of facilities for the import or export of natural gas …, including onshore LNG facilities," that are not subject to the Deepwater Port Act. Mem. of Understanding Related to the Licensing of Deepwater Ports 5 (2004) (Deepwater Port MOU).[11]

**Energy Policy Act of 2005**. Colloquially, deepwater ports are sometimes referred to as "offshore" facilities, while facilities elsewhere are collectively described as "onshore." 2020 GAO Report 2. For instance, in 2004, Commission Chairman Patrick H. Wood, III and a Maritime Administration representative testified in a colloquy with Representative Ose:

> Mr. OSE. Commissioner Wood, to try and simplify things just so I can understand them, I want to make sure that I have it clear. FERC is responsible by derivation from DOE with siting and permitting—permit and siting questions for onshore facilities?

> Mr. WOOD. Yes, sir.

> Mr. OSE. And, Admiral, you are responsible for permitting and siting facilities offshore in conjunction with [the Maritime Administration]?

---

[11] https://www.ferc.gov/media/2004-mou-deepwater-ports.

Admiral GILMOUR. That is correct, sir.

*LNG Import Terminal and Deepwater Port Siting: Federal and State Roles, Hearing before the House Subcomm. on Energy Policy, Natural Res. and Reg. Affairs*, 108th Cong. 68 (2004) (2004 Hearing).

The following year, the Director of the Commission's Office of Energy Projects J. Mark Robinson explained the distinction in more precise terms: "The Commission has interpreted section 3 of the Natural Gas Act as conferring exclusive jurisdiction on the Commission with respect to the siting, construction, operation, and safety of LNG facilities *onshore and in state water* (as distinguished from those offshore facilities that are within the Coast Guard's jurisdiction)." *Liquefied Natural Gas, Hearing before the Senate Subcomm. on Energy*, 109th Cong. 40 (2005) (2005 Hearing) (emphasis added). Thus, in 2005, Congress understood that the Commission retained jurisdiction over natural-gas import and export facilities that were not covered by the Deepwater Port Act.

Congress incorporated that distinction into the NGA when it enacted the Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594. The Energy Policy Act amended section 3 to provide that the Commission has "exclusive authority to approve or deny an application for the siting,

construction, expansion, or operation of an LNG terminal." 15 U.S.C. § 717b(e)(1).[12] The Energy Policy Act defines "LNG terminal" to include "all natural gas facilities located *onshore or in State waters* that are used to receive, unload, load, store, transport, gasify, liquefy, or process natural gas that is imported to the United States from a foreign country, exported to a foreign country from the United States, or transported in interstate commerce by waterborne vessel." 15 U.S.C. § 717a(11) (emphasis added). The definition excludes waterborne vessels from the definition of "LNG terminal," as well as pipelines and storage facilities regulated under section 7 of the NGA. *Id.* The Energy Policy Act also emphasizes the NGA's historic regulation of foreign commerce by confirming that it applies "to the importation or exportation of natural

---

[12] The NGA continues to define "Commission" as the FPC. 15 U.S.C. § 717a(9), but by virtue of the transfer of the FPC's section 3 authority to DOE, the term "Commission" in section 3 refers to DOE in the first instance. This Court has recognized, however, that DOE's delegation of section 3 authority over the construction and authorization of export facilities to the Federal Energy Regulatory Commission continues to encompass the authority with respect to LNG terminals conferred by 15 U.S.C. § 717b(e)(1). *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1325 (D.C. Cir. 2021) ("The Department has delegated to the Commission the authority to approve or disapprove the siting, construction, expansion, or operation of an LNG terminal for exporting LNG.").

gas in foreign commerce" and "to persons engaged in such importation or exportation." 15 U.S.C. § 717(b).

Along with granting the Commission exclusive authority over "LNG terminals," the Energy Policy Act imposes on the Commission the duty to consider environmental and safety concerns associated with their construction and operation. In particular, the Energy Policy Act directed the Commission to (1) issue regulations under the National Environmental Policy Act of 1969 (NEPA) to "require that the pre-filing process commence at least 6 months prior to the filing of an application for authorization to construct an LNG terminal and encourage applicants to cooperate with State and local officials," 15 U.S.C. § 717b-1(a); (2) take account of "State and local safety considerations," *id.* § 717b-1(b); (3) "require the LNG terminal operator to develop an Emergency Response Plan," *id.* § 717b-1(e); and (4) act as "the lead agency for the purposes of coordinating all applicable Federal authorizations and for the purposes of complying with [NEPA]," *id.* § 717n(b).

## C.    Proceedings Below

**1.** In December 2020, Nopetro LNG, LLC applied for DOE's approval under section 3 to export LNG "to emerging markets, including

in the Caribbean, Central America, and South America."[13] Pursuant to
section 3(c), DOE automatically grants approval to export natural gas to
countries with which the United States has a free-trade agreement. *See*
15 U.S.C. § 717b(c). For other countries, DOE's small-scale export rule
applies for exports of less than 51.75 billion cubic feet of gas per year. *See*
Small-Scale Natural Gas Exports, 83 Fed. Reg. 35,106, 35,106 (Aug. 24,
2018). Under that rule, DOE will grant the application if it "is eligible for
a categorical exclusion under DOE's [NEPA] regulations." *Id.*

In its DOE Application, Nopetro asserted that it would export LNG
exclusively in containers. DOE Application 2–3; *see also* Email of Jan. 15,
2021, FE Dkt. No. 20-167-LNG.[14] Nopetro identified Port St. Joe, Florida
as one of the ports from which it would export LNG, although it did not
list a liquefaction facility in Port St. Joe as one of the facilities from which
it would obtain LNG for export. *See* DOE Application 3 & App. C.

---

[13] *Nopetro LNG, LLC*, Application for Long-Term and Short-Term, Multi-Contract Authorizations to Export Liquefied Natural Gas to Free Trade Agreement and Non-Free Trade Agreement Nations 2, FE Dkt. No. 20-167-LNG (Dec. 28, 2020) (DOE Application), https://www.energy.gov/sites/prod/files/2021/01/f82/20-167-LNG.pdf.

[14] https://www.energy.gov/sites/prod/files/2021/01/f82/Supplement%20to%20Application.pdf.

In March 2021, DOE granted Nopetro's application.[15] DOE concluded that Nopetro's application was entitled to categorical exclusion B5.7, DOE Order 6–7, which excludes section 3 export authorizations and associated transportation by marine vessel from individualized environmental analysis under NEPA, 10 C.F.R. Part 1021, Subpt. D, App. B. That categorical exclusion applies only to the "marine transport" portion of the export: As DOE explained when it adopted the current version of B5.7, "LNG terminal construction and operation" are "beyond its decision-making authority" because "FERC, not DOE, reviews the potential environmental impacts of the construction and operation of the LNG terminals." NEPA Implementing Procedures, 85 Fed. Reg. 78,197, 78,197, 78,199 & n.21 (Dec. 4, 2020) (DOE NEPA Rule).

**2.** Within a month of receiving DOE's authorization, Nopetro filed a petition for declaratory order with the Commission. *See* Nopetro LNG, LLC, Petition for Declaratory Order, Docket No. CP21-179 (Apr. 20, 2021) (Nopetro Petition) (JA 7). The petition requested a ruling that the

---

[15] *Nopetro LNG, LLC*, Order 4671, Granting Long-term Authorization to Export Liquefied Natural Gas to Free Trade Agreement Nations, and Long-term Authorization for Small-Scale Export of Liquefied Natural Gas, FE Docket No. 20-167-LNG (Mar. 23, 2021) (DOE Order), https://www.energy.gov/sites/default/files/2021-03/ord4671.pdf.

company's "proposed project that includes a small-scale facility that produces liquefied natural gas … to be transported in … containers via trucks to a dock …, where the LNG-filled containers will be placed onto general cargo waterborne vessels bound for Central and South America and the Caribbean … is not subject to the Commission's jurisdiction under the Natural Gas Act." *Id.* at 2 (JA 10). The petition explained that the facility would be located on "60 acres of private land in Port St. Joe, Florida," *id.* at 3 (JA 11), and that "the truck route is approximately 1,329 feet or roughly a quarter mile from the Facility to the primary Dock," *id.* at 4 (JA 12), as illustrated on this image:



*Id*. App. A (JA 34). The petition represented that "[a]ll the natural gas that will be liquefied at Nopetro's Facility will be exported in foreign commerce." *Id*. at 20 (JA 28).

Public Citizen opposed Nopetro's petition. *See* Protest of Public Citizen, Inc., Docket No. CP-21-179 (May 24, 2021) (JA 35). Public Citizen argued that granting the petition would enable Nopetro "to circumvent the Commission's jurisdiction," *id*. at 1 (JA 35), and "likely usher a wave of similar LNG export terminals located within shouting distance from an export dock in an effort to evade Commission oversight," *id*. at 4 (JA 38).

In March 2022, the Commission issued a declaratory order concluding that Nopetro's facility was not subject to the Commission's jurisdiction under sections 3 or 7 of the NGA. *See* Nopetro LNG, LLC, Order on Petition for Declaratory Order, CP21-179-000 (Mar. 25, 2022) (Declaratory Order) (JA 40). With respect to the definition of "LNG terminal," the Commission cited its "experience" with "large, coastal facilities … receiving natural gas vapor from a transportation pipeline and delivering LNG into a large, ocean going bulk carrier." *Id*. ¶ 9 (JA 43). Based on that experience, the Commission devised "three criteria"

for "determining whether a facility is an LNG import or export terminal":

"(1) whether an LNG terminal would include facilities dedicated to the import or export of LNG; (2) whether the facility would be located at *or near* the point of import or export; and (3) whether the facility would receive or send out gas via a pipeline." *Id*. (emphasis added; footnote references omitted). The Commission concluded that "Nopetro's liquefaction facility" failed only the second criteria "because it is not located at the point of export *such that LNG can be directly transferred to vessels for export*." *Id*. ¶ 10 (JA 44) (emphasis added).

The Commission rejected the argument that Nopetro's facility qualified as an LNG terminal because it would be "located onshore." *Id*. ¶ 12 (JA 45–46). The Commission stated that it interpreted "onshore" to mean "located on or near the water or the coast." But the Commission declined to consider whether Nopetro's facility was sufficiently "near the water." Instead, the Commission reiterated that it would consider only whether the facility is "capable of transferring LNG onto water-borne vessels." *Id*. (JA 46). Because Nopetro's containers would be hauled by truck from its liquefaction facility to a general-use dock and loaded "onto

19

general cargo ships," the Commission determined that Nopetro's facility "does not meet this standard." *Id*.

**3.** Public Citizen sought rehearing by the agency. *See* Request for Rehearing of Public Citizen, Docket No. CP-179 (Apr. 22, 2022) (JA 51). It argued that a facility is "located onshore" if it is located on land, regardless of its distance to the shoreline. *Id*. at 1 (JA 51). Alternatively, Public Citizen argued that Nopetro's facility would be located at or near the point of export because it would be "a mere quarter mile" from the water. *Id*. ¶ 12 (JA 55). The rehearing request explained that "the statute nowhere requires that an onshore facility be capable of transferring LNG directly onto oceangoing vessels," as the Commission's test demands. *Id*. ¶ 13 (JA 55).

Quoting Commissioner Bay's dissent in a prior order, Public Citizen also noted the incongruity of an outcome where "a natural gas facility that is used to export gas" whose export requires "an export license from the Department of Energy is not, from FERC's perspective, an 'export' facility within the meaning of the Natural Gas Act and thus not subject to FERC's jurisdiction." *Id*. ¶ 14 (JA 55–56) (quoting *Pivotal LNG, Inc.*, 151 FERC ¶ 61,006 (2015) (*Pivotal II*) (Bay, Comm'r, dissenting)). Public

20

Citizen also explained that the history of the MTSA and the Energy Policy Act and other uses of "onshore" in federal oil and gas regulation and under the NGA demonstrated Congress's intent to provide the Commission with exclusive jurisdiction over all export facilities other than offshore facilities subject to the Deepwater Port Act. *Id.* ¶¶ 18–26 (JA 56–59). The rehearing request argued that "[l]imiting the Commission's authority to facilities on the shoreline, as opposed to onshore facilities more generally, bears no relationship to the statute's function of conferring regulatory authority with respect to export facilities." *Id.* ¶ 26 (JA 59).

**4.** In July 2022, the Commission denied Public Citizen's rehearing request. *See* Nopetro LNG, LLC, Order Addressing Arguments Raised on Rehearing, CP 21-179-001 (July 29, 2022) (Rehearing Order) (JA 61). The Commission reaffirmed its conclusion that the term "onshore" includes "only those onshore facilities that are on the coast such that LNG can be directly transferred to vessels for export." *Id.* ¶ 9 (JA 65). The Commission stated that this limitation on its section 3 authority "was well-established" when Congress enacted the Energy Policy Act, and that

Congress did not intend to "expand[] the universe of facilities" over which section 3 applies. *Id*. ¶ 12 (JA 66).

The Commission found "conclusory" the assertion that the regulation of deepwater offshore facilities under the Deepwater Port Act means that the Commission "necessarily has section 3 jurisdiction over any onshore facility which might liquefy natural gas which might ultimately be exported from the country." *Id*. ¶ 17 (JA 69–70). The Commission concluded that its staff's testimony before Congress drawing a jurisdictional distinction between those types of facilities "does not prevail over the Commission's interpretation" that "onshore" does not include "inland facilities." *Id*. ¶ 18 (JA 70). The Commission also declined to draw insight from other uses of the term "onshore" elsewhere in federal law, *id*. ¶¶ 21–24 (JA 72–75), concluding that the "context" of section 3 "is far more relevant … than its use in other statutory schemes," *id*. ¶ 21 (JA 73).

## SUMMARY OF ARGUMENT

**I.** The Commission erred in concluding that a natural-gas export facility—here, a liquefaction and truck-loading facility used to produce and transport LNG for export—is not "located onshore" if it is not located

22

so near the shoreline that it pipes LNG directly to ships for export. Although the term "onshore" can sometimes refer to proximity to the shore, it also is more conventionally used in statutes to refer to any location on land and to distinguish locations on land from locations on or in waters. The context, history, and purpose of the Energy Policy Act demonstrate that Congress intended the broader and more conventional statutory meaning of "onshore" when it enacted the definition of "LNG terminal."

**A.** Before 2002, the Commission's authority to regulate import and export facilities under section 3 of the NGA did not turn on their physical location. Instead, section 3 authorized the FPC and then DOE to regulate import and export activities (authority that DOE in turn delegated in part to the Commission shortly after its creation). As this Court confirmed in *Distrigas*, the relevant agency regulating imports and exports under section 3 also had the authority to regulate the facilities that were used to engage in such activities. The Commission's delegated authority under section 3, therefore, was linked to the underlying import or export activity, not the physical location of the facility.

When Congress enacted the MTSA in 2002, it removed only certain offshore natural-gas facilities subject to the Deepwater Port Act from the scope of the NGA and the Commission's jurisdiction. Congressional testimony by high-level Commission representatives confirms the contemporaneous understanding that the Commission retained authority over "onshore" import and export facilities not covered by the Deepwater Port Act. When Congress enacted the Energy Policy Act, it codified this understanding by defining "LNG terminal" subject to the Commission's exclusive authority to encompass facilities "located onshore or in State waters."

Congress's use of "onshore" to encompass all land-based facilities reflects the consistent meaning given to that term in other areas of oil and gas regulation. It also reflects how "onshore" is used elsewhere in the Energy Policy Act, as well as how it is used in other contexts under the NGA. In fact, the Commission identifies no other analogous context in which the term "onshore" is confined to locations near the shoreline.

A broad interpretation of "onshore" also furthers the purpose of the Energy Policy Act. In granting the Commission exclusive authority over onshore facilities, Congress intended to preempt state regulation of

natural-gas facilities that would be used in connection with import and export activities authorized under section 3 (as well as certain interstate activities). A narrow interpretation of "onshore" that would exclude inland import or export facilities would undermine Congress's goals by enabling state regulation of facilities used to undertake foreign commerce in natural gas.

**B.** The Commission's reasons for interpreting "onshore" to mean near the water or the point of export do not withstand scrutiny. Contrary to the Commission's suggestion, the facts that "onshore" is paired with "in State waters" and that the definition of LNG terminal encompasses facilities that liquefy gas for interstate transportation by waterborne vessel do not suggest that "onshore" facilities must be located near the shoreline. Rather, the statutory language is consistent with Congress's intent to include all liquefaction facilities on land, as well as facilities in state waters.

The Commission's attempt to find support in the legislative history of the Energy Policy Act also falls short. Although the Commission dismisses its staff's congressional testimony regarding the Commission's jurisdiction over "onshore" facilities, that testimony represents the

25

prevailing understanding of the agency's authority at the time Congress enacted the Energy Policy Act. None of the other statements in the legislative history on which the Commission relies address the meaning of "onshore" or the scope of the Commission's jurisdiction under section 3.

The Commission also errs in suggesting that Congress intended to codify the agency's historical experience with coastal LNG facilities served by LNG tankers. The Commission's regulations have long defined the scope of the Commission's section 3 authority by reference to whether a facility will be used for import or export, not its location. The Commission, moreover, identifies no pre-Energy Policy Act agency precedent that considered and rejected the application of section 3 to inland export facilities due to their physical location. And even if export facilities historically were designed as large coastal facilities served by LNG tankers, the Commission's traditional section 3 authority is textually linked to the underlying import or export activity being conducted, not to geographic location.

**II.** Even if the term "onshore" were read to require proximity to the shoreline, the Commission erred in concluding that Nopetro's Port St. Joe

facility—which would be located no further than a quarter mile from the dock—does not satisfy that standard. The Commission failed to explain why that facility was not close enough to qualify as "onshore," or to specify any distance from the point of export that would be sufficient.

Instead, even while acknowledging that "onshore" includes locations near the shoreline, the Commission shifted the inquiry from the physical location of a facility to the method by which LNG is transported to the ship: use of pipes to transfer LNG to directly LNG tankers would cause the facility to be located onshore, while transport by truck to general cargo ships would not. The Commission's test has no basis in the statutory language of the definition of "LNG terminal," which expressly excludes certain types of transportation but does not exclude facilities that use truck transport or cargo ships. The direct-transfer test is also at odds with the Commission's stated concern about exporters designing their export facilities to circumvent the Commission's jurisdiction.

The Commission failed to provide a reasonable explanation for its direct-transfer test. It argues that the Nopetro-owned crane that would load LNG onto cargo ships is a general-use facility, but that explanation

does not justify the Commission's refusal to regulate dedicated natural-gas facilities such as Nopetro's liquefaction plant.

The Commission stated that it adopted the direct-transfer test out of concern that the plain language of the definition of "LNG terminal" would sweep in too many facilities. The Commission's policy concern does not allow it to disregard the statutory text. The Commission, in any event, has failed to support its policy concern with any reasonable explanation grounded in the goals of the NGA and the Energy Policy Act.

## STANDING

"An organization has associational standing to bring suit on its members' behalf when: (1) at least one of its members would have standing to sue in his or her own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Sierra Club v. FERC*, 827 F.3d 59, 65 (D.C. Cir. 2016) (*Sierra Club II*) (internal quotation marks omitted).

"To satisfy the first requirement of the associational standing inquiry, [an organization] must show that: (1) at least one of its members has suffered an injury-in-fact that is concrete and particularized and

actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Sierra Club II*, 827 F.3d at 65 (internal quotation marks omitted). This Court has recognized that individuals suffer a concrete injury from the environmental and aesthetic harms caused by LNG facilities located within their communities, and from the Commission's failure to evaluate those effects adequately under NEPA. *See id.* at 66 (concluding that an individual was injured because he engaged in recreational activities in the vicinity of the LNG terminal); *Sierra Club I*, 827 F.3d at 44 (finding standing to challenge a NEPA analysis where a member who lived near an LNG facility asserted aesthetic injury); *Sierra Club v. FERC*, 867 F.3d 1357, 1366 (D.C. Cir. 2017) (same).

As reflected in the standing addendum to this brief, members of Public Citizen who live and work in the Port St. Joe community would be injured by the construction and operation of Nopetro's liquefaction and truck-loading facility. For instance, Chester Davis, a pastor at the Philadelphia Primitive Baptist Church and the president of the North Port St. Joe Area Coalition, a community redevelopment organization,

lives and works within a half-mile of the proposed facility. He is concerned that the pollution and the noise and light from the facility will harm the peace and enjoyment of his home and activities at his church, and about the economic impact that the facility may have on efforts to redevelop his community, which is in the process of recovering from past industrial pollution. Davis Decl. ¶¶ 3–9. He also anticipates that the increased ship traffic caused by Nopetro's export activities would harm his enjoyment of the recreational activities that he engages in around St. Joseph Bay. *Id.* ¶ 10.

Public Citizen members Cheryl Steindorf and John Ehrman, both Port St. Joe residents, have similar concerns. Ms. Steindorf is the president of the Pioneer Bay Community Development Corporation, which operates a food program approximately one-third mile from where Nopetro's liquefaction facility will be located. Steindorf Decl. ¶ 8. She has concerns about the environmental and aesthetic impact of the facility on her workplace, as well as safety concerns given the community's recent experience with a category 5 hurricane. *Id.* ¶¶ 10–12. Mr. Ehrman lives near the water across the bay from the location of Nopetro's export operations and engages in various recreational and volunteer activities

around the bay. Ehrman Decl. ¶¶ 6, 12. He is concerned about the loss of enjoyment that would be caused by noise and light from Nopetro's export operations and the increased ship traffic that it would entail, as well as the harm that the facility would cause to the character of the Port St. Joe community. *Id*. ¶¶ 10–14.

The foregoing harms are caused by the orders on review and redressable by this Court. The Commission's orders permit Nopetro to construct and operate its Port St. Joe facility without undergoing the Commission's public-interest, environmental, and safety analysis. If the Court concludes that the Commission has jurisdiction over Nopetro's proposed export facility, then Nopetro will be required to obtain the Commission's approval before constructing and operating the facility, and the Commission will be required to undertake a NEPA analysis of the environmental impact of the facility on the local community, consider State and local safety concerns, and require Nopetro to prepare an emergency response plan. *See* 15 U.S.C. § 717b-1.

The other two elements of associational standing are also satisfied. As reflected in the declaration of Public Citizen's president Robert Weissman, the interests at stake are germane to the organization's

purpose, which include advocacy for governmental policies to protect citizens against threats to public safety and the environment caused by corporate activities, as well as regulatory and litigation-based efforts to ensure that agencies comply with their NEPA obligations. Weissman Decl. ¶ 2. And "the relief sought under the Administrative Procedure Act does not require the participation of individual members." *Sierra Club I*, 827 F.3d at 43.

## STANDARD OF REVIEW

The Court's review of the Commission's action is governed by the familiar standards of the APA, under which agency action must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2); *see*, *e.g.*, *La. Pub. Serv. Comm'n v. FERC*, 772 F.3d 1297, 1302 (D.C. Cir. 2014). Agency action is arbitrary and capricious if the agency "failed to consider an important aspect of the problem it faces." *Humane Soc. of the U.S. v. Zinke*, 865 F.3d 585, 605 (D.C. Cir. 2017) (internal quotation marks omitted). An agency action premised on the legally erroneous view that the agency lacks authority conferred on it by statute must be set aside as "not in

32

accordance with law." *See*, *e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 528 (2007).

This Court reviews "the Commission's interpretation of the NGA under the familiar two-step framework of *Chevron*." *City of Clarksville v. FERC*, 888 F.3d 477, 482 (D.C. Cir. 2018): If the Court determines that "Congress has directly spoken to the precise question at issue," and "the intent of Congress is clear, that is the end of the matter." *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). If "the statute is silent or ambiguous with respect to the specific issue," then the Court must determine "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. A permissible construction is one that is "reasonable in light of the [statute's] text, legislative history, and purpose." *Maryland v. EPA*, 958 F.3d 1185, 1198 (D.C. Cir. 2020) (internal quotation marks omitted). *Chevron*'s second step and arbitrary-and-capricious review are "often the same, because under *Chevron* step two, the court asks whether an agency action is arbitrary or capricious in substance." *Pharm. Research & Mfrs. of Am. v. FTC*, 790 F.3d 198, 210 (D.C. Cir. 2015) (cleaned up). Accordingly, under step two, an agency's interpretation must be "a reasonable resolution of

an ambiguity in a statute that the agency administers," *Michigan v. EPA*, 576 U.S. 743, 751 (2015), and the agency has "has offered a reasoned explanation for why it chose that interpretation," *Cigar Ass'n of Am. v. FDA*, 5 F.4th 68, 77 (D.C. Cir. 2021) (internal quotation marks omitted).

## ARGUMENT

**I.    Nopetro's proposed Port St. Joe facility is "located onshore" because it is situated on land.**

"In addressing a question of statutory interpretation, [the courts] begin with the text." *City of Clarksville*, 888 F.3d at 482. Here, the statutory definition of "LNG terminal" provides that the Commission's jurisdiction extends to "all natural gas facilities located onshore … that are used to receive, unload, load, store, transport, gasify, liquefy, or process natural gas that is … exported to a foreign country," 15 U.S.C. § 717a(11), subject only to two exceptions not applicable here, *see id*. §§ 717(a)(11)(A) and (B). When the "statute includes an explicit definition of a term, [the courts] must follow that definition, even if it varies from a term's ordinary meaning." *Van Buren v. United States*, 141 S. Ct. 1648, 1657 (2021) (internal quotation marks omitted). In *City of Clarksville*, for example, this Court adhered to the "clear and unambiguous" exclusion of municipalities from the NGA's definition of "person" and rejected a

34

contrary Commission interpretation that would have brought municipalities within the agency's jurisdiction. 888 F.3d at 483.

The Commission's jurisdiction, therefore, turns on whether Nopetro's proposed facility in Port. St. Joe satisfies the express statutory definition. With respect to several of the definitional elements, it indisputably does. The Commission has interpreted "natural gas facilities" to exclude facilities not dedicated to handling natural gas, *The Gas Company*, LLC, 142 FERC ¶ 61,036, at 61,189 para. 14 (2013), and to include only those facilities "that receive and/or send out gas by pipeline," *Shell U.S. Gas & Power, LLC*, 148 FERC ¶ 61,163, at para. 43 (2014). Even assuming that the Commission's interpretation of "natural gas facilities" is correct, Nopetro's liquefaction plant would be a natural-gas facility because its sole purpose is to liquefy natural gas, Rehearing Order ¶ 3 (JA 40–41), and it would receive gas "via pipeline," Declaratory Order ¶¶ 9 & n.21, 10 n.23 (JA 43–44). Moreover, the only purpose of the Port St. Joe facility is to liquefy and transport gas for "export[] to a foreign country." 15 U.S.C. § 717a(11); Nopetro Petition 20 (JA 28).

Thus, the Commission's conclusion that the Port St. Joe facility would not be an LNG terminal rests solely on its determination that the

facility would not be "located onshore." That determination was wrong. The term "located onshore" is not limited to facilities near the shoreline. Rather, in the context of the NGA and the regulatory history of the statutory definition, the term "located onshore" must be interpreted to encompasses all natural-gas facilities physically situated on land.

### A. The term "located onshore" in the definition of "LNG terminal" refers to a facility's physical location on land.

The definition of "LNG terminal" ties the Commission's jurisdiction over natural-gas export facilities to the place where they are "located." If "located onshore or in State waters," 15 U.S.C. § 717a(11), they are subject to the Commission's "exclusive authority," *id*. § 717b(e)(1). By contrast, facilities "located beyond State seaward boundaries" are subject to the Department of Transportation's jurisdiction under the Deepwater Port Act. 33 U.S.C. § 1502(9).

Viewed in isolation, the term "onshore" can mean either "[e]xisting or occurring on the shore, or on land." Oxford English Dictionary Online ("onshore"); *see also* Merriam-Webster's Collegiate Dictionary 813 (10th ed. 1993) ("situated on or near the shore as distinguished from being in deep or open water" or "situated on land"); Random House Webster's

36

Collegiate Dictionary 946 (1992) ("located on or close to the shore" or "done or taking place on land"). The term is also sometimes defined to refer to on-land locations or activities that are domestic as opposed to foreign. *See* Webster's Third New Int'l Dictionary Unabridged 1577 (1965) ("situated on or near the shore" or "placed or made within the country"); Webster's II New Riverside University Dictionary 821 (1994) ("[b]ased or operating on or along the shore" or "[d]omestic").

Statutory terms, however, are not construed "in a vacuum," but "must be read in their context and with a view to their place in the overall statutory scheme," taking account of the statute's "history and purpose." *Gundy v. United States*, 139 S. Ct. 2116, 2126 (2019) (cleaned up). Here, statutory context, history, and purpose demonstrate that the term "located onshore" in the definition of "LNG terminal" must be interpreted to cover all land-based natural-gas export facilities within the United States.

**1.** Before the enactment of the MTSA in 2002, geographical distinctions in the location of import and export facilities had no legal relevance. Although, as a practical matter, non-pipeline import and export facilities were often located near navigable waters, section 3 of the

NGA treated regulation of import and export facilities as adjunct to the regulation of import and export activities. *See*, *e.g.*, *Distrigas*, 495 F.2d at 1064. Thus, since its creation, DOE has always exercised authority to approve the import or export of natural gas under section 3(a), regardless of where the underlying facilities are located. *See* DOE NEPA Rule, 85 Fed. Reg. at 78,201. From 1978 until 2002, the Commission's jurisdiction over import and export *facilities* was derivative of DOE's section 3 authority, as reflected in DOE's delegation to the Commission of "exclusive authority to approve or disprove proposals for the siting, construction, and operation of facilities." *Dynegy LNG Prod. Terminal, L.P.*, 97 FERC ¶ 61,231, at 62,050 (2001). Thus, immediately prior to the enactment of the MTSA, it was settled that the Commission "has consistently asserted jurisdiction over the construction and operation of LNG and non-LNG import and export facilities." *Id.*

That changed with the passage of the MTSA, which brought most natural-gas import facilities located offshore under the Deepwater Port Act, 33 U.S.C. § 1507(e), and put them under the jurisdiction of the Transportation Secretary, *id.* § 1503. As the Commission recognized at the time, the MTSA "*transfer[red]* to the Department of Transportation

regulatory authority over LNG facilities constructed offshore in federal waters." *Hackberry*, 101 FERC ¶ 61,294, at 62,180 para. 25 (emphasis added). Import and export facilities not part of a deepwater port remained within the Commission's section 3 jurisdiction. *See* Deepwater Port MOU 5 (recognizing the Commission's jurisdiction over "the construction and siting of facilities for the import or export of natural gas …, including onshore LNG facilities," and its resultant retention of authority over "third-party offshore facilities" not part of a deepwater port, and "any facilities on the landward side of the high water mark").

Commission representatives testified before Congress regarding this division of responsibility. As then-Chairman Wood and a Maritime Administration representative confirmed, "FERC is responsible by derivation from DOE with siting and permitting … for onshore facilities," while the Maritime Administration is "responsible for permitting and siting facilities offshore." 2004 Hearing 68; *see supra* pp. 11–12. The following year, the Director of the Commission's Office of Energy Projects, J. Mark Robinson, drew the same contrast, using language that Congress would eventually incorporate into the definition of "LNG terminal": "The Commission has interpreted section 3 of the Natural Gas

Act as conferring exclusive jurisdiction on the Commission with respect to the siting, construction, operation, and safety of LNG facilities *onshore and in state water* (as distinguished from those offshore facilities that are within the Coast Guard's jurisdiction)." 2005 Hearing 40 (emphasis added).

Thus, when Congress enacted the Energy Policy Act, it understood that the phrase "onshore or in State waters" in the definition of "LNG terminal" would encompass all natural-gas facilities used for imports and exports that were not among those offshore facilities carved out from the Commission's jurisdiction by the Deepwater Port Act, as amended by the MTSA. Section 311(a) of the Energy Policy Act supports this interpretation. Section 311(a) amended section 1(b) of the NGA, 15 U.S.C. § 717(b), to provide that the NGA applies "to the importation or exportation of natural gas in foreign commerce and *to persons engaged in such importation or exportation*." § 311(a), 119 Stat. at 685 (emphasis added). Such persons had always been required to obtain section 3 authorization before exporting or importing natural gas. 15 U.S.C. § 717b(a). But by amending section 1(b) in the context of granting the Commission direct statutory authority over LNG terminals and the

responsibility to evaluate their environmental effects and safety, Congress made even clearer that it expected any LNG terminals used by importers and exporters to be subject to the Commission's exclusive jurisdiction.

**2.** In using the term "onshore" to define LNG terminal, Congress did not just incorporate the terminology that Commission representatives used in congressional hearings to describe non-offshore facilities. It borrowed the terminology used in other oil and gas regulatory regimes, which consistently use the term "onshore" to describe activities or facilities that occur anywhere on land.

For instance, the Oil Pollution Act of 1990, which governs liability for oil spills in navigable waters and shorelines, distinguishes between an "offshore facility" and an "onshore facility": An "offshore facility" is one "located in, on, or under any of the navigable waters of the United States" or "subject to the jurisdiction of the United States and … located in, on, or under any other waters," 33 U.S.C. § 2701(22), while an "onshore facility" is one "located in, on, or under, any land within the United States other than submerged land," *id.* § 2701(24); *accord* 33 U.S.C. §§ 1321(10), (11) (Clean Water Act). Like the NGA's definition of "LNG terminal,"

41

those definitions differentiate onshore facilities from those in state or federal waters. And they make clear that the term "onshore" unambiguously extends to all dry land, without regard to proximity to the shoreline.

Other examples abound. The Arctic Research and Policy Act of 1984 distinguishes between "onshore and offshore" areas of the Arctic that "contain[] vital energy resources." 15 U.S.C. § 4101(a)(1); *see also* Exec. Order 13,580 (July 12, 2011), 76 Fed. Reg. 41,989 (July 15, 2011) (referring to "onshore and offshore energy resources and associated infrastructure in Alaska"). So does 30 U.S.C. § 226, which describes the leasing of federal land "known or believed to contain oil or gas deposits" as "the Nation's onshore leasing program," *id.* §§ 226(a), (b)(1)(C), in contradistinction to 43 U.S.C. § 3006(a)(2), which defines "offshore lease sale" as an oil and gas lease under the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et seq.*; *see also* 42 U.S.C. § 6217(a) (requiring "inventory of all onshore Federal lands" to identify oil and gas reserves); 42 U.S.C. § 15912(a) (requiring inventory of "oil and natural gas resources beneath all of the waters of the United States Outer Continental Shelf").

42

Indeed, the Energy Policy Act itself enacts provisions that use the term "onshore" in a manner that could only mean land-based activities or facilities. *See*, *e.g.*, 42 U.S.C. § 15902(h) (distinguishing "onshore oil and gas leases" from leases under the Outer Continental Shelf Lands Act); *id.* § 15909(b)(2)(A) (same); *id.* § 15910(b)(3)(A) (same); *id.* § 15921(b)(1) (referring to the "onshore oil and gas leasing program under the Mineral Leasing Act," 30 U.S.C. § 181 *et seq.*); *id.* § 16181(b)(4) (referring to "onshore and offshore oil and gas resource recovery"); Energy Policy Act, § 999A, 119 Stat. at 916 (distinguishing between "territorial waters" and "areas onshore") (repealed Bipartisan Budget Act of 2013, Pub. L. No. 113-67, § 301, 127 Stat. 1165, 1181). "[T]he normal rule of statutory interpretation [is] that identical words used in different parts of the same statute are generally presumed to have the same meaning." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005). Here, the Energy Policy Act consistently used "onshore" the same way it is used in other oil-and-gas contexts—to signify activities or facilities located on land.

The Commission acknowledges that "in other contexts" under the NGA, it has used "the term 'onshore' to reference facilities not located off the coasts in state or deep waters." Rehearing Order ¶ 23 n.67 (JA 74–

43

75). In *Transcontinental Gas Pipeline Corp.*, 96 FERC ¶ 61,118, at 61,450 (2001), for example, the Commission used the terms "onshore" and "offshore" to "distinguish[] between parts of a pipeline system located underwater versus on land, rather than to indicate proximity to the shoreline." Rehearing Order ¶ 23 (JA 74–75). This Court has recognized the same distinction when addressing "jurisdictional questions" under the NGA. *See, e.g.*, *ExxonMobil Gas Marketing Co. v. FERC*, 297 F.3d 1071, 1077 (D.C. Cir. 2002). In fact, in the orders on review, the Commission did not identify *any* circumstance in the oil or gas context where the term "onshore" was limited to describing activities or facilities occurring on or near the shoreline.

"[W]hen Congress employs a term of art, that usage itself suffices to adopt the cluster of ideas that were attached to each borrowed word in the absence of indication to the contrary. *George v. McDonough*, 142 S. Ct. 1953, 1963 (2022) (cleaned up); *see also Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019) ("When a statutory term is obviously transplanted from another legal source, it brings the old soil with it." (cleaned up)); *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 794 F.3d 99, 103 (D.C. Cir. 2015) ("When a statute uses a term of art, Congress intended it to have its

established meaning.") (brackets removed, quoting *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342 (1991))). When Congress used the term "onshore" in the definition of "LNG terminal," the established meaning of that term in the context of natural gas regulation encompassed facilities located on land.

**3.** Interpreting "onshore" to require proximity to the shoreline would undermine the purposes of the NGA, as amended by the Energy Policy Act. As the Commission notes, the Energy Policy Act was enacted in the midst of a jurisdictional dispute between the Commission and California over an import terminal "on the Long Beach coast" where the imported gas "would be consumed entirely within California." Rehearing Order ¶ 19 & n.50 (JA 71) (internal quotation marks omitted). By granting the Commission "exclusive authority to approve or deny an application for the siting, construction, expansion, or operation of an LNG terminal," 15 U.S.C. § 717b(e)(1), Congress intended to preempt state regulation of natural-gas facilities used in connection with all imports of natural gas, as well as exports and interstate transportation by waterborne vessels. The Commission's exclusive authority came along with the responsibility to engage in the NEPA process, obtain input from

state authorities, and consider safety concerns. *Id*. § 717b-1.  Under the Commission's reading, however, two exporters, otherwise engaging in similar export activities requiring section 3 authorization from DOE, could be subject to different regulatory regimes—one federal, the other state—and different environmental-review and safety requirements based solely on the distance between their facilities and the shoreline. The Commission does not explain how this outcome is consistent with the purpose of the Energy Policy Act.

The Commission asserts that, "although [Nopetro's] facility is not subject to our environmental review, the facility has been subject to NEPA review through DOE's issuance of a categorical exclusion" from individualized NEPA analysis. Declaratory Order ¶ 18 (JA 48–49). DOE's conclusion that Nopetro's § 3 application was entitled to a categorical exclusion, however, did not consider Nopetro's onshore facility, which Nopetro did not even disclose in its DOE application. DOE has made clear that it does not evaluate the environmental effects of onshore LNG terminals because the Commission "has exclusive statutory authority to approve construction and operation of natural gas export facilities" and, therefore, to engage in the requisite NEPA analysis, while "DOE has no

46

[such] authority." DOE NEPA Rule, 85 Fed. Reg. at 78,200 (citing *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 767 (2004)). Therefore, the categorical exclusion that DOE applied to Nopetro's application—B5.7— relates only to the "marine transport" component of the export that occurs after LNG is loaded onto ships. *Id.* at 78,199 & n.21. Accordingly, if the Commission were correct that it lacks jurisdiction over Nopetro's Port St. Joe facility, that facility would not be subject to federal NEPA review.

**B.    The Commission's reasons for refusing to recognize that facilities situated on land are "located onshore" are flawed.**

The Commission rejected the broader definition of "located onshore" in favor of one that considered whether a facility was "located on or near the water or the coast," Declaratory Order ¶ 12 (JA 45–46); Rehearing Order ¶ 21 (JA 72), or "located at or near the point of import or export," Declaratory Order ¶ 9 (JA 44); Rehearing Order ¶ 6 (JA 64). The Commission further defined "at" the point of export as being at a location from which gas "can be directly transferred to vessels for export," and it disclaimed jurisdiction solely because the liquefaction facility was not "at the point of export" in that sense. Declaratory Order ¶ 10 (JA 44). Even if the Commission's view of what it means to be "at or near" the shoreline

were correct (*but see infra* section II), its justifications for adopting a proximity-based interpretation of "onshore" do not withstand scrutiny.

**1.** The Commission argues that the term "onshore" "connotes that [the LNG terminal definition] applies to facilities that are located on or near the water or the coast" because the definition also covers facilities "in State waters" and facilities used to process natural gas "transported in interstate commerce by waterborne vessel." Declaratory Order ¶ 12 (JA 45–46) (internal quotation marks omitted); Rehearing Order ¶¶ 14, 17 (JA 67, 69–70). The Commission never explains the basis for this connotation. As discussed above, the phrase "onshore or in State waters" is best read to encompass natural-gas facilities not subject to the Deepwater Port Act, and that broad reach easily covers both import and export facilities and those used in connection with the interstate transportation of natural gas by ship. That the definition covers preparation of gas for transportation by ship, however, does not mean that it is limited to activities that occur in direct proximity to the shoreline or the ship.

**2.** Asserting that "staff testimony does not prevail over the Commission's interpretation," the Commission seeks to downplay

48

Director Robinson's congressional testimony, in which he used the phrase "onshore or in state water" to describe LNG facilities not covered by the Deepwater Port Act. Rehearing Order ¶ 18 (JA 70). Courts, however, "normally interpret[] a statute in accord with the ordinary public meaning of its terms *at the time of its enactment.*" *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1738 (2020) (emphasis added). At the time Congress enacted the definition of "LNG terminal," Mr. Robinson's testimony, which echoed the testimony that Chairman Wood had provided Congress the previous year, *see supra* pp. 11–12, reflected the prevailing understanding that the Commission's authority over "onshore" and in state-waters LNG terminals extended to all such facilities not covered by the Deepwater Port Act. *See also* Deepwater Port MOU 5. No contrary "Commission interpretation" had been proffered and, thus, no contrary Commission interpretation could have informed the public meaning of the term at the time Congress chose to use it.

The Commission cites other parts of Mr. Robinson's testimony to suggest that Congress intended to limit the Commission's jurisdiction to shoreline facilities, but none speaks to the prevailing understanding of "onshore." For instance, in testifying about the Commission's process for

49

reviewing applications for LNG import terminals, Mr. Robinson stated that applicants must take account of the need for "deepwater access to accommodate LNG ship traffic" by coordinating with the Coast Guard and others over "navigation suitability." 2005 Hearing 35. The Commission argues that this "would only be possible for facilities sited on a coast or shore." Rehearing Order ¶ 18 (JA 70). Mr. Robinson, however, did not assert that the Commission's authority would turn on whether Coast Guard coordination was required for a particular facility or otherwise link deepwater access with the meaning of "onshore." And his testimony also noted the need for applicants to comply with applicable Department of Transportation safety regulations, 2005 Hearing 35–36, which in turn apply to "LNG container[s]" and "LNG transfer system[s]" without any limitation on where they may be located. *See* 49 C.F.R. §§ 193.2057, .2059; *see also id.* § 193.2007 (definitions).

Likewise, Mr. Robinson testified that "LNG import projects are also subject to the authorities of state agencies that have been delegated authority to act pursuant to federal law, including state agencies that have been delegated duties with respect to the Coastal Zone Management Act, Clean Water Act, and Clean Air Act. 2005 Hearing 37. The

50

Commission seizes on the reference to Coastal Zone Management Act to argue that Congress intended "a nexus between the facility's location and the coast." Rehearing Order ¶ 18 (JA 70). But the Coastal Zone Management Act does not use the term "onshore." Instead, it defines the "coastal zone" to mean "coastal waters (including the lands therein and thereunder) and the adjacent shorelands (including the waters therein and thereunder), strongly influenced by each other and in proximity to the shorelines of the several coastal states," and inland areas "only to the extent necessary to control shorelands, the uses of which have a direct and significant impact on the coastal waters, and to control those geographical areas which are likely to be affected by or vulnerable to sea level rise." 16 U.S.C. § 1453(1). The absence of any language in the LNG terminal definition that similarly refers to "proximity to the shorelines" or "adjacent shorelands" is striking. Had Congress intended the Coastal Zone Management Act to inform the Commission's authority under the NGA, "it would have used language similar to" that of the earlier statute. *Boumediene v. Bush*, 553 U.S. 723, 777 (2008). Indeed, both the Clean Water Act and the Clean Air Act, also referred to in the Robinson testimony, use the term "onshore," and in those statutes, "onshore" is a

synonym of "on land." *See* 33 U.S.C. §§ 1321(10), (11) (Clean Water Act); 42 U.S.C. § 7436(d) (Clean Air Act) (cross-referencing 40 C.F.R. § 98.230).

The Commission also quotes floor statements by California's senators that address the environmental impact that LNG facilities would have on a state's coastal areas. *See* Rehearing Order ¶ 19 n.51 (JA 71). Those statements reflect the reality that most LNG importers and exports will choose to locate their facilities near to the coastline for easier access to shipping; none of the statements suggests an intent to limit the Commission's authority to coastal facilities. Indeed, Senator Feinstein, in proposing a failed amendment to the Energy Policy Act that would have authorized governors to disapprove of proposed LNG terminals, expressed concern that LNG terminals could be located "right on State land, right in the heart of a metropolitan area." 151 Cong. Rec. S6991 (daily ed. June 22, 2005); *see also id.* at S6982 (statement of National Governors Association supporting the right of governors to disapprove of "the siting of LNG facilities [on] state land or in state waters"). These concerns are not confined to state lands located on or near the shoreline.

The Commission invokes the context of its jurisdictional dispute with California, which it asserts formed the "backdrop" for the Energy

Policy Act. *See* Rehearing Order ¶ 19 & n.50 (JA 71). But Congress did not tailor the definition of "LNG terminal" to resolve a single dispute over an import terminal: Congress granted the Commission exclusive authority over "all natural gas facilities" used in connection with exports and interstate transportation by waterborne carrier as well. To the extent the backdrop of that dispute is relevant, it cuts against the Commission's interpretation, which would allow states—not the Commission—to decide whether import or export facilities (or facilities to prepare gas for waterborne interstate transport)) may be constructed as long as they are just inland from the shoreline. There is no basis for believing that Congress intended to allow states to interfere with foreign commerce in this manner.

**3.** The Commission also argues that "onshore" must refer to proximity to the shore because the Commission historically has used its section 3 authority to regulate "coastal LNG facilities that are served by ocean-going, bulk-carrier LNG tankers." Rehearing Order ¶ 11 (JA 66); *see also* Declaratory Order ¶ 9 (JA 43). The Commission asserts that Congress was legislating "against the backdrop" of this "preexisting practice," Rehearing Order ¶ 21 (JA 73), and did not intend to "expand[]

53

the universe of facilities of which [its § 3] authority applies," *id*. ¶ 12 (JA 66). Indeed, the Commission advanced this argument as the sole reason for declining to adopt the broader meaning of "onshore" used in "other statutory schemes" regulating the oil and gas industry. *See id*. ¶ 21 (JA 72–73).

The Commission's argument does not withstand scrutiny. The Commission's regulations have made clear since at least 1997 that "[a]ny person proposing to site, construct, or operate facilities which are to be used for the export of natural gas … shall file" a section 3 application with the Commission. 18 C.F.R. § 153.5(a). Nothing in the plain text of the Commission's regulation exempts a facility that is "used for the export of natural gas" from that requirement based on the facility's physical location or its use of containers as opposed to bulk carriers to undertake the export. *Cf. Newman v. FERC*, 27 F.4th 690, 696 (D.C. Cir. 2022) ("To so depart from the regulation's obvious meaning would permit the Commission, under the guise of interpreting a regulation, to create *de facto* a new regulation." (cleaned up)).

Furthermore, the Commission identifies no prior judicial or agency precedent indicating that that its asserted "preexisting practice"

54

reflected a conscious decision not to regulate inland export facilities, or export facilities for containerized rather than bulk LNG, because of a perceived absence of jurisdiction under section 3. The Commission cites four agency decisions predating the Energy Policy Act, *see* Rehearing Order ¶¶ 11–12 nn. 30 & 31 (JA 66–67), but none addresses the scope of the Commission's section 3 jurisdiction. Indeed, three of those decisions cut against the Commission's current interpretation. In *Sound Energy Solutions*, the Commission recognized that "section 3 has traditionally required authorization of both a plan on paper to move gas and a proposal to put facilities in place to make that happen." 107 FERC ¶ 61,263, at 62,163 para. 35 (2004); *id*. at 62,165 para. 42 ("Section 3, standing alone, has always been treated as including authority over siting and facilities."); *see also Dynegy LNG Prod. Terminal, L.P.*, 97 FERC ¶ 61,231, at 62,055 (2001) (concluding that the Commission "retains its long-held authority to review LNG import facilities under section 3 of the NGA."). *Hackberry*, in particular, draws a direct contrast between "onshore LNG facilities" and "LNG facilities constructed offshore in federal waters" under the Deepwater Port Act, 101 FERC ¶ 61,294, at 62,180 para. 25—a statement directly at odds with the Commission's

current view that the Deepwater Port Act has no relevance to the meaning of "onshore." *See* Reconsideration Order ¶ 17 (JA 69–70).

The only other agency precedents that the Commission cites arose years after Congress enacted the definition of "LNG terminal." *See*, *e.g.*, *Shell*, 148 FERC ¶ 61,163; *Emera CNG, LLC*, 148 FERC ¶ 61,219 (2014); *Andalusian Energy, LLC*, 174 FERC ¶ 61,107 (2021); *Pivotal II*, 151 FERC ¶ 61,006. These decisions, accordingly, cannot speak to Congress's understanding of the Commission's traditional section 3 jurisdiction or its intent when it authorized the Commission to regulate "onshore" export facilities.

The Commission's observation that import and export facilities traditionally have been "large, coastal facilities" transporting LNG to or from "large, ocean going bulk carrier[s]," Declaratory Order ¶ 9 (JA 43–44); Rehearing Order ¶ 6 (JA 63–64), also does not bear on the meaning of "onshore." As the Commission has recognized, the definition of "LNG terminal" does not require that the natural-gas facilities or the ships transporting LNG be "large." *See New Fortress Energy LLC*, 174 FERC ¶ 61,207, at 61,850 para. 18 (2021) ("[The] assertion that an LNG carrier must be a certain size is without merit."), *aff'd*, *New Fortress Energy Inc.*

*v. FERC*, 36 F.4th 1172 (D.C. Cir. 2022); *id.* at 61,851 para. 23 ("[J]urisdiction under section 3 … is not dependent on the size of the facility."). Although the Commission has argued that "dedicated LNG tankers" differ from "general use cargo ships that may transport LNG-filled … containers," *id.* at 61,580 para. 18, that distinction does not appear in the definition of "LNG terminal." And while it is true that LNG terminals have historically been situated near the coast, the Commission's traditional section 3 authority over facilities is, as explained above, textually linked to the underlying import or export activity being conducted, not the geographic location of the facilities used to engage in such activity. To interpret "onshore" as confined to shoreline facilities would represent a narrowing of the Commission's traditional section 3 authority.

## II. If "located onshore" requires a facility to be located at or near the shoreline, Nopetro's Port St. Joe facility satisfies that requirement.

**A.** Even assuming that "onshore" means "located on or near the water or the coast," Declaratory Order ¶ 12 (JA 46); Rehearing Order ¶ 21 (JA 72–73), or "located at or near the point of import or export," Declaratory Order ¶ 9 (JA 44); Rehearing Order ¶ 6 (JA 63–64), the

57

Commission erred in concluding that Nopetro's proposed Port St. Joe facility would not meet that standard. Nopetro's liquefaction plant, which is the furthest facility from the water, would be a mere quarter-mile from the dock that would load LNG containers on the ship for export, and most of that distance lies within the perimeter of the facility lease site. The Commission failed to explain why a quarter-mile is insufficiently "near" the shoreline to qualify as "onshore." In fact, the Commission has steadfastly refused to "specif[y] that LNG facilities must be within a certain distance from the point of export" to qualify as an LNG terminal. Declaratory Order ¶ 12 (JA 45–46); Rehearing Order ¶ 21 (JA 72–73).

Despite purporting to read the statutory definition to require that a facility be "at *or near*" the shoreline (emphasis added), the Commission applied an entirely different standard that disregards its own proximity-based reading of the definition: To qualify as "onshore," the Commission stated, "LNG terminals must be capable of transferring LNG onto water-borne vessels." Declaratory Order ¶ 12 (JA 45–46); *see also* Rehearing Order ¶ 9 (JA 65) (stating that an "onshore" facility must "directly transfer" LNG "to vessels for export"). Because Nopetro would truck LNG-filled containers to a dock for loading onto cargo ships, the

58

Commission concluded that its Port St. Joe facility could not be an LNG terminal because it was not "at" the shoreline under the restrictive meaning of its capable-of-direct-transfer test. Declaratory Order ¶ 12 (JA 45–46).

The Commission's direct-transfer test renders half of its own definition of "onshore"—"near"—meaningless, makes the physical location of a facility irrelevant, and treats the method of transport between the facility and the ship as dispositive. For instance, the following two facilities, located equidistant from the shore, would be classified differently, with only the one on the left treated as an LNG terminal," solely because the exporter used pipes rather than trucks to transport the LNG from the facility to the ship:



That outcome makes no sense. Because the facility's proximity to the shoreline is the same in both configurations, either both should be "located onshore" or neither should be, even under the Commission's reading of the statute's language. Nothing in definition of "LNG terminal" creates a jurisdictional distinction between LNG tankers and general cargo ships, or between transport by pipe or by truck.

The Commission's direct-transfer standard is particularly misplaced because Congress expressly excluded certain transport methods from the definition of "LNG terminal." The definition excludes (1) "waterborne vessels used to deliver natural gas to or from" a natural-gas facility and (2) "any pipeline or storage facility" subject to the Commission's section 7 authority over interstate commerce. 15 U.S.C. § 717a(11). Congress did not, however, exclude trucks that haul LNG from the liquefaction plant to the dock. *Cf. Hillman v. Maretta*, 569 U.S. 483, 496 (2013) ("[W]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." ((internal quotation marks omitted)).

60

The direct-transfer standard is also at odds with concerns that the Commission has expressed about exporters designing methods of transporting LNG to evade the Commission's jurisdiction. *See New Fortress*, 174 FERC ¶ 61,207. In *New Fortress*, the Commission concluded that an import facility was an LNG terminal even though the LNG had to be transported from "ocean-going bulk-carrier LNG tankers" to "shuttle vessels" to a "floating storage unit (FSU)" to "cryogenic hoses" to the facility. 174 FERC ¶ 61,207, at 61,847 para. 3. As the Commission explained, the NGA does not "exempt facilities that rely on a chain of transfers from ocean-going vessels to smaller ocean-going vessels to avoid the Commission's jurisdiction" because "[a]dopting such an approach would undermine the NGA's purpose of providing Commission oversight of the siting and construction of LNG terminals." *Id*. at 61,850 para. 19. Thus, an exporter could not "avoid the Commission's jurisdiction by building a dock capable of having two ships moored to it and routing LNG through one of the vessels before transferring it to the vessel that would ultimately export it." *Id*. The same regulatory avoidance concerns exist when it comes to an exporter's decision where to design and operate its

land-based facilities. The Commission, however, did not grapple with them in its decisions below.

**B.** The Commission's various explanations for its direct-transfer test do not withstand scrutiny. The Commission noted that the crane that would be used to load the containers onto ships, while "owned by Nopetro," was a "general-use facilit[y]" not subject to the Commission's jurisdiction. Declaratory Order ¶ 10 (JA 44–45). But the Commission concluded in *New Fortress* that the transport of LNG through a floating storage unit that was not subject to the Commission's jurisdiction did not deprive the Commission of jurisdiction over "other LNG facilities." *New Fortress*, 174 FERC ¶ 61,207, at 16,850 para. 20. Here, even if the crane is a general-use facility, the liquefaction facility, at a minimum, is not— it is used solely to produce LNG for export.

To the extent the Commission suggests that the liquefaction facility falls outside of its jurisdiction because it is not located at the ship, *i.e.*, "at the point of export," Declaratory Order ¶ 10 (JA 45), that argument is flawed. First, that argument is inconsistent with the Commission's statement that an LNG terminal need only be "*near* the point of import or export" or "*near* the water or the coast," Declaratory Order ¶¶ 9, 12

62

(emphases added). Second, that argument cannot be reconciled with the Commission's section 3 precedent in which the agency has exercised jurisdiction over facilities up to several *hundred* miles from the point of export. *See*, *e.g.*, *Alaska Gasline Dev. Corp.*, 171 FERC ¶ 61,134, at 61,836 paras. 9–11 (2020) (concluding that the "definition of LNG terminal … is broad enough to encompass" over 800 miles of pipeline connecting gas-treatment facilities to a liquefaction facility); *Freeport LNG Development, L.P.*, 107 FERC ¶ 61,278, at 62,294 para. 1 (2004) (authorizing construction of LNG terminal and 9.6-mile-long pipeline under section 3). Third, several of the facilities identified in the definition of "LNG terminal"—for example, those used to store, gasify, liquefy, or process natural gas—will rarely be located at the ship. The Commission's suggestion that any such non-adjacent facilities are not "located onshore" would drastically curtail the reach of the Commission's jurisdiction, undermining Congress's goal in the Energy Policy Act of giving the Commission exclusive jurisdiction vis-à-vis the states over "all" natural-gas export facilities "located onshore." 15 U.S.C. § 717a(11).

In the end, the Commission's justification of its direct-transfer test is based on its policy concern that "the plain language" of the definition

63

of "LNG terminal" could sweep in "a far larger universe of facilities than Congress intended." Rehearing Order ¶ 24 (JA 75). An agency's "policy concerns cannot compel [the courts] to redraft the statutory boundaries set by Congress." *Loan Syndications & Trading Ass'n v. SEC*, 882 F.3d 220, 229 (D.C. Cir. 2018). But even if policy arguments were relevant, the Commission makes no attempt to describe the "far larger universe of [export] facilities" (other than small-scale exporters like Nopetro) that it believes would be regulated by a plain-language reading of "located onshore" but that should not be as a policy matter. For instance, the Commission does not explain why exporters operating liquefaction facilities that produce LNG for export via containers should not be required to undergo NEPA review, take account of state and local safety concerns, or develop an emergency response plan—requirements that the Energy Policy Act indisputably imposes on export facilities that use pipes to transport LNG to tankers. *See* 15 U.S.C. § 717b-1. Even if the definition of "located onshore" were "ambiguous," Rehearing Order ¶ 24 (JA 75)—and it is not—the Commission's resolution of that ambiguity cannot survive APA review because it has not "reasonably explained how the permissible interpretation it chose is rationally related to the goals

64

of the statute." *Good Fortune Shipping SA v. Comm'r of IRS*, 897 F.3d 256, 261 (D.C. Cir. 2018) (internal quotation marks omitted).

## CONCLUSION

For the foregoing reasons, the Court should vacate the orders on review.


May 8, 2023                                Respectfully submitted,

                                           /s/ Nandan M. Joshi
                                           Nandan M. Joshi
                                           Scott L. Nelson
                                           Public Citizen Litigation Group
                                           1600 20th Street NW
                                           Washington, DC 20009
                                           (202) 588-1000
                                           njoshi@citizen.org

                                           *Counsel for Petitioner*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by the Federal Rules of Appellate Procedure and this Court's rules, this document contains 12,585 words, as calculated by my word processing software.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface, 14-point Century Schoolbook, using Microsoft Word 365.

/s/ Nandan M. Joshi
Nandan M. Joshi

## CERTIFICATE OF SERVICE

I hereby certify that, on May 8, 2023, the forgoing document was served through the Court's ECF system on counsel for all parties.

<u>/s/ Nandan M. Joshi</u>
Nandan M. Joshi

**STATUTORY PROVISIONS**

# Natural Gas Act

## Section 1(a) and (b) of the Natural Gas Act, 15 U.S.C. § 717(a) and (b):

(a) Necessity of regulation in public interest

As disclosed in reports of the Federal Trade Commission made pursuant to S. Res. 83 (Seventieth Congress, first session) and other reports made pursuant to the authority of Congress, it is declared that the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and that Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest.

(b) Transactions to which provisions of chapter applicable

The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, and to the importation or exportation of natural gas in foreign commerce and to persons engaged in such importation or exportation, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.

## Section 2(11) of the Natural Gas Act, 15 U.S.C. § 717a(11):

(11) "LNG terminal" includes all natural gas facilities located onshore or in State waters that are used to receive, unload, load, store, transport, gasify, liquefy, or process natural gas that is imported to the United States from a foreign country, exported to a foreign country from the United States, or transported in interstate commerce by waterborne vessel, but does not include—

(A) waterborne vessels used to deliver natural gas to or from any such facility; or

(B) any pipeline or storage facility subject to the jurisdiction of the Commission under section 717f of this title.

**Section 3(a) and (e)(1) of the Natural Gas Act, 15 U.S.C. § 717b(a) and (e)(1):**

(a) Mandatory authorization order

After six months from June 21, 1938, no person shall export any natural gas from the United States to a foreign country or import any natural gas from a foreign country without first having secured an order of the Commission authorizing it to do so. The Commission shall issue such order upon application, unless, after opportunity for hearing, it finds that the proposed exportation or importation will not be consistent with the public interest. The Commission may by its order grant such application, in whole or in part, with such modification and upon such terms and conditions as the Commission may find necessary or appropriate, and may from time to time, after opportunity for hearing, and for good cause shown, make such supplemental order in the premises as it may find necessary or appropriate.

…..

(e) LNG terminals

(1) The Commission shall have the exclusive authority to approve or deny an application for the siting, construction, expansion, or operation of an LNG terminal. Except as specifically provided in this chapter, nothing in this chapter is intended to affect otherwise applicable law related to any Federal agency's authorities or responsibilities related to LNG terminals.

**Section 3A of the Natural Gas Act, 15 U.S.C. § 717b-1:**

(a) Promulgation of regulations

The Commission shall promulgate regulations on the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) pre-filing process within 60 days after August 8, 2005. An applicant shall comply with pre-filing process required under the National Environmental Policy Act of 1969 prior to filing an application with the Commission. The regulations shall require that the pre-filing process commence at least 6 months prior to the filing of an application for authorization to construct

an LNG terminal and encourage applicants to cooperate with State and local officials.

(b) State consultation

The Governor of a State in which an LNG terminal is proposed to be located shall designate the appropriate State agency for the purposes of consulting with the Commission regarding an application under section 717b of this title. The Commission shall consult with such State agency regarding State and local safety considerations prior to issuing an order pursuant to section 717b of this title. For the purposes of this section, State and local safety considerations include-

(1) the kind and use of the facility;

(2) the existing and projected population and demographic characteristics of the location;

(3) the existing and proposed land use near the location;

(4) the natural and physical aspects of the location;

(5) the emergency response capabilities near the facility location; and

(6) the need to encourage remote siting.

(c) Advisory report

The State agency may furnish an advisory report on State and local safety considerations to the Commission with respect to an application no later than 30 days after the application was filed with the Commission. Before issuing an order authorizing an applicant to site, construct, expand, or operate an LNG terminal, the Commission shall review and respond specifically to the issues raised by the State agency described in subsection (b) in the advisory report. This subsection shall apply to any application filed after August 8, 2005. A State agency has 30 days after August 8, 2005 to file an advisory report related to any applications pending at the Commission as of August 8, 2005.

(d) Inspections

The State commission of the State in which an LNG terminal is located may, after the terminal is operational, conduct safety inspections in conformance with Federal regulations and guidelines with respect to the LNG terminal upon written notice to the Commission. The State commission may notify the Commission of any alleged safety violations. The Commission shall transmit information regarding such allegations

to the appropriate Federal agency, which shall take appropriate action and notify the State commission.

(e) Emergency Response Plan

(1) In any order authorizing an LNG terminal the Commission shall require the LNG terminal operator to develop an Emergency Response Plan. The Emergency Response Plan shall be prepared in consultation with the United States Coast Guard and State and local agencies and be approved by the Commission prior to any final approval to begin construction. The Plan shall include a cost-sharing plan.

(2) A cost-sharing plan developed under paragraph (1) shall include a description of any direct cost reimbursements that the applicant agrees to provide to any State and local agencies with responsibility for security and safety-

   (A) at the LNG terminal; and
   (B) in proximity to vessels that serve the facility.


## Deepwater Port Act

**Section 3(9) of the Deepwater Port Act, 33 U.S.C. 1502(9):**

As used in this chapter, unless the context otherwise requires, the term—

(9) "deepwater port"—

   (A) means any fixed or floating manmade structure other than a vessel, or any group of such structures, that are located beyond State seaward boundaries and that are used or intended for use as a port or terminal for the transportation, storage, or further handling of oil or natural gas for transportation to or from any State, except as otherwise provided in section 1522 of this title, and for other uses not inconsistent with the purposes of this chapter, including transportation of oil or natural gas from the United States outer continental shelf;

   ......

**Section 8(e) of the Deepwater Port Act, 33 U.S.C. 1507(e):**

(e) Jurisdiction

Notwithstanding any provision of the Natural Gas Act (15 U.S.C. 717 et seq.), any regulation or rule issued thereunder, or section 1518 of this title as it pertains to such Act, this chapter shall apply with respect to the licensing, siting, construction, or operation of a deepwater natural gas port or the acceptance, transport, storage, regasification, or conveyance of natural gas at or through a deepwater port, to the exclusion of the Natural Gas Act or any regulation or rule issued thereunder.

**STANDING**

## DECLARATION OF PASTOR CHESTER DAVIS

I, Chester Davis, declare as follows:

1. My name is Chester Davis. I am over 18 years old. The information in this declaration is based on my personal experience.

2. My primary residence is 282 Avenue D, Port St. Joe, Florida. I have lived at my current address for 28 years. I previously lived in Port St. Joe from 1954 to 1968, when I entered the military.

3. I serve as pastor at the Philadelphia Primitive Baptist Church, which is located at 261 Avenue D, Port St. Joe, Florida. I have been the pastor at the church for over 6 years. Before that, I served as the co-pastor at the church for 15 years. I have approximately 50 parishioners in my congregation.

4. I also serve as the president of the North Port St. Joe Project Area Coalition (PAC). The primary mission of the PAC is to promote the redevelopment of the local community surrounding Martin Luther King Boulevard in Port St. Joe, without displacing any of the local residents. Martin Luther King Boulevard runs between Avenue A and Avenue G in Port St. Joe one block from and roughly parallel to West Highway 98/Monument Avenue.

5. I am a member of Public Citizen.

6. I understand that Nopetro LNG, LLC is proposing to construct and operate a liquified natural gas facility to be located on a lot off of West Highway 98 in Port St. Joe, across the highway from the Dollar General Market. I also understand that Nopetro is proposing to export the gas using the Port St. Joe dock on St. Joseph Bay to load the gas onto ocean-going ships.

B-1

7. My home is approximately 2000 feet east from where Nopetro proposes to build and operate its facility. The Philadelphia Primitive Baptist Church is a couple of hundred feet closer to the proposed facility.

8. I am worried about the pollution coming from Nopetro's proposed liquid natural gas facility. My home and my church are very close to where the facility will be built. From my home, I can look down Avenue D and see and hear the shipbuilding facility that operates at the Port St. Joe dock. Nopetro proposes to build its natural gas export plant even closer to Avenue D than the shipbuilding facility. I am concerned that the noise, air, and light pollution from the Nopetro's proposed plant will adversely affect the peace and quiet of my home life and quality of the environment at the church during service, Bible studies, choir rehearsals, and other activities.

9. I am especially concerned about re-industrialization in the Port St. Joe because the local community has previously suffered harm from the pollution from an industrial facility located near where the Nopetro plant will be built. Until 1999, the St. Joe Company operated a paper mill on the lot. The paper mill generated a lot of pollution that harmed the local community. Port St. Joe was designated a brownfield community because of pollution from the mill. Through the hard work of the local residents, Port St. Joe has reestablished itself as a recreational destination. I am concerned that Nopetro's proposal to reintroduce heavy industry back into the heart of Port St. Joe will undo much of that work by creating new sources of pollution that will harm local residents and businesses and discourage tourists.

10. On a personal level, I am concerned that the construction and operation of Nopetro's liquid natural gas facility will reduce my enjoyment of outdoor activities in Port St. Joe. I

regularly enjoy engaging in recreational activities around St. Joseph Bay, such as fishing, crabbing, and walking on the beach. I believe that the increased ship traffic in the bay that will occur if Nopetro's export facility is built will reduce the pleasure I get from these activities.

11. I understand that Public Citizen is filing a lawsuit against the Federal Energy Regulatory Commission for its failure to exercise authority over Nopetro's proposed facility and conduct an analysis of the adverse impacts of the facility to the surrounding community. I am participating in this case because I support Public Citizen's efforts.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed ___9/26/___, 2022

Chester Davis

## DECLARATION OF CHERYL STEINDORF

I, Cheryl Steindorf, declare as follows:

1. My name is Cheryl Steindorf. I am over 18 years old. The information in this declaration is based on my personal experience.

2. My primary residence is 150 Azazzo Way, Port St. Joe, Florida. I have lived at my current residence for 1 year. I have lived in Port St. Joe for 8 years.

3. I am the president of the Pioneer Bay Community Development Corporation (PBCDC). PBCDC is located at 217 Avenue A, Port St Joe, Florida. PBCDC is a non-profit organization that seeks to contribute to the redevelopment of North Port St. Joe and to improve residents' quality of life in a way that fosters resilience and environmental justice.

4. PBCDC operates the Farmacy out of its Avenue A location. The Farmacy is a food security program that makes farm fresh produce available to the community at subsidized prices.

5. I am a member of Public Citizen.

6. I understand that Nopetro LNG, LLC is proposing to construct and operate a liquified natural gas facility to be located on a lot off of West Highway 98 in Port St. Joe, across the highway from the Dollar General Market. I also understand that Nopetro is proposing to export the gas using the Port St. Joe dock on St. Joseph Bay to load the gas onto ocean-going ships.

7. My home is approximately two miles as the crow flies south southeast from where Nopetro proposes to build and operate its facility.

8. The PBCDC and the Farmacy are located approximately one-third mile southeast from Nopetro's proposed facility.

9. I have two grandchildren who also live in Port St. Joe. I often take them to the beaches around Port St. Joe to swim in the waters of St. Joseph Bay.

10. I am deeply worried about the pollution coming from Nopetro's proposed liquid natural gas facility. The PBCDC is very close to where the facility will be built. I am concerned that the noise and the air pollution from the plant will adversely affect the quality of my work environment.

11. I'm also worried about how Nopetro's facility will impact my enjoyment of St. Joseph Bay. Nopetro will export its natural gas using ocean-going ships, which will increase ship traffic in the bay. I also believe that St. Joseph Bay will need to be dredged to allow ships to access the dock at Port St. Joe. These activities would reduce my enjoyment of the beaches and waters around St. Joseph Bay.

12. I also have safety concerns about the proposed plant. In 2018, Hurricane Michael, a category 5 storm, made landfall a few miles to the northwest of Port St. Joe. Hurricane Michael caused extensive storm surge and wind damage in the Port St. Joe community. As I understand it, the Federal Energy Regulatory Commission is not preparing an environmental study that would examine whether Port St. Joe's residents will be safe if a devastating storm like Hurricane Michael strikes near Nopetro's liquid natural gas facility, which will be located just a quarter-mile from the bay. I am especially concerned that if a hurricane, or any industrial accident, causes damage to Nopetro's facility, it will harm my ability to work at the PBCDC and to carry out the Farmacy's work of providing food to the residents of Port St. Joe.

13. I understand that Public Citizen is filing a lawsuit against the Federal Energy Regulatory

Commission for its failure to exercise authority over Nopetro's proposed facility and

conduct an analysis of the adverse impacts of the facility to the surrounding community.

I am participating in this case because I support Public Citizen's efforts.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and
correct.

Executed  9/26  , 2022

Cheryl Steindorf

## DECLARATION OF JOHN EHRMAN

I, John Ehrman, declare as follows:

1. My name is John Ehrman. I am over 18 years old. The information in this declaration is based on my personal experience.

2. My primary residence is 385 Blue Heron Drive, Port St. Joe, Florida. I have lived at my current residence for 15 years. I am currently retired.

3. I am a member of Public Citizen.

4. I understand that Nopetro LNG, LLC is proposing to construct and operate a liquified natural gas facility to be located on a lot off of West Highway 98 in Port St. Joe, across the highway from the Dollar General Market. I also understand that Nopetro is proposing to export the gas using the Port St. Joe dock on St. Joseph Bay to load the gas onto ocean-going ships.

5. My home is located on St. Joseph's Peninsula across the bay from Nopetro's proposed facility and export operations.

6. I regularly use St. Joseph Bay for recreational activities such as kayaking and fishing, and viewing wildlife such as dolphins and other marine life. I also participate in a volunteer program to survey endangered nesting sea turtles on beaches along the Gulf of Mexico and also participate in sea turtle rescues during 'cold stun' events in the bay side of St. Joseph's Peninsula.

7. St. Joseph Bay currently does not experience any significant ship traffic. There is a shipbuilding facility near the Port St. Joe dock performs finish work for Staten Island ferries and other ships. The pace at which that facility uses the dock and surrounding area

does not result in significant ship traffic in the bay. I have never seen a commercial ocean-going vessel use St. Joseph Bay.

8. I regularly go into central Port St. Joe to do my grocery shopping. I shop at the Piggly Wiggly and Dollar General, both of which are located one street south and west, respectively, from where Nopetro proposes to build its facility. I also regularly shop for produce at the Farmacy, a local community store located on Avenue A located about a quarter mile from the proposed facility.

9. I also frequently go into central Port St. Joe to visit local shops and restaurants, some of which offer outdoor dining. Many of the restaurants and shops in Port St. Joe that I go to are located off of West Highway 98 about a half mile south of Nopetro's proposed facility.

10. I am concerned that Nopetro's proposed facility will harm my use and enjoyment of St. Joseph Bay. The facility would cause commercial shipping in the bay to increase. In addition, I believe that the bay will need to be dredged to allow ocean-going vessels to navigate to the dock. The dredging operation and the increased ship traffic will have a negative effect on my enjoyment of the bay for recreation. The increase of large ships in the bay will also create more wave actions in the bay, resulting in erosion of the beaches and shoreline around the bay.

11. I am also concerned that I will be subject to more light and noise pollution from Nopetro's facility. From my home, I can see the lights of the shipbuilding facility located near the Port St. Joe dock. Because the Nopetro facility would be located in the same general area, I am concerned that the lights from its facility will increase the light pollution I experience at night.

12. In addition, because my home is not far from the water, I am concerned that the sound from the facility, including the trucks that will transport gas from the facility to the ships, will interfere with my enjoyment of my property, as well as my enjoyment of the bay for recreational purposes.

13. I am also concerned about being exposed to air and noise pollution from the proposed Nopetro facility when I go into central Port St. Joe to shop and for other activities. The facility will be less than 1000 feet from the Dollar General Store, only about a quarter mile from the Farmacy and the Piggly Wiggly, and about a half mile from most of the restaurants and shops in Port St. Joe. I do not want to be exposed to pollution from an industrial plant when I am shopping for food and other items for me and my family, or when I go into town to eat out at a local restaurant.

14. I believe that Nopetro's proposed natural gas facility will adversely affect my enjoyment of the Port St. Joe community. Port St. Joe is primarily a recreational community and its economy is based on recreational tourism, such as fishing, snorkeling, beach-going, and boating. Having a liquid natural gas industrial plant located in the heart of Port St. Joe, with the increase in ship traffic that the plant's export operations would entail, would change the town's character for its residents and make it less attractive as a tourist destination. I am concerned that Port St. Joe would be a less ideal place to live if Nopetro's proposed facility is built.

15. I understand that Public Citizen is filing a lawsuit against the Federal Energy Regulatory Commission for its failure to exercise authority over Nopetro's proposed facility and conduct an analysis of the adverse impacts of the facility to the surrounding community. I am participating in this case because I support Public Citizen's efforts.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed  9/23/22  2022

John Ehrman

## DECLARATION OF ROBERT WEISSMAN

I, Robert Weissman, declare as follows:

1.      I am President of Public Citizen, Inc., a non-profit public-interest advocacy group that represents the interests of its members on a wide range of issues before administrative agencies, courts, and legislatures. Public Citizen has long been involved in regulatory issues involving the environment and the energy industry, including matters falling within the regulatory authority of the Federal Energy Regulatory Commission (FERC).

2.      Public Citizen's organizational mission includes advocating for the interests of its members in the promotion, adoption, and implementation of governmental policies and actions that protect citizens against corporate actions and behaviors that threaten to harm public health and safety and the environment. For example, Public Citizen has advocated for legislative and regulatory policies that would address climate change caused by the burning of fossil fuels, filed comments at FERC supporting greater transparency in the reporting of natural-gas pricing for consumers, and urged the Department of Energy to consider the economic impact that natural-gas exports have on low-income households and communities of color. In addition, Public Citizen has filed regulatory comments and litigated cases concerning agencies' responsibility to conduct adequate environmental analyses when undertaking federal activities.

3.      Public Citizen is an active participant in FERC matters, intervening and commenting over many years in hundreds of Federal Power Act and Natural Gas Act proceedings. The organization regularly files comments in FERC dockets on a variety of topics affecting the public interest, including the establishment of just and reasonable rates for energy products, regulatory oversight of energy facilities, and public accountability for public utilities.

4.      I am aware that FERC is generally required to prepare an environmental impact statement under the National Environmental Policy Act (NEPA) before authorizing the

-1-

construction and operation of jurisdictional liquefied natural-gas import/export facilities where the natural gas will be transported by water. 18 C.F.R. § 380.6(a)(1). FERC rules require applicants for such facilities to submit an environmental report that details the impact of the facility on water use and quality; fish, wildlife, and vegetation; socioeconomics; land use, recreation, and aesthetics; air and noise quality; and reliability and safety, as well as various other environmental effects. *Id*. § 380.12. Under FERC's procedures, persons may submit comments and file motions to intervene in NEPA proceedings. *Id*. § 380.10. Environmental impact statements are also available to the public through the Freedom of Information Act. *Id*. § 380.9. These rights and procedures protect the interests of citizens, including Public Citizen members, who would be affected by the construction and operation of natural-gas facilities.

5.      FERC's refusal to treat natural-gas facilities used to produce liquefied natural gas for export as jurisdictional facilities under its NEPA rules means that FERC will not conduct a proceeding to assess the environmental impact that the construction and operation of such facilities would have on the local community. As a result, affected citizens, including Public Citizen members, will not have an opportunity to participate in such proceedings and will be deprived of information about the environmental impacts of those facilities that would otherwise be contained in an environmental impact statement prepared by FERC. In addition, because FERC has disclaimed jurisdiction over natural-gas export facilities, there is no possibility that FERC will deny approval of such facilities and thereby avoid the environmental harm that they otherwise might cause. These outcomes directly affect interests of Public Citizen members and other consumers.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 9, 2023.

_____
Robert Weissman